600 F.2d 844
 12 ERC 1961, 195 U.S.App.D.C. 30, 9
Envtl. L. Rep. 20,194
 CITIZENS TO SAVE SPENCER COUNTY et al., Petitioners,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY et al., Respondents,
Alabama Power Company et al., American Petroleum Institute,
et al., Sierra Club, et al., BF Goodrich Company, American
Paper Institute, et al., Hoosier Energy Division, Mountain
Fuel Supply Company, Montana Power Co., et al., Natural
Resources Council of Maine, Pittston Co., Intervenors.
ENVIRONMENTAL DEFENSE FUND, INC., Appellant,
v.
Douglas M. COSTLE, Administrator, U. S. Environmental
Protection Agency, et al.
NORTHERN CHEYENNE TRIBE, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,
Montana Power Co. et al., Intervenors.
ENVIRONMENTAL DEFENSE FUND, INC.
v.
Douglas M. COSTLE, Administrator, U. S. Environmental
Protection Agency, et al., Natural Resources
Council of Maine, Appellants.
ENVIRONMENTAL DEFENSE FUND, INC., Petitioner,
v.
Douglas M. COSTLE, Administrator, U. S. Environmental
Protection Agency, Respondent.
The BF GOODRICH COMPANY, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and Douglas
M. Costle, Administrator, Respondents.
HAMPTON ROADS ENERGY COMPANY, Petitioner,
v.
Douglas M. COSTLE, Administrator, Environmental Protection
Agency, Respondent.
NORTHERN CHEYENNE TRIBE, Sierra Club, and Friends of the
Earth, Petitioners,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.
The MONTANA POWER COMPANY et al., Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY and Douglas M. Costle,
Administrator, Respondents.
NORTHERN CHEYENNE TRIBE, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,
Pittston Company, Colorado Interstate Gas Co., Ideal Basic
Industries, Inc., Intervenors.
NIAGARA MOHAWK POWER CORPORATION, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Douglas M.
Costle, Administrator, Respondents.
The PITTSTON COMPANY, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Douglas M.
Costle, Administrator, Respondents.
AMERICAN PAPER INSTITUTE and the National Forest Products
Association, Petitioners,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Douglas M.
Costle, Administrator, Respondents.
MANUFACTURING CHEMISTS ASSOCIATION, Chemical Products
Corporation, Dow Chemical Company, FMC Corporation, Monsanto
Company, PPG Industries, Inc., Rohm and Haas Company,
Stauffer Chemical Company, Union Carbide Corporation, Allied
Chemical Corporation, Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
ALABAMA BY-PRODUCTS CORPORATION, Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.
KOPPERS COMPANY, INC., Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY and Douglas M. Costle,
Administrator of EPA, Respondents.
USM CORPORATION, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY and Douglas M. Costle,
Administrator, EPA, Respondents.
 Nos. 78-1002, 78-1239, 78-1331, 78-1401, 78-1525, Part I,
78-1557, 78-1590, Part I, 78-1604, 78-1610, Part I, 78-1626,
78-1703, 78-1810, Part I, 78-1815, Part I, 78-1819, Part I,
78-1826, 1838, Part I, and 78-1839, Part I.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued 10 Oct. 1978.
Decided 27 March 1979.
As Amended 26 April and 30 April 1979.
Rehearing Denied April 19, 1979.
As Amended July 17, 1979.
 
 Robert J. Rauch, Washington, D. C., for petitioners/appellants Environmental Defense Fund, et al., in Nos. 78-1239, 78-1401 and intervenors 78-1002.
 Bruce J. Terris, Washington, D. C., with whom Philip G. Sunderland, Washington, D. C., was on the brief for petitioners/appellants, Northern Cheyenne Tribe, et al., in Nos. 78-1002, 78-1239, 78-1331, 78-1401, 78-1604 and 78-1626. Mr. Terris also argued for intervenor, Northern Cheyenne Tribe.
 Francis M. Shea, Washington, D. C., with whom Richard T. Conway, James R. Bieke and William R. Galeota, Washington, D. C., were on the brief, for petitioners, Montana Power Company, et al., in No. 78-1610 intervenors in Nos. 78-1002 and 78-1331 and appellees in No. 78-1239.
 Michael F. McBride, Washington, D. C., with whom Eugene B. Thomas, Jr. and Margaret R. A. Paradis, Washington, D. C., were on the brief for petitioners Niagara Mohawk Power Corp. in No. 78-1703 and appellee in No. 78-1239.
 Albert J. Beveridge, III and Carl Eardley, Washington, D. C., were on the brief, for petitioners the B. F. Goodrich Co., in No. 87-1557, intervenor in No. 78-1002 and amicus curiae in No. 78-1239.
 J. Michael Hines, John D. Field, III and John R. Feore, Jr., Washington, D. C., were on the brief, for petitioner, Hampton Roads Energy Co. in No. 78-1590 and amicus curiae in No. 78-1002.
 Donald W. Markham and Jonathan B. Hill, Washington, D. C., were on the brief for petitioner, The Pittston Co. in No. 78-1810, appellees in No. 78-1239 and intervenor in Nos. 78-1002 and 78-1626.
 Michael K. Glenn, Washington, D. C., was on the brief, for petitioners, American Paper Institute, et al., in No. 78-1815, amicus curiae in No. 78-1239 and intervenor in No. 78-1002.
 Theodore L. Garrett, Washington, D. C., was on the brief, for petitioners, Manufacturing Chemists Ass'n, et al., in No. 78-1819 and amicus curiae in No. 78-1002.
 H. Thomas Wells, Jr., Birmingham, Ala., was on the brief, for petitioners, Alabama By-Products Corp. in No. 78-1626.
 William D. Kramer, Washington, D. C., was on the brief for petitioners Koppers Corporation and USM Corp. in No. 78-1838 and No. 78-1839.
 Angus MacBeth, Atty., Dept. of Justice, Washington, D. C., with whom Erica L. Dolgin, Atty., Dept. of Justice and Joan Z. Bernstein, Gen. Counsel, Environmental Protection Agency, Washington, D. C., were on the brief, for respondents.
 
 
 1
 George C. Freeman, Jr., Richmond, Va., with whom Henry V. Nickel and Michael B. Barr, Washington, D. C., were on the brief, for intervenor/appellee Alabama Power Co., et al., in Nos. 78-1002 and 78-1239.
 
 
 2
 John J. Adams and David F. Peter, Richmond, Va., were on the brief, for intervenor/appellee American Petroleum Institute, et al., in Nos. 78-1002 and 78-1239.
 
 
 3
 Jon T. Brown and J. Cathy Lichtenberg, Washington, D. C., were on the brief, for intervenor/appellee Hoosier Energy Division in No. 78-1002 and No. 78-1239.
 
 
 4
 George J. Meiburger, James M. Broadstone and John F. Harrington, Washington, D. C., were on the brief, for intervenor/appellee Mountain Fuel Supply Co. in No. 78-1002 and No. 78-1239.
 
 
 5
 Charles F. Lettow and Henry J. Plog, Jr., Washington, D. C., were on the brief, for appellee PPG Industries, in No. 78-1239.
 
 
 6
 Fred F. Fielding, Thomas C. Watson and James Skelly Wright, Jr., Washington, D. C., were on the brief, for appellee The Sierra Pacific Power Co. in No. 78-1239.
 
 
 7
 William A. Mogel, Washington, D. C., was on the brief for intervenor Ideal Basic Industries, Inc. in Nos. 78-1002, 78-1401, 78-1525, 78-1557, 78-1604, 78-1610, 78-1626 and 78-1703 and amicus curiae in No. 78-1239.
 
 
 8
 William E. Murane, Robert T. Connery, Paul D. Phillips, Denver, Colo., and William R. Duff, Washington, D. C., were on the brief, for intervenor Colorado Interstate Gas Co. in Nos. 78-1002, 78-1401, 78-1525, 78-1557, 78-1604, 78-1610, 78-1626, 78-1703 and amicus curiae in No. 78-1239.
 
 
 9
 J. Eugene Marans, Washington, D. C., was on the brief for amicus curiae, Texas Industries, Inc. in No. 78-1002.
 
 
 10
 Also Michael C. Kendall, Jasper, Ind., entered an appearance for petitioners in No. 78-1002.
 
 
 11
 Also James W. Moorman, Earl Salo, Attys., Dept. of Justice, Washington, D. C., entered appearances for respondents.
 
 
 12
 Also James H. Cohen, Washington, D. C., entered an appearance for intervenor, Sierra Club in Nos. 78-1810, 78-1815, 78-1819, 78-1826, 78-1838 and 78-1839.
 
 
 13
 Also R. G. Groussman and J. F. Bates, Salt Lake City, Utah, entered appearances, for amicus curiae, Mountain Fuel Supply Co. in No. 78-1239.
 
 
 14
 OUTLINE OF THE OPINION
 Citizens to Save Spencer County v. EPA
 Page
Introduction ............................................................. 850
 I. BACKGROUND TO THE PRESENT LITIGATION ............................... 851
 A. Statutory Inconsistency ......................................... 851
 B. Administrative Interpretation and Action ........................ 854
 C. Litigation ...................................................... 857
 D. Continuing Administrative Action ................................ 857
 II. THE FRUITLESS SEARCH FOR A HARMONIOUS CONSTRUCTION OF
 Sections 165 AND 168 ............................................... 860
 A. Relative Weight to be Afforded the Two Sections: The
 "Plain Language" Argument ...................................... 861
 B. Other Sections of the Act Cited in Support of "Plain
 Language" Contentions .......................................... 864
 C. Legislative History of Sections 165 and 168 ..................... 866
 D. The Overall Scheme of the Clean Air Act and the
 Amendments of 1977 ............................................. 868
 E. Applicable Rules of Statutory Construction ...................... 870
III. THE SOURCE OF AUTHORITY AND PROCEDURES APPROPRIATE FOR
 PROMULGATION OF EPA'S "HARMONIZATION"
 REGULATIONS ........................................................ 873
 A. The Source of Authority for EPA'S Rulemaking .................... 873
 B. The Appropriate Form of Rulemaking for EPA to Pursue
 in Harmonizing the Conflicting Standards ....................... 874
 1. EPA's Final Rule Incorporating Into Its
 Regulations the Immediately Effective PSD
 Requirements Identified in Section
 168(b): The "First"Rule .................................... 875
 2. EPA's Rules Providing PSD Guidance to States and
 Implementing the Requirements of Section 165:
 The "Second" and "Third" Rules ............................. 877
 C. The Issuance of Final Regulations with Allegedly
 "Retroactive" Effects .......................................... 879
 D. The Exemption of Certain Facilities from the Permit
 Deadline and from the Requirements of Section 165
 Because of Extensions in the Public Comment Period ............. 881
 1. EPA's Statement of Basis and Purpose for the
 Special Exemption .......................................... 883
 2. Allegations that the Special Exemption was Arbitrary and
 Capricious ................................................. 886
 IV. REVIEW ON SUBSTANTIVE GROUNDS OF EPA'S RULEMAKING
 FOR PRECONSTRUCTION REVIEW ......................................... 888
 A. Review of the Interpretive Rule ................................. 888
 B. Review of the Legislative Rules ................................. 889
 V. CONCLUSION ......................................................... 890
 
 
 15
 Before LEVENTHAL, ROBINSON and WILKEY, Circuit Judges.
 
 
 16
 Opinion for the Court filed by WILKEY, Circuit Judge.
 
 
 17
 Concurring opinion filed by LEVENTHAL, Circuit Judge.
 
 
 18
 Dissenting opinion filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge.
 
 WILKEY, Circuit Judge:
 
 19
 This case arises out of the conflict posed by two provisions of the Clean Air Act,[1] as amended in 1977,[2] that establish inconsistent guidelines for implementation of new federal preconstruction review requirements for major pollution-emitting facilities. The Environmental Protection Agency (EPA), in an effort to resolve the statutory inconsistency, resorted to rulemaking proceedings authorized elsewhere in the Clean Air Act to establish a new timetable and procedures for implementation of the federal requirements. These rules promulgated by EPA have been challenged on both procedural and substantive grounds by a number of environmental petitioners (Environmental Groups) and industry petitioners and intervenors (Industry Groups). We believe the EPA properly and faithfully discharged its responsibility to harmonize the statutory provisions so as to implement the congressional mandate that new federal preconstruction review requirements be instituted promptly but with minimum economic dislocation. Thus we sustain those regulations against the attack by parties here.
 
 I. BACKGROUND TO THE PRESENT LITIGATION
 A. Statutory Inconsistency
 
 20
 In 1963 Congress enacted the Clean Air Act (the Act) in order "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population . . . ."[3] The Act and its subsequent Amendments, most importantly the Clean Air Act Amendments of 1977 (the Amendments), prescribe an intricate set of relationships between federal and state agencies in order to implement that goal.[4]
 
 
 21
 At issue in the present case are provisions of the Act directed toward the prevention of significant deterioration (PSD) of air quality in relatively "clean air" areas. This program is founded on a set of federal standards concerning allowances for pollution emissions in various regions and federal supervision and approval of state plans designed to implement those standards.[5] Until Congress passed the Clean Air Act Amendments in 1977, specific PSD requirements were provided not in the Clean Air Act itself but in EPA regulations[6] promulgated pursuant to rulemaking authority conferred by the Act.[7] The Amendments of 1977 significantly tightened these requirements[8] and shifted the principal burden of administration of PSD programs from the federal to state governments, while retaining substantial federal supervisory authority.[9]
 
 
 22
 The present litigation concerns just one aspect of the Act's program: the effective date for new substantive and procedural prerequisites to the issuance of permits for the construction of major pollution-emitting facilities,[10] and the shift of principal responsibility for the enforcement of those prerequisites from the federal Government to the states. Two contested sections of the Clean Air Act, as amended, set forth these preconstruction requirements, as well as the procedures that govern their implementation in the interim period before state agencies have gained federal approval of environmental plans drawn up to implement all new PSD requirements.[11]
 
 
 23
 Section 165 of the Act sets forth new substantive requirements for government review of applications by private parties for permits to construct new pollution-emitting facilities. Before setting forth these new substantive requirements, however, the section provides in straightforward language that:[12]
 
 
 24
 (a) No major emitting facility on which construction is commenced[13] After AugustITE, 195 U.S.App.D.C. August 7, 1977, may be constructed in any area to which . . . (Part C of Title I of the Act)[14] Applies unless
 
 
 25
 (1) a permit has been issued for such proposed facility in accordance with this part . . .
 
 
 26
 (2) the proposed permit has been subject to a review in accordance with this section . . .
 
 
 27
 (3) the owner or operator of such facility demonstrates . . . that emissions from construction or operation of such facility will not cause, or contribute to, air pollution . . . in excess of (applicable standards) . . .
 
 
 28
 (4) the proposed facility is subject to the best available control technology for each pollutant subject to regulation under this chapter . . . .
 
 
 29
 Other substantive preconditions to construction of a major emitting facility follow in § 165 subsections (a)(5) through (a)(8).[15]
 
 
 30
 Section 168 of the Act, on the other hand, provides generally for the regulation of pollution-emitting sources in the interim period before approval by the EPA of revised state environmental plans and identifies certain substantive provisions of the Act that are to be of immediate effect even prior to federal approval of revised state plans:[16]
 
 
 31
 (a) Until such time as an applicable (state) implementation plan is in effect for any area, which plan meets the requirements of this part to prevent significant deterioration of air quality with respect to any air pollutant, Applicable regulations under this Act prior to enactment of this part shall remain in effect to prevent significant deterioration of air quality in any such area for any such pollutant except as otherwise provided in subsection (b).
 
 
 32
 (b) If any regulation in effect prior to enactment of this part to prevent significant deterioration of air quality would be inconsistent with the requirements of section 162(a), section 163(b) or section 164(a) (of the Act), then such regulations shall be deemed amended so as to conform with such requirements. . . .
 
 
 33
 For the purposes of this litigation, it is most important to note that § 165, which sets forth new preconstruction requirements for major pollution-emitting facilities, is absent from the list in § 168(b) of substantive provisions of the Act that are specifically identified as of immediate effect.
 
 
 34
 Sections 165 and 168 of the Clean Air Act, as amended, therefore, are inconsistent in the following respect: Section 165 by its terms explicitly and without qualification prohibits the construction of any major pollution-emitting facility after 7 August 1977 unless the substantive requirements of that section have been met with regard to that facility. These requirements are far more stringent than those contained in federal regulations previously in effect and thus constitute a major environmental and regulatory hurdle to the construction of many industrial facilities. Section 168, on the other hand, fails to include § 165 among those sections of that part of the Act designated as of immediate effect, and thereby suggests that the less stringent preconstruction requirements contained in state plans pursuant to pre-existing federal regulations are to remain in effect until a state plan implementing All new PSD requirements of the Act has been federally approved. Standing alone, therefore, § 168 would have the practical effect of allowing permits to be issued for the construction of many projects for which permits would be barred by the rigorous environmental standards of § 165.[17] As suggested by EPA, "Section 165(a) . . . would appear to prohibit, until its requirements were met, most of the post-enactment construction that section 168 would permit."[18]
 
 
 35
 As will be discussed in Part II Infra, Environmental and Industry Groups have argued at length that the conflict between the two statutory sections is more apparent than real. But the two Groups are at odds in proposing how the apparent inconsistency should be reconciled. Environmental Groups argue that § 168 sets no bar to immediate enforcement of the construction prohibitions of § 165, while Industry Groups argue that the language of § 165 is subject to the "interim period" provisions in § 168. In effect, therefore, each Group argues that one of the two sections should be given full effect so as to control the other, but the two Groups disagree as to which of the two sections should control.
 
 B. Administrative Interpretation and Action
 
 36
 The EPA, as the federal agency charged with the unenviable task of administering the two sections, finds the statutory interpretations proposed by both Environmental and Industry Groups to be untenable. EPA concedes that the two provisions are inconsistent and argues that it had no choice but to proceed by means of administrative rulemaking to implement, to the fullest extent possible, the intent of Congress in passing both sections. EPA further submits that the rules it has derived by these processes strike a reasonable and responsible balance between the two sections.
 
 
 37
 EPA has not always been so firm in its resolve to pursue this "harmonization" position. On 4 October 1977, less than two months after the two sections were enacted on 7 August 1977, an assistant administrator of the EPA issued a memorandum expressing the understanding of EPA that § 165 had been inadvertently omitted from inclusion in the list of sections in § 168(b) to be afforded immediate effect, and that Congress intended that the preconstruction review requirements of § 165 be given immediate effect.[19] The EPA assistant administrator thereafter instructed regional administrators to follow § 168(b) as if that subsection made explicit reference to § 165.[20] This interpretation was endorsed by the principal sponsors of the Clean Air Act Amendments in both Houses,[21] but it aroused a chorus of protest from a number of other Senators and Representatives. In a series of letters to EPA, these Congressmen argued that EPA had misconstrued the intent of Congress, and that immediate enforcement of the preconstruction review requirements of § 165 would wrongfully delay construction of a wide range of industrial projects that had not commenced construction prior to the effective date of § 165.[22] The issue became further clouded when a provision designed to relieve the inconsistency between the two sections was expressly Excluded from a list of technical amendments to the Act passed by both Houses and subsequently signed into law on 16 November 1977.[23] The record shows that the issue of new preconstruction review requirements had become politically too sensitive to be resolved by means of technical amendment following passage of the Clean Air Act Amendments.[24] As Senator Muskie prophetically remarked on the Senate floor on 1 November 1977, "(The) issue (of the proper construction of sections 165 and 168 of the Act) appears to be headed to the courts. . . ."[25]
 
 
 38
 In light of this failure of Congress to clarify the meaning of its statutory instructions, and possibly also in response to political pressure, EPA reevaluated its interpretation of sections 165 and 168.[26] On 27 October 1977 a memorandum was issued by EPA to regional administrators expressing the view that § 165 "should not (be) interpreted as immediately effective."[27]Subsequently incorporating into EPA's PSD regulations the "immediately effective changes" required by the 1977 Amendments, not including those of § 165.[28] EPA also promulgated two proposed rules to become effective "no later than March 1, 1978." One of these proposed rules provided guidance to the states on how to incorporate the new PSD requirements of the 1977 Amendments into state implementation plans, and the other incorporated the preconstruction review requirements of § 165 into federal PSD regulations as of 1 March 1978.[29] EPA explained that "In light of the drafting inconsistencies between Sections 165(a) and 168, EPA feels that the most prudent course is to implement Section 165(a) as quickly as possible, but through the rulemaking process."[30]
 
 
 39
 The EPA's "prudent course" was designed to minimize air pollution during the period in which states were to develop their own implementations plans, but to exempt fully from the § 165 preconstruction requirements any project that had received a final PSD permit before 1 March 1978 And had commenced construction before 1 December 1978.[31] Thus this regulation proposed to establish a "dual-date" system to determine, with regard to each proposed new facility, whether pre-existing preconstruction requirements or the new restrictions of § 165 would govern the issuance of the construction permit: pre-existing restrictions of § 165 would continue to apply to those facilities (1) for which a construction permit had been obtained by 1 March 1978 (with the exception discussed herein, of those facilities for which a construction permit Would have been obtained but for an extension in the period of public comment), And (2) on which construction had actually commenced by 1 December 1978. Thus a facility that had received its construction permit by 1 March 1978 but had not commenced construction within nine months of that date would nevertheless be subject to the more stringent PSD requirements of § 165 and would be obliged to undergo a permit review in light of those requirements. The EPA cited as authority for these proposed rules § 301(a)(1) of the Clean Air Act, which provides that "The Administrator (of EPA) is authorized to prescribe such regulations as are necessary to carry out his functions under . . . (the Clean Air) Act."[32]
 
 C. Litigation
 
 40
 These notices of proposed rulemaking set in motion the train of legal petitions that has led us to the present litigation and decision. First to pass through a courthouse door was a group called Citizens to Save Spencer County (Citizens), an environmental group based in Spencer County, Indiana.[33] Citizens filed a petition in this court on 3 January 1978 objecting to a decision by EPA to issue a PSD permit authorizing the construction of a coal-burning electric generating plant in Spencer County. The group sought from this court an injunction to set aside the "rule" that EPA had relied upon in its decision not to apply the requirements of § 165(a) to the application of that plant for a construction permit.[34] On 15 February 1978 EPA moved to dismiss the petition for review on jurisdictional grounds, arguing that petitioners were objecting only to "notices of proposed rulemaking" and not to actual "regulations promulgated" or "final action taken" by EPA and that therefore by the terms of the Clean Air Act[35] review could not be had in this court.[36] By an order of 28 March 1978, this court stated that it would rule on EPA's motion to dismiss at the time we reviewed the merits of the petition, as we do in this decision.[37]
 
 
 41
 Shortly after the filing by Citizens of their complaint in this court, the Environmental Defense Fund (EDF) commenced a similar action against EPA in the District Court,[38] alleging that EPA was unlawfully processing PSD applications of major pollution-emitting facilities submitted after 7 August 1977 without applying the preconstruction requirements of § 165(a). EPA again moved to dismiss the action on jurisdictional grounds, and the motion was granted by the District Court on 15 March 1978.[39] Touching also on the merits of the issue, the trial court noted in dictum that "A reading of the 1977 (Clean Air Act) Amendments as a whole demonstrates that § 165 need not be made immediately effective. . . . (T)he Administrator had to exercise his discretion to interpret the Amendments as a whole and proceed to administer them."[40] EDF appealed, and by order of 27 April 1978[41] this court consolidated the suit brought by EDF, the action brought earlier to this court by Citizens, and actions then underway in this and other courts by other parties on questions related to the effective date of § 165.
 
 D. Continuing Administrative Action
 
 42
 While legal action was working its way through the courts, however, EPA moved ahead with the rulemaking proceedings that it commenced with the several public notices of 3 November 1977. Though EPA had proposed in one of those notices that its regulations incorporating the Act's new preconstruction review requirements were to be effective as of 1 March 1978,[42] extensive public comment on the proposed regulations led EPA to extend the comment period. On 23 December 1977 EPA announced an extension of the period to 31 January 1978 and gave notice that "In light of this extension, EPA may not be able to meet the March 1 publication date" for the new rules.[43] EPA further stated, however, that the "previously-announced 'permit deadline' of March 1, 1978, for determining whether sources will be subject to the new PSD rules" would not be changed.[44] The volume of public comment caused EPA to back off slightly from this position as well, and on 8 March 1978 EPA published an additional notice stating that EPA's preconstruction requirements in effect prior to enactment of the 1977 Amendments would continue to apply beyond 1 March 1978 to facilities for which "by March 1, 1978, the normal comment period would have ended and EPA review of a permit would have been completed but for an extension of the public comment period in response to a valid request for additional comment time" beyond that date.[45] Two major industrial projects were finally issued permits pursuant to pre-existing PSD requirements as a result of that special exemption, and separate legal petitions have been entered in this case in their regard,[46] as will be discussed in Part III of this opinion.
 
 
 43
 The delay in publication of EPA's final regulations foreseen by EPA in December 1977 more than came to pass, for it was not until 19 June 1978 that EPA published its final rules seeking to harmonize sections 165 and 168.[47] Those rules retained the "dual-date" schedule for implementation of the new preconstruction review requirements proposed by EPA in November, but changed the deadline for commencement of construction (after which a project would become subject to the PSD requirements of § 165) from 1 December 1978 to 19 March 1979.[48] Thus the new construction deadline would coincide with the date that state implementation plans, in light of the eventual date of publication of EPA's transition period regulations, would now be "due."[49] The preamble to the new rules also contained the most thorough defense of the EPA's rulemaking process with regard to sections 165 and 168 that EPA to that date had made public.[50] In defense of its new regulations, EPA explained that:[51]
 
 
 44
 In passing the 1977 Amendments, Congress left standing contradictory indications as to when it intended the new PSD requirements to be effective. . . . Because of the contradiction between Section 165 and 168, EPA had no choice but to fashion a reasonable program for the transition from the old to the new requirements. . . . Three major considerations have shaped this transition program. One is that the rate of consumption of . . . (allowable increments in pollution in various regions) should be minimized. . . . The other two major considerations are that economic disruption should be minimized and that orderly administration of the new requirements should be maximized. . . . The transition program promulgated today is reasonable . . . (for it) has equitably accommodated these competing considerations. . . .
 
 
 45
 As acknowledged by EPA in its final rule,[52] however, Industry and Environmental Groups have joined (from opposite sides) in opposing various aspects of EPA's rulemaking procedures and results. Industry petitioners have complained, both in these proceedings and in their public comments to EPA, that EPA was without legal justification in implementing any new preconstruction requirements prior to the time of approval of revised state plans, and that EPA's actions will cause them serious and unwarranted economic harm by ensnarling numerous construction projects in the tight environmental net of § 165.[53] Environmental petitioners, on the other hand, have argued that EPA's proposed regulations are far too lax, and that EPA's decision not to enforce § 165 as of 7 August 1977 has unlawfully allowed almost 100 major pollution-emitting facilities to escape the stringent preconstruction review requirements that Congress applied to them in § 165.[54]
 
 
 46
 The numerous contentions that have been raised concerning EPA's rulemaking, and the rules themselves, are of baroque complexity. In reviewing these matters we recognize that the agency here is charged with the task of applying a new and highly complex regulatory program while being besieged on all sides by vocal private and public interest groups. The EPA argues that it sought to pursue a legally supportable "middle path" between inconsistent statutory provisions so as to harmonize to the maximum extent possible both the public policy concerns and conflicting directives of Congress. To a large extent, at least on all critical features, we think it did.
 
 
 47
 We begin our review by considering in Part II of this opinion the threshold question of the proper construction of sections 165 and 168 of the Clean Air Act, as amended, and the proper role of an administrative agency in enforcing statutory provisions that, like those at issue here, are inconsistent on certain particulars but clearly aim to establish a new regulatory scheme. In Part III we will consider the source of authority for the rulemaking in which EPA engaged in order to harmonize the statutory scheme, and whether EPA followed the appropriate procedural route and complied with all necessary procedural requirements in devising a plan to carry out the contested mandate of Congress. Finally, in Part IV we will consider on substantive grounds whether EPA properly exercised its discretion in weighing various relevant factors in promulgating its rules concerning preconstruction review.
 
 
 48
 II. THE FRUITLESS SEARCH FOR A HARMONIOUS CONSTRUCTION OF
 
 SECTIONS 165 AND 168
 
 49
 As is often the case in law, the present case turns on the question of the meaning and proper construction of a very few words. To recall, § 165 of the Clean Air Act provides explicitly that "No major emitting facility on which construction is commenced after . . . (7 August 1977), may be constructed in any area to which . . . (Part C of Title I of the Act)[55] applies unless (1) a permit has been issued for such proposed facility in accordance with . . . (the standards of Part C)" . . . .[56] Section 168, on the other hand, provides that "Until such time as an applicable (state) implementation plan is in effect for any area, which plan meets the (PSD) requirements of . . . (Part C) . . ., applicable regulations under this Act prior to . . . (7 August 1977) shall remain in effect . . . (Except for several specified sections, not including § 165)."[57]
 
 
 50
 The central question, therefore, is whether the preconstruction review requirements of § 165 are to take effect as of 7 August 1977, as provided in § 165, or only upon the approval by EPA of revised state implementation plans, which plans (in accord with the Act and present EPA regulations) need not even be submitted to EPA prior to 19 March 1979.[58] The timing, cost, and perhaps in some cases the very feasibility of construction of numerous industrial facilities, and also the rate of deterioration of air quality in various regions, will be determined by the resolution of this question.
 
 
 51
 Environmental Groups, on one side, and Industrial Groups, on the other, have devised numerous ingenious arguments to support their contention that, in fact, sections 165 and 168 do not mean what they say. First, each Group emphasizes the importance of the one (or the other) statutory section that aids the environmental or industrial interests that they represent, and each Group argues that the "plain language" of the two sections must be read so as to allow the mandate of the favored section to take precedence over that of the other. Each Group then buttresses this "plain language" argument by citing various subsections of the two principal sections, as well as other sections of the Act, to reinforce its particular view. Each Group plumbs the intricacies of legislative history for further substantiating evidence. And finally, each Group argues that only one (or the other) of the proposed statutory constructions would be consistent with the overall scheme of the Clean Air Act and with the intent of Congress with regard to the implementation role of states and the balance to be struck between economic growth and environmental protection. Judge Robinson, who takes the side of Industry Groups in his thoughtful dissent, structures his argument along similar lines and adopts many, though by no means all, of the points put forward by Industry Groups to support his dissenting view.
 
 
 52
 Though we are impressed by the industry and ingenuity of counsel for both Groups,[59] we are not convinced by their arguments. Because this case finally turns on the proper construction of sections 165 and 168, however, we must consider with some care each of the principal modes of interpretation ITE, 195 U.S.App.D.C. 47 interpretation of those sections that have been urged upon this court, and explain why we find them all to be unpersuasive.
 
 
 53
 A. Relative Weight to be Afforded the Two Sections: The "Plain Language" Argument
 
 
 54
 Environmental Groups argue that conclusive weight should be afforded to § 165, in part because § 168 is no more than a routine "savings clause" designed to ensure that there is no general lapse in the applicability of pre-existing federal regulations while state environmental plans undergo revision to implement the new federal regulations of 1977.[60] Industry Groups, however, point out that § 406(b) of the Clean Air Act Amendments is specifically identified as a "Saving Provision" and amply serves the function attributed by the Environmental Groups to § 168.[61] Section 406(b)[62] provides that "All rules, regulations, orders . . . or other actions duly . . . taken by or pursuant to the Clean Air Act, as in effect immediately prior to the date of enactment of this Act . . . shall continue in full force and effect after the date of enactment of this Act until modified or rescinded in accordance with the (1977 Amendments)."
 
 
 55
 Though § 406(b) begs the question of the time at which any particular provision of the Amendments actually "modifies" or "rescinds" particular sections of the Act and thus sheds no new light specifically on the meaning of sections 165 and 168, § 406(b) does ably fulfill the "savings clause" function attributed by Environmental Groups to § 168. Congress is not barred from enacting statutes that are redundant (or, for that matter, inconsistent), but there is no evidence that Congress enacted redundant provisions here. Section 168, by its heading, is specifically targeted to deal with the "(p) eriod before (state) plan approval."[63] Regardless of whether § 168 is a "mere" savings clause, it states a rule that is specific to PSD requirements in Part C of Title I[64] of the Act and provides certain enumerated exceptions to that rule. We cannot, therefore, lightly dismiss § 168 because its function is in part duplicated by another, more general section of the Act, or because it bears a resemblance to statutory provisions that are frequently enacted to ensure the continuity of programs during a period of regulatory transition.
 
 
 56
 Nor are we persuaded by the counter-assertion of the Industry Groups that the first sentence of § 165, which absolutely prohibits the construction of facilities for which a permit has not been issued in accord with the requirements of that section, is merely an "introductory" phrase and a "scrap of general language" to be dismissed in favor of the assertedly more compelling language of § 168.[65] The first sentence of § 165 establishes the general prohibition to which the subsections of § 165(a)(1) through (a)(8)[66] provide a broad, cumulative exception. These subsections set forth the new substantive and procedural requirements provided by the 1977 Amendments for preconstruction review of new facilities. Since these requirements are essentially nullified without the rule to which they make exception, the rule itself cannot be ignored or swept away.
 
 
 57
 Citing the accepted canon of statutory construction that the more specific of two statutory provisions should govern, both Environmental and Industry Groups argue that their favored section is the more specific and, therefore, should control. Environmental Groups argue that § 165 is more specific than § 168 to the issue of preconstruction195 U.S.App.D.C. 48 preconstruction review,[67] while Industry Groups argue that § 168 is more specific than § 165 to the issue of whether the old or new PSD requirements are to govern during the "interim" period before revised state plans are approved by EPA.[68] Both Groups, of course, are correct.
 
 
 58
 Both Groups, however, are in error in failing to concede the obvious point, damaging to both of their respective positions, that the two sections are of equal relevance to the question of which set of Preconstruction review requirements are to govern in the interim period. Section 165 establishes a rule prohibiting, as of 7 August 1977, the construction of certain facilities and also sets forth its own exceptions to that general rule. Likewise, § 168 establishes a rule extending the applicability of pre-existing federal regulations through the interim period, beyond 7 August 1977, also with several exceptions. Unfortunately, The various rules and exceptions of these two sections simply do not mesh. Since the matters addressed in the two sections play an equally central role in this case, and since the two sections are equally specific in seeking to resolve those matters, no resolution of the inconsistency between the two sections can be derived by quibbling over which of the two sections is the more "specific."
 
 
 59
 Industry Groups also argue that § 168 should be afforded priority over § 165 because § 168 states in commanding terms that regulations in effect prior to the 1977 Amendments "shall remain in effect . . . (until a revised state plan is in effect)." By such language, it is argued, EPA is not merely authorized, but is required to extend the effective date of most PSD regulations (including those pertaining to preconstruction review) beyond 7 August 1977.[69] Despite any special role that is customarily afforded the word "shall" in legal parlance, we find that the negative command of § 165 ("No major emitting facility . . . may be constructed . . . ." ) is no less commanding than the positive command of § 168. Neither provision makes express allowance for the exercise of discretion by the Administrator in waiving or adding new exceptions to the rules set forth, and both provisions provide in clear and unequivocal terms that certain action is (or is not) to take place. It is indisputable that the one section allows what the other prohibits.
 
 
 60
 Similarly, we must rebuff the contention of Industry Groups[70] that the plain language of § 165 delimits its own effective date, in conformity with § 168, by confining its prohibition of construction to "any area to which (Part C of Title I of the Clean Air Act) applies . . . ." Industry Groups note that under § 107(d)(1)[71] of the Act, "clean air" areas are to be identified by the states in accord with federal ambient air quality standards within 120 days after the enactment of the Amendments, and that therefore the prohibition of § 165 (which applies to those areas) could not possibly take effect as early as 7 August 1977. But we believe Environmental Groups are on firmer ground in pointing out that the phrase "any area to which . . . (Part C) applies" was intended solely to define the geographic scope of the section's application and not to postpone its effective date. Section 165 does not suggest that the list of geographic areas to which its requirements apply must have been fully promulgated by the first date on which the preconstruction requirements in § 165(a) are to take effect. Furthermore, § 163(b)(1)[72] of the Act, like § 165, applies by its terms to designated "clean air" areas, and yet Congress directed specifically in § 168(b) that § 163(b) was to take effect on 7 August 1977. Finally, if the contested phrase in § 165 were given the import urged byIndustry E, 195 U.S.App.D.C. 49 industry Groups, that phrase would undermine entirely the more explicit prescription of the immediately preceding phrase, which provides that no nonconforming facility may be constructed After 7 August 1977 unless the requirements set forth are met. Though we are constrained by all logic to find inconsistent language in two different sections of the same Act, we Are reluctant, unless so compelled, to find such incongruities within the same sentence of a single section of that Act.
 
 
 61
 Debate has also focused on the proper interpretation of § 165(e). Subsections 165(e)(1) and (e)(2)[73] provide that, as of 7 August 1978, an analysis of ambient air quality at the site of any proposed facility must have been gathered "over a period of one calendar year preceding the date of application for a (construction) permit . . . ." It follows from this, according to Environmental Groups, that all of the requirements of § 165 must take effect by 7 August 1977 (when air quality analysis must begin for a permit proposal to be made by 7 August 1978), or be in place at least by 7 August 1978, which is the date cited by § 165(e)(1), since there is no indication in § 165 that the various subsections of that section are to be effective on different dates.[74] Industry Groups, however, argue that § 165(e) proves just the opposite: that Congress, to ensure that the preconstruction review program of § 165 would bring about no delay in the issuance of construction permits, gave early notice in § 165(e) that a lengthy period of air quality monitoring would be required before permits would be issued under § 165. Industry Groups argue that § 165(e) does not suggest that the requirements of other subsections of § 165 must take effect on 7 August 1977, or even before 7 August 1978. They also suggest that subsection (e) demonstrates generally that the requirements of § 165 may be implemented in phases, rather than simultaneously on the date of enactment of the 1977 Amendments an argument buttressed by time schedules provided in other sections of the Act.[75]
 
 
 62
 Unfortunately, these various arguments do little to lift the fog of ambiguity surrounding the effective date of § 165. Even if Environmental Groups are correct in their interpretation of § 165(e), their argument does nothing to relieve the inconsistency between sections 165 and 168, which is at the center of the present controversy. Likewise, the argument of Industry Groups is seriously undermined by the explicit language of subsection § 165(a), which sets forth both its own effective date and (in § 165(a)(2)[76]) the requirement of air quality review for which further amplification is provided in § 165(e)(1) and (e)(2). We see no reason why the effective date in § 165(e) should control the effective date provided in § 165(a). Thus the two contending Groups have failed in yet another place to move the harmonization of sections 165 and 168 past their facial contradiction.
 
 
 63
 In summary, the "plain language" arguments concerning sections 165 and 168 fail to convince us that one or the other of the two sections should control. Instead, we can only conclude that the "plain language" of each of the sections 165 and 168 means what it says and that the two sections are inconsistent.B. Other Sections of the Act Cited in Support of "Plain Language" Contentions
 
 
 64
 Environmental and Industry Groups have also engaged in an analytical tour de force of other sections of the Clean Air Act and its Amendments to buttress their "plain language" contentions. Though we cannot respond to each point raised, we will consider those that seem most credible.
 
 
 65
 To defeat the potentially corrosive effect of § 168 on the environmental protections afforded by § 165, Environmental Groups have argued that the effective date contained in § 165 makes that section self-executing and therefore immune from the conflicting effective date prescription of § 168.[77] These Groups argue that there was thus no need to list § 165 among the various sections cited in § 168(b) that are to be afforded immediate effect. The counter-argument is raised, however,[78] that § 162(a), which Is included among the sections cited in § 168(b), also provides its own effective date.[79] It is asked, therefore, why Congress in § 168 would specifically cite one self-executing section as immediately effective but not another, if it intended for both to be immediately effective? The elaborate attempts of Environmental Groups to distinguish § 165 from § 162(a) in this regard are scarcely comprehensible, let alone credible,[80] and we need not attempt to review their arguments here. But we are also not persuaded by the argument of Industry Groups that because Congress in its wisdom decided to cite § 162(a) in § 168(b), it intended by omitting § 165 from § 168(b) to negate entirely the self-executing language of § 165. If Congress intended to negate the effective-date provision of § 165, why would it have included that effective-date provision at all in § 165? Once again, like the search of Ponce de Leon for the fountain of youth, the search for perfect logic fails, and we recognize again an imperfect statute that gives inconsistent instructions to its administering agency.
 
 
 66
 The Groups have also fallen hungrily upon various provisions of § 406 of the Amendments to support their contentions concerning sections 165 and 168. Subsection 406(d)(1),[81] for example, provides that "Except as otherwise expressly provided, the amendments made by this Act shall be effective On date of enactment." Environmental Groups cite the second portion of this sentence as confirmation that the requirements of § 165 are to be effective immediately. Industry Groups, on the other hand, cite the first phrase of the sentence and argue that § 168 is a section that "otherwise expressly provide(s) . . . ." We believe, however, that § 406(d)(1) contributes essentially nothing to the present debate, for the section fails to specify which of the various other sections of the Act should be construed so as to "expressly provid(e)" for a later effective date and which do not, and we are thus thrown back on the internal construction of those sections.
 
 
 67
 Similarly, § 406(c)[82] provides that "Nothing in this Act . . . shall in any way affect any requirement of an approved (state) implementation plan in effect . . . before . . . (7 August 1977) until modified or rescinded in accordance with the Clean Air Act as amended by this Act." Though this subsection plays a useful function in ensuring that programs and regulations in effect before enactment of the Amendments are to continue until changed, it in no way indicates which regulations are to continue and which are deemed, by the Amendments, to be changed. Yet this very question is central to the present case. Thus § 406(c) leaves our analysis where it began.
 
 
 68
 The contending Groups also find support in § 110 of the Act, which provides for the promulgation of state implementation plans in accord with federal air quality standards and for the review of such plans by EPA. Predictably, Industry Groups cite § 110(a)(1),[83] which allows each state nine months to incorporate into its implementation plan certain new federal air quality standards promulgated by EPA,[84] and § 110(a)(2)(B) and (D),[85] which require the EPA Administrator to ensure that a state plan complies with federal standards for preconstruction review of new pollution-emitting sources. Industry Groups argue that it follows from these sections that implementation of the requirements of § 165 must await the promulgation and approval of new state plans.[86] Environmental Groups, on the other hand, note that § 110 nowhere provides that federal requirements for preconstruction review may not take effect before the expiration of the nine-month period allowed a state to revise its plan. In support of this contention, Environmental Groups[87] cite § 110(c)(1),[88] which instructs the Administrator at any time to "prepare and publish proposed regulations setting forth an implementation plan . . . for a State if . . . (B) the plan . . . is determined by the Administrator not to be in accordance with the requirements of . . . (§ 110)." This authority, they argue, allows the Administrator at any time to suspend a state plan that is not in accord with new statutory requirements and to promulgate new regulations that are to be directly and immediately applicable in such state. This procedure was followed in implementing the new PSD requirements made effective as of 7 August 1977, in accord with § 168(b),[89] and arguably could also have been followed in the case of preconstruction requirements of § 165.
 
 
 69
 Environmental Groups are on even firmer ground in finding "interim period" authority for the EPA to enforce new, immediately-effective federal preconstruction requirements in § 167 of the Act, which provides that the "(EPA) Administrator Shall . . . take such measures, including issuance of any order, or seeking injunctive relief, as necessary to prevent the construction of a major emitting facility which does not conform to the requirements of . . . (§§ 160-169A of the Act)."[90] Section 167, however, nowhere specifies Which requirements of sections 160-169A are to be held up as the conforming standards in any particular period: those of § 165 or of § 168?
 
 
 70
 There is merit in the interpretations by both sides of sections 110 and 167, but the arguments all tend to be circular in their logical effect and provide no more than the most circumstantial support for the opposing contentions concerning sections 165 and 168. Sections 110 and 167 provide ample authority for state and federal action to implement and enforce new regulations, but neither section specifies which level of government is to take the lead in implementing particular other sections, or on what date those other sections are to take effect. Section 110 merely sets forth steps to be taken by state and federal agencies in the implementation of new federal air quality standards promulgated by regulation, but the section does not prohibit (and in subsection (c) may even facilitate) the direct amendment of federal air quality standards, and thereby also of state implementation plans, by federal regulation. Similarly, § 167 provides for new federal enforcement authority but points to both 165 and 168 as sections to be enforced. Sections 110 and 167, therefore, are vehicles on which all the parties can ride, but the journey takes them (and also this court) no closer to a resolution of the present question.
 
 
 71
 C. Legislative History of Sections 165 and 168
 
 
 72
 An examination of legislative history adds strength to our conclusion that Congress wrote inconsistent instructions into sections 165 and 168 and that the two sections cannot be resolved by favoring one of them above the other.
 
 
 73
 The present controversy can be traced directly back to the fact that sections 165 and 168 were conceived in separate Houses and their provisions never reconciled when the Act as a whole was given birth in Conference. The Act's eventual § 165 originated in a Senate bill, S. 252.[91] Section 6 of that bill unmistakably aimed to give immediate effect to the preconstruction review requirements eventually set forth in § 165,[92] and there was no provision parallel to the present Act's § 168, arguably postponing the effective date of those requirements until approval of state implementation plans.[93] As conceded by Industry Groups, S. 252 "would have made all the new PSD requirements immediately applicable."[94] The House bill, H.R. 6161,[95] however, was silent on the question of the effective date for the preconstruction requirements set forth in that bill.[96] Instead, in a section that is the direct precursor to the present Act's § 168, the bill provided generally that pre-existing PSD regulations were to remain in effect until revised state implementation plans were approved.[97]
 
 
 74
 In great haste, at the close of the first session of the 95th Congress, the Conference Committee accepted key provisions of both bills.[98] As reported later by Senator Muskie, who was a principal sponsor of the Clean Air Act Amendments and a member of the Conference Committee, the Committee worked very fast and without the usual attention to coordinating all provisions fully.[99] The pace of events also was swift thereafter. On 3 August 1977 the bill was reported out of conference, on 4 August it was passed by both Houses, and on 7 August it was signed into law.
 
 
 75
 It may never be known whether the members of the Conference Committee, while at conference, were aware of the inconsistencies they were writing into law, and what they would (or could) have done if they had known. But the conferees, and other Members of Congress, certainly became aware of the issue shortly thereafter. On 4 October 1977, EPA issued a memorandum pointing out the inconsistencies in the language of the two sections and expressing the view that the inconsistency was "inadvertent" and would shortly be corrected by technical amendment.[100] On 1 November, in introducing a bill of technical amendments to the Act, Congressman Rogers (a principal sponsor of the earlier Amendments and a member of the Conference Committee) conceded that there was an "apparent conflict between section 165 and 168" and that "considerable controversy (had) developed" on whether the conflict should be resolved by technical amendment.[101] Though Rogers stated that he believed it to be the "intent of the conferees" that the requirements of § 165 be effective as of 7 August 1977, he urged that because of the risk of "significant controversy" no attempt be made to clarify the matter by means of technical amendment.[102] Likewise, Senator Muskie, in introducing the bill of technical amendments before the Senate, stated that EPA's memorandum of 4 October contained the "correct interpretation" of the two sections, but he implied that because of controversy that had arisen no technical amendment would address the issue.[103]
 
 
 76
 Though these Post hoc interpretations by the principal sponsors of the 1977 Amendments are entitled to some consideration,[104] the statements themselves and also the barrage of letters of protest directed to EPA by other Congressmen[105] reflect the fact that many divergent views were held in Congress on the proper interpretation of the two sections. All Post hoc interpretations by the sponsors of the 1977 Amendments and their opponents, therefore, truly cancel each other out on the matter of "congressional intent." We are left only to surmise about the cause of the drafting inconsistency. It may have been merely "inadvertent," as first noted by EPA. Or, the conferees may have found that it was politically necessary to accept Both sections 165 and 168 in order to speed the Clean Air Act Amendments back to the House and Senate for passage before the end of the session.
 
 
 77
 The circumstances of the passage through Congress of the Clean Air Act Amendments, and the statements of various Congressmen after enactment, indicate convincingly that Congress did not clearly resolve the issue of the effective date for the new preconstruction review requirements; this history provides no justification for implementation of only one of the two statutory sections to the exclusion of the other.
 
 
 78
 D. The Overall Scheme of the Clean Air Act and the Amendments of 1977
 
 
 79
 As a "last resort" line of argument, Environmental and Industry Groups contend that EPA's final resolution of the conflict between sections 165 and 168 is inconsistent with the policy concerns and overall intent of Congress in enacting the Clean Air Act and its Amendments.
 
 
 80
 Industry Groups argue that only the implementation scheme prescribed in § 168 is consistent with the congressional goal of enhancing the role of states in implementing new federal ambient air quality standards.[106] Not surprisingly, these Groups find the clearest support for their position in statements issued by committees of the House, which sponsored the predecessor version to § 168 and which was apparently more hostile than the Senate to federal enforcement of new PSD requirements.[107]
 
 
 81
 Even the Senate committee responsible for passing on the Amendments supported the general shift in emphasis from federal to state enforcement of PSD requirements.[108] That general shift of responsibility, however, is not at issue in this case, but only the time of applicability and level of government responsible for implementation of the early stages of just one aspect of the PSD program: that pertaining to preconstruction review. Furthermore, Congress clearly prescribed a somewhat larger role for the federal government in the formulation of PSD requirements than in some other aspects of the Act,[109] and even under the scheme prescribed in § 168 the EPA would be obliged to administer the PSD program, including requirements for preconstruction review, under pre-existing federal regulations until state plans are revised to incorporate all new PSD requirements.[110] Also, Congress in § 168(b) of the Clean Air Act[111] demonstrated its willingness to amend state plans directly in certain respects, and thus to provide for only Ultimate state administrative authority. If Congress followed this route in § 168(b), it may also have chosen to do so in § 165.
 
 
 82
 It has also been argued that literal application of § 165, and even the administrative scheme devised by EPA, runs counter to the intent of Congress that implementation of new PSD requirements not disrupt industrial construction by suspending the process of granting permits for construction of new industrial facilities. This argument, however, is undermined by the fact that both the House and Senate committees responsible for the Clean Air Act Amendments were concerned about the possibility of economic disruption from implementation of new PSD requirements[112] and took measures to reduce such disruption,[113] and thus presumably were prepared to assume such disruption as was inherent in § 165. In consolidating various portions of House and Senate bills, the conferees rejected a number of key House provisions designed to prevent a "moratorium on growth"[114] and accepted a number of comparable provisions proposed by the Senate.[115] It cannot be said, therefore, that the Conference "leaned" either toward the Senate or House proposals on the matter of economic disruption, or that the EPA in pursuing a middle course between sections 165 and 168, originating in provisions passed by the two Houses, in any sense violated the intent of Congress.
 
 
 83
 Furthermore, Congress demonstrated by enacting the Clean Air Act itself, and again in enacting the Act's strengthening Amendments in 1977, that it considered the task of protecting the quality of the nation's air to be of key importance. The intent of Congress thus compels a balancing of the need for air quality protection against any economic loss or delay that may result from enforcement of the Amendments' strengthened environmental standards a balancing which Congress did not clearly effect.
 
 
 84
 Thus an examination of the intent of Congress in enacting the Act and its Amendments lends little strength to the contentions of either of the opposing Groups. Instead, the various policy objectives melded by Congress into the Act provide a standard by which to judge the reasonableness of the administrative actions taken by EPA. As we discuss later,[116] EPA was on solid ground in resorting to rulemaking to balance the various goals of Congress and the statutory instructions expressed in sections 165 and 168 and elsewhere in the Act; EPA would have been subject to even sharper legal attack if it had opted for one-sided enforcement of only § 165 Or § 168, or chosen to abandon preconstruction review requirements altogether, for reason of statutory conflict concerning principally the time and authority by which those requirements were to take effect.
 
 
 85
 E. Applicable Rules of Statutory Construction
 
 
 86
 As we have seen, petitioners and intervenors have resorted to numerous constructional devices to prove that either § 165 or § 168 of the Act should control, and that the two provisions should not both be construed to mean what they say. It is a cardinal rule of statutory construction, however, that ambiguities should not be found where statutes are clear on their face.[117] In the present case, each of the two sections of the statute at issue is clear, and it is equally clear that their provisions do not coincide. The only arguable "ambiguity" in the two sections is the Lack of consistency between the two. There is thus no plain direction as to which plain provision shall prevail.
 
 
 87
 Courts have frequently pointed out that statutory provisions, whenever possible, should be construed so as to be consistent with each other.[118] But it is apparent, in all honesty and candor, that such harmonious construction is not always possible. It is not the task of a reviewing court or administering agency in the case of statutory inconsistency to distort the words of the contested provisions so as to derive a result consistent in logic but exotic in meaning, extreme in effect, and never contemplated or imagined by the legislature or within the range of the legislature's intention. Statutory conflict gives no license to a court or agency to indulge in unrestrained and fanciful flights of constructional imagination to arrive at artful but artificially consistent interpretations.[119]
 
 
 88
 In the present case, therefore, we are guided by the rule that the maximum possible effect should be afforded to all statutory provisions, and, whenever possible, none of those provisions rendered null or void.[120] We hold that this principle applies TE, 195 U.S.App.D.C. 57 applies with equal strength when statutory provisions are in certain respects inconsistent; if the inconsistent provisions Point generally in a common direction as here, sections 165 and 168 of the Act both point toward eventual implementation of new preconstruction review requirements for major pollution-emitting facilities it is the task of an agency with the requisite authority[121] to pursue a middle course that vitiates neither provision but implements to the fullest extent possible the directives of each,[122] and it is the task of a reviewing court to ensure that the agency has effected an appropriate harmonization of the conflicting provisions while remaining within the bounds of that agency's statutory authority. In devising such a course, it is appropriate for the agency, as courts have so often done, to look for guidance to the statute as a whole and to consider the underlying goals and purposes of the legislature in enacting the statute,[123] while avoiding unnecessary hardship or surprise to affected parties[124] and remaining within the general statutory bounds prescribed.[125] Only by this approach can legislative purposes and statutory instructions be given the greatest possible practical effect.
 
 
 89
 It is obvious, but bears repeating, that in legislative (as in judicial) affairs, allowance must be made for human error and inadvertence.[126] In coping with such inadvertence and error, a reviewing court should eschew an overly technical view that would invalidate all facial instructions of the law that may be inconsistent in certain respects when there is an ascertainable, functionally viable, reasonable legislative purpose lying beneath which would be fundamentally disrupted or violated by any judicial command to return, for reason of the inconsistency, to any Status quo ante.
 
 
 90
 In the present case, Congress in great haste at the close of a legislative session drew upon two bills originating in different Houses and containing provisions that, when combined, were inconsistent in respects never reconciled in conference. The one bill proposed that certain regulations take effect immediately; the other bill proposed that those same regulations take effect at a later date, upon incorporation of those regulations into state implementation plans. But both bills and the provisions of both bills adopted by the conferees provided that the regulations should eventually take effect. To require that the regulations not take effect at all until the inconsistent provisions for their implementation have been reconciled by a later session of Congress would defeat the intent of both Houses and could have the practical effect of eviscerating a substantial part of a legislative plan, the Substantive terms of which were not finally the subject of legislative dispute. Such a result would truly "topple the temple" to correct the lean of a single pillar; for clearly, it was of primary concern to Congress in the present case that the new preconstruction review requirements enacted in 1977 take effect, and only secondarily on what precise date and under which administering authority (I. e., the states or federal government) they initially should do so.
 
 
 91
 Likewise, to give effect to just one of the contested provisions would give full rein to just one of perhaps many competing interests that in the final legislative enactment were given even weight, and would work a serious injustice to some of those interests. On the other hand, to give unlimited license to an agency to devise whatever course it pleased in the case of statutory breach or inconsistency would overreach the bounds of delegation and confer on that agency inordinate power and authority.
 
 
 92
 Under the circumstances of the present case, it was the greater wisdom for the agency to devise a middle course between inconsistent statutes so as to give maximum possible effect to both. Not every administrative agency will have authority to pursue such a course; but where such authority is present, and where the agency in a reasonable and responsible manner exercises the discretion that by inadvertence or legislative impasse it has been afforded, and properly takes into account the various concerns and determinations that lay behind the legislative enactment, it is the duty of the reviewing court to sustain the agency's result.[127]
 
 
 93
 It remains for this court, therefore, to determine whether the administering agency in the present case had authority to devise its "middle path," whether it pursued the appropriate procedural route in so doing, and whether its results are substantively reasonable.
 
 
 94
 III. THE SOURCE OF AUTHORITY AND PROCEDURES APPROPRIATE FOR
 
 
 95
 PROMULGATION OF EPA'S "HARMONIZATION" REGULATIONS
 
 
 96
 The interrelated questions of the source of authority and procedures to be followed by EPA in promulgating its "harmonization" rules[128] lead to several subquestions. We will consider first whether EPA had the requisite authority to adopt other present rules, and in light of that authority and the matters contained in the rules what form of rulemaking procedure was appropriate to pursue. We will then consider whether EPA in this case properly followed the steps required to engage in that form of rulemaking. Specifically, we will consider whether EPA was justified in issuing final rules with allegedly "retroactive effects" and in applying pre-existing PSD regulations to two major facilities for which EPA extended the 1 March 1978 permit-issuance deadline to accommodate an extension of the public comment period.
 
 
 97
 A. The Source of Authority for EPA's Rulemaking
 
 
 98
 Although EPA says nothing of it in its brief, the Agency's notices of proposed and final rulemaking issued on 3 November 1977[129] cited section 301 of the Clean Air Act[130] as one of the statutory provisions on which it relied for rulemaking authority.
 
 
 99
 Section 301(a)(1) provides, in pertinent part, that "(t)he Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under . . . (the Clean Air Act)."[131] Such a provision does not provide the Administrator with Carte blanche authority to promulgate any rules, on any matter relating to the Clean Air Act, in any manner that the Administrator wishes. But in light of the dilemma posed by the conflicting provisions of sections 165 and 168, and tracking the words of § 301(a)(1), it was clearly "necessary" for the Administrator in order to "carry out his functions" in administering the new preconstruction review requirements of the 1977 Amendments to employ the rulemaking authority provided in § 301(a)(1) to resolve the conflict between sections 165 and 168.
 
 
 100
 Without § 301 rulemaking, EPA would have been compelled to pursue one of several equally undesirable and untenable paths of action: to enforce only section 165, in violation of section 168; to enforce only section 168, in violation of section 165; to enforce neither section, thus aborting entirely or forestalling for several years the implementation of the new program of preconstruction review mandated by Congress; or, by administrative fiat, to strike a compromise between the two sections. Without rulemaking or some comparable procedure, the last of these choices would have lost the "saving grace" of notice, public participation, and comment by affected parties, and as a result would also have lost the legislative legitimacy that is present here.[132]
 
 
 101
 Sierra Club v. Ruckelshaus[133] suggests that even without the explicit rulemaking authority conferred in section 301 of the Clean Air Act, which was not cited in the court's opinion in that case, EPA would have had authority to implement the Act's explicit prescription for a program of preconstruction review, despite the conflict between sections 165 and 168.[134] The concept of agency rulemaking authority as implied from the general purposes and other substantive provisions of an Act, afforded strong support in Sierra Club v. Ruckelshaus, has also been suggested by the Supreme Court in Morton v. Ruiz.[135] The Court in that case stated clearly that "The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the Making of rules to fill any gap left, implicitly or explicitly, by Congress."[136] Because of the rulemaking authority expressly conferred on EPA by § 301(a)(1), however, we need not reach any question of implied agency power here. It is enough to say that with § 301 EPA unquestionably had authority to fashion, via rulemaking, a compromise between sections 165 and 168.
 
 
 102
 B. The Appropriate Form of Rulemaking for EPA to Pursue in Harmonizing the Conflicting Standards
 
 
 103
 The fact that EPA had authority to engage in rulemaking to harmonize sections 165 and 168 does not, of course, determine which form of rulemaking it was appropriate to use, especially where (as in the present case) the authorizing statute specifies no particular form of rulemaking procedure. In publishing general notices of proposed rulemaking on 3 November 1977, and calling therein for public comment for a period of at least 30 days prior to the expected effective date of the rules, EPA in fact employed the procedures of notice and comment (informal) rulemaking set forth in § 4 of the Administrative Procedure Act (APA).[137] EPA sought to adhere to these informal rulemaking procedures from the first day of issuance of the proposed regulations on 3 November 1977 to the day of their final issuance on 19 June 1978.
 
 
 104
 In response to the attack lodged by both Environmental and Industry Groups that EPA failed to adhere to the required notice and comment procedures, as will be discussed herein,[138] EPA has argued that all three rulemaking proceedings commenced on 3 November 1977 were merely interpretiveCITE, 195 U.S.App.D.C. 61 interpretive in nature, and thus exempt from many of the informal rulemaking requirements of the Administrative Procedure Act.[139] We find, however, that EPA has correctly characterized only one of its three rulemaking proceedings as interpretive, and that the other two proceedings can only be described (and could only have been carried forward) as informal rulemaking proceedings. Our conclusions concerning the procedures to be followed in promulgating the three rules follow from our characterizations above.[140] But we find in any event that EPA properly conformed its procedures to those required in all three cases and need not, with regard to the two legislative-type rules, have sought for those rules the exemptions allowed in the APA for interpretive rules.
 
 
 105
 1. EPA's Final Rule Incorporating Into Its Regulations the Immediately Effective PSD Requirements Identified in Section 168(b): The "First Rule"
 
 
 106
 On 3 November 1977 EPA issued a final rule incorporating into its PSD regulations the immediately effective changes in those regulations prescribed by the 1977 Amendments to the Clean Air Act[141] (the "First Rule"). These changes, originally set forth in sections 162(a), 163(b), and 164(a) of the Act[142] and specifically identified in § 168(b) as sections to be effective on 7 August 1977,[143] impose more stringent environmental prerequisites to the issuance of permits for modification or construction of pollution sources in areas of the country with relatively "clean air."[144] Significantly, the First Rule omitted from its list of "immediately effective" regulations the preconstruction review requirements of § 165. EPA set forth in other notices issued on 3 November 1977[145] its reasons for that omission, but the First Rule clearly reflects the effect of EPA's decision not to enforce the new preconstruction review requirements of § 165 as of 7 August 1977 and is part of the "package" of rules attacked in the present litigation.[146]
 
 
 107
 EPA's First Rule, standing alone, is perhaps a classic example of interpretive rulemaking. As EPA explained in Supplementary Information published with the Rule, the new PSD requirements of the 1977 Amendments as a general matter were not to become fully effective "until the States and/or EPA undertake further rulemaking activity."[147] EPA noted that as an exception to the general rule, however, § 168 of the Act provided that "EPA's current regulations must be considered immediately superseded in certain respects."[148] The purpose of the First Rule, therefore, was to amend EPA's PSD regulations to comply with § 168. EPA further pointed out that "Since these changes are mandated by statute to be effective as of August 7, 1977 (date of enactment of 1977 Amendments), the Administrator finds that it would be unnecessary and impracticable to propose these changes for public comment before making them administratively final."[149] The statement said that EPA would "consider" comments submitted on the Rule,[150] but no notice and comment period was provided before the Rule's effective date, which in fact was set retroactively as 7 August 1977 the effective date provided by § 168.
 
 
 108
 As this court stated some years ago, setting a standard that we have not since controverted:[151]
 
 
 109
 Administrative officials frequently announce their views as to the meaning of statutes or regulations. Generally speaking, . . . "regulations", "substantive rules" or "legislative rules" are those which create law, usually implementary to an existing law; whereas interpretative rules are statements as to what the administrative officer thinks the statute or regulation means.
 
 
 110
 This court has noted even more recently that an interpretive rule is an "administrative construction of a statutory provision on a question of law reviewable in the courts,"[152] and that "(i)nterpretive rules, unlike the quasi-legislative rules which are subject to the prescriptions of § 553 (of the APA), are merely an agency's interpretation of a statute it is charged with implementing and create no law and have no effect beyond that of the statute."[153]
 
 
 111
 Clearly, by these standards, the First Rule promulgated by EPA on 3 November 1977 is an interpretive rather than a legislative rule, since principally the First Rule amends the Code of Federal Regulations to incorporate new, explicit statutory provisions that are not themselves subject to the contradictions embodied in sections 165 and 168, and explains the relationship between these new Regulations and others proposed that same day (the "Second" and "Third" Rules). As such, the First Rule merely sets forth EPA's interpretation of the new regulations and their implications for the PSD program generally.
 
 
 112
 Furthermore, to the extent that the First Rule (together with the others issued as proposed rules on 3 November 1977) determined that § 165 should not be implemented immediately because of drafting inconsistencies 95 U.S.App.D.C. 63 inconsistencies between sections 165 and 168, that determination (without more) is also a matter of interpretation. Such a legal assessment of instructions of Congress, even if reaching the conclusion that those instructions are inconsistent and cannot be implemented without administrative harmonization, cannot itself be termed "legislative"; for EPA's assessment in this case created no new law, but merely followed Congress into the administrative abyss that Congress itself had created.
 
 
 113
 If an agency balks at the enforcement of an unambiguous congressional instruction, such refusal to act is contrary to law and can be challenged on substantive grounds in court. But it cannot credibly be argued that an agency caught in a legal impasse between Conflicting statutory instructions need engage in notice and comment proceedings Prior to deciding merely that to follow one or the other of those instructions would be legally untenable, when a facial reading of the two statutes is enough to show that to follow either one of the two would violate the other and thus would subject the agency to legal attack. Contrary to the assertions of Environmental Groups,[154] therefore, EPA's decision not to implement § 165 as of 7 August 1977 Standing alone, without the "compromise" plan promulgated by EPA in its Second and Third Rules, need not have been reached via notice and comment rulemaking procedures.[155] Thus EPA's First Rule properly omitted the provisions of § 165 from the several others implemented by final rule that day.[156]
 
 
 114
 2. EPA's Rules Providing PSD Guidance to States and Implementing the Requirements of Section 165: The "Second" and "Third" Rules
 
 
 115
 By contrast, EPA's Second and Third Rules, which were set forth as "proposed rules" rather than "final action" on 3 November 1977, were clearly legislative rather than interpretive and could only have been promulgated in accordance with the notice and comment procedures of § 4 of the APA.
 
 
 116
 The Second Rule,[157] in accordance with § 110 of the Act,[158] provides guidance to states on how to incorporate into state implementation plans the comprehensive set of new PSD regulations prescribed by the 1977 Amendments. In proposing the Rule, EPA called for submission of written public comments within two months,[159] and for final submission of revised state implementation plans within nine months after the anticipated date of the Rule's final promulgation on 1 March 1978.[160] Significantly, the Second Rule provides guidance to states on the implementation of the preconstruction review program prescribed by Congress in the controversial § 165(a), which by the terms of that section sets an effective date of 7 August 1977 rather than the more protracted schedule proposed by EPA in the Second and Third Rules.
 
 
 117
 The Third Rule[161] aims to make effective as of 1 March 1978 the preconstruction review requirements of § 165. The Rule seeks to "bring EPA's current regulations into conformity with . . . the Clean Air Act Amendments of 1977," and thus provides for the direct administration and enforcement of preconstruction requirements by EPA prior to their eventual adoption into state plans. The Third Rule thus aims to provide a degree of "interim period" effect to the requirements of § 165. As an unabashed compromise between the inconsistent provisions of sections 165 and 168 of the Act, the Third Rule gives effect to the requirements of § 165 on a date almost seven months after the effective date set by § 165 itself,[162] but nine months prior to the earliest date on which those requirements could take effect according to § 168.[163] EPA has explained that it was both "necessary and appropriate" to set these dates in light of the "drafting inconsistencies between Sections 165(a) and 168," and that it was most "prudent" to do so through the rulemaking process.[164]
 
 
 118
 Because of extended public controversy, the Second and Third Rules were promulgated in final form more than three months late, on 19 June 1978,[165] but in a substantive form unchanged (in particulars relevant here) from that proposed on 3 November 1977.[166]
 
 
 119
 According to the rulemaking standards enunciated earlier,[167] the Second and Third Rules both as proposed and as finally promulgated were clearly legislative rather than interpretive. On the issue of the timing for implementation of the requirements of § 165, the Second and Third Rules were founded on no explicit provisions passed by Congress. Unlike the First Rule, which implemented other new PSD requirements according to a schedule in undisputed conformity with the "immediately effective" timing provision of § 168(b), the Second and Third Rules sought to fill a Breach on the timing issue opened by the inconsistent instructions of Congress. Though, as we have discussed above, EPA had clear authority under § 301 of the Clean Air Act to fill this breach,[168] and, as we will discuss herein, the substantive result of the Second and Third Rules was perhaps in as substantial a degree of harmony as possible with the intent of Congress,[169] that rulemaking result by no stretch of the imagination could have been derived by mere "interpretation" of the instructions of Congress. According to the standard of this court, these two Rules were clearly legislative because they served to "create law . . . implementary to an existing law," rather than serving as mere "statements as to what . . . (a) statute . . . means."[170] In the present case, "interpretation" could only go so far as to spot the dilemma posed by the statutory inconsistency, while legislative-type action was required to carry the agency the rest of the way toward a compromise solution.[171]
 
 
 120
 C. The Issuance of Final Regulations with Allegedly "Retroactive" Effects
 
 
 121
 Because of the legislative nature of the Second and Third Rules, it is of relevance to determine whether EPA properly complied with the procedural requirements of notice and comment rulemaking in promulgating those rules.
 
 
 122
 The most serious procedural error alleged by Industry Groups is that the EPA Administrator violated the Administrative Procedure Act and abused his discretion by promulgating, on 19 June 1978, two final rules that applied the requirements of § 165 to any major proposed facility that had not received a construction permit prior to the earlier date of 1 March 1978.[172] Industry Groups contend that the effective date set by these rules is unlawful for reason of retroactivity. In support of that contention, they cite APA § 2(c), which defines "rule" as an agency statement having "future effect";[173] APA § 4(c), which generally requires the publication of a rule "not less than 30 days before its effective date";[174] and a number of cases supporting the general proposition that agency rules should be issued with prospective effect only.[175] EPA, however, has noted that the APA provides explicitly for an exception to the rule of prospective effect where "provided by the agency for good cause found and published with the rule."[176] EPA points out, we find correctly, that the reason for the exception in this case was published with the final rule,[177] and that "good cause" for the exception was present. We support the general principle that agency rulemaking, wherever possible, should be prospective only in effect. But we find "good cause" for the ostensibly retroactive effect of EPA's rulemaking here, and a lack of counter-balancing ill effects, for the following reasons: (1) Public notice had been given almost Four months prior to 1 March that 1 March 1978 would be the effective date of the contested regulations;[178] (2) the publication date for the final rules was postponed in large part because of repeated extensions made in the public comment period in response to requests by affected parties for such extensions;[179] (3) public notice was given more than two months prior to 1 March 1978 that, because of extensions in the public comment period, EPA might not be able to publish its regulations in final form by 1 March 1978 but that The effective date of those regulations would not be changed ;[180] (4) the permit-review process in the interim period between 1 March 1978 and 19 June 1978 was not halted, but instead, EPA upon request of the applying parties reviewed certain applications for construction permits during that period in accord with the new regulations;[181] (5) the substantive content of the rules was essentially unchanged between the date of their initial proposal on 3 November 1977 and final promulgation on 19 June 1978, and thus there was no surprise or sudden "injury" to affected parties from the form of their final promulgation, or as a result of the delay; (6) there was no substantive abuse of discretion in EPA's determination that a further delay of the effective date of the preconstruction review requirements of § 165 would be inconsistent with the agency's overall attempt to harmonize ITE, 195 U.S.App.D.C. 67 harmonize the competing interests expressed by Congress in sections 165 and 168 of the Clean Air Act.[182]
 
 
 123
 The "retroactive" effect alleged in this case, therefore, is not one of substance, for at every point in time between the publication of the proposed rules on 3 November 1977 and their final promulgation on 19 June 1978, no affected party (with the exception of parties subject to the permit deadline exemption granted to allow further public comment, to be discussed herein) had been given any reason by EPA to expect that either the content or the effective date of the proposed regulations would be other than what they eventually were. On balance, therefore, and in light of the APA's "good cause" exception to the 30-day notice requirement[183] and the standard of "reasonableness" of retroactive agency action suggested by the Supreme Court in Securities and Exchange Comm'n v. Chenery[184] and followed in this jurisdiction[185] as in others,[186] the agency's deadline of 1 March 1978 for approval of construction permits under pre-existing PSD regulations must be sustained despite the subsequent publication of the regulations in final form setting that date.
 
 
 124
 D. The Exemption of Certain Facilities from the Permit Deadline and from the Requirements of Section 165 Because of Extensions in the Public Comment Period
 
 
 125
 The second principal allegation of a procedural lapse by EPA in implementing the Second and Third Rules arises as a more specific case among others consolidated in this litigation on the general issue of the effective date of § 165 of the Clean Air Act.
 
 
 126
 The Northern Cheyenne Tribe (Cheyenne Tribe) petitions this court[187] to reverse EPA's utilization of its interim (pre-1 March 1978) PSD requirements to review an application sought by the Montana PowerPCITE, 195 U.S.App.D.C. 68 Power Company to construct two 750-megawatt coal-fired electric generating plants (known as Colstrip Units 3 and 4) in a "clean air" region fifteen miles from the Cheyenne Tribe's reservation in Montana. This permit review process was conducted according to EPA's interim PSD requirements but After 1 March 1978 the "permit deadline" established by EPA's Second and Third Rules for review of permit applications according to those requirements. Montana Power Company and other energy interests[188] have intervened to support EPA's process of review for the Colstrip facilities, as has the Pittston Company, which plans to build a 250,000 barrel-a-day low-sulfur oil refinery and marine terminal in Eastport, Maine, and whose construction permit was issued by EPA at a similar time and under the same standards as those applied to the Colstrip facility.[189]
 
 
 127
 The present issue arises because of a "special exemption," in EPA's Third Rule, which allows review of any permit application under interim preconstruction review requirements "if review . . . (of the application) would have been completed by March 1, 1978, but for an extension of the public comment period pursuant to a request for such an extension."[190] This special exemption was created to resolve a dilemma that EPA faced as it approached the deadline of 1 March 1978 for review of sources under the environmentally less stringent interim preconstruction requirements.
 
 
 128
 Serious public controversy had been aroused by the proposals to construct both the Colstrip and Pittston facilities, and numerous interested parties had appealed to EPA for extensions in the public comment period prior to final administrative review of those applications. To grant such extensions was a matter of discretion in EPA,[191] and in the present cases the extensions were deemed merited because of the complexity of the environmental and scientific issues raised by the planned construction of the Colstrip and Pittston units.[192] EPA determined, however, that extensions of the period for public comment would postpone final EPA review of the applications beyond the 1 March cut-off date for the less restrictive, interim review requirements and thus could seriously prejudice eventual disposition of those applications. After 1 March 1978 the review process for each facility would need to begin anew, subject to the more stringent review requirements of § 165. By choosing to extend the period of public comment, therefore, EPA might effectively preclude eventual approval of applications for which the process of review by 1 March 1978 was otherwise nearing completion.
 
 
 129
 This dilemma was not totally unanticipated by EPA. On 22 February 1978, EPA issued a memorandum instructing regional administrators that, as a general matter, "If you are not able to complete a thorough evaluation of important permit issues prior to March 1 (with regard to a particular application) you should . . . not issue the permit by that date" and that "(i)f this situation occurs, the permit application would have to be amended to show that the new PSD requirements of . . . (§ 165) are met."[193] Administrators were thus instructed to continue to process permit applications "as if" the 1 March cut-off date for the less stringent, pre-existing preconstruction requirements was not approaching.
 
 
 130
 Six days later, however, EPA reversed its policy. EPA regional officers on 28 February 1978 were instructed that because of "significant public comment" and requests for additional comment time "on meritorious grounds" concerning certain permit applications, the "comment period . . . may be extended" for those facilities for which if no such extension were granted "EPA review . . . would have been completed by March 1." Regional officers were further advised that permit applications subject to such an exemption "may continue to be processed . . . under EPA's . . . (pre-existing) PSD regulations."[194] The Administrator's decision to exempt certain sources from the 1 March 1978 deadline was announced in a Federal Register notice on 8 March 1978,[195] and incorporated into the Third Rule issued by EPA on 19 June 1978.[196] As noted above, permit applications for the Colstrip units in Montana and the Pittston facility in Maine were eventually reviewed according to pre-s 165 requirements as a result of this exemption.
 
 
 131
 The Cheyenne Tribe attacks EPA's "special exemption" on two grounds. First, the petitioner argues that EPA's decision to provide the exemption was not accompanied by a "concise general statement of . . . basis and purpose," as required generally for agency rulemaking by APA § 4(b).[197] It is also argued, under the APA, that EPA's decision was arbitrary and capricious and an abuse of discretion because of an alleged absence in the record of information indicating that the treatment of applicants would be inequitable if no such exemption were allowed.[198] We reject both contentions and sustain the exemption.
 
 
 132
 1. EPA's Statement of Basis and Purpose for the Special Exemption
 
 
 133
 The APA requires that a statement of basis and purpose accompanying any rule be "concise" and "general."[199] We have cautioned, however, against an "overly literal reading" of those terms and noted that a statement of basis and purpose must be sufficient to enable a reviewing court to "see what major issues of policy were ventilated by the . . . proceedings and why the agency reacted to them as it did."[200] We have also noted, on the other hand, that "statements of less than ideal clarity have been held to be sufficient,"[201] and that "on occasion, regulations with no statement of purpose have been upheld where the agency's purpose was considered obvious and unmistakable."[202] We have suggested further than other materials made public in the course of rulemaking may be considered by a court in evaluating the adequacy of a rule's statement of basis and purpose,[203] though we have not included among such other material the Post hoc rationalizations entered by counsel for an agency while rulemaking is undergoing court review.[204]
 
 
 134
 In the present case the agency's public record explanation of the "basis" and "purpose" for its exemption of certain facilities from the 1 March deadline is adequate to allow this court to ascertain whether the agency's exemption of certain facilities comports generally with the requirements of due process and is not "arbitrary" or "capricious."[205] In the Supplementary Information to its Third Rule, EPA reprinted in its entirety the Memorandum issued by the EPA Administrator to Regional Administrators on 28 February 1978, voicing concern about the need for "interested persons" to have "additional time to comment on the propriety of granting . . . permit(s)" for certain pollution sources, and the need for "completion of any PSD review of any case where an extension of the comment period has been requested on meritorious grounds."[206] More to the point, perhapsITE, 195 U.S.App.D.C. 71 perhaps, was the Federal Register notice of 8 March 1978 the first public notice of the agency's "special exemption" which justified the exemption as a means to "avoid any possible inequities" resulting from a decision, "(a)s March 1 grew closer," to extend the period for public comment.[207] Neither of these notices is particularly laudable either for candor or comprehensiveness. EPA failed to point out explicitly in either notice the obvious fact that further delay in the processing of PSD permit applications would subject the applicants to higher standards of review and could necessitate recommencement of the permit review process.[208] EPA also failed to specify (although it was certainly known to the affected parties) which permit applications were likely to be affected by the exemption and why it would be "inequitable" to allow the natural course of permit review to extend beyond 1 March 1978 if the requests for extensions in the comment period were, as EPA contemporaneously determined, "meritorious."[209]
 
 
 135
 Yet we believe that the various rulemaking statements made by EPA setting forth the basis and purpose for its special exemption must be seen in the context of the multi-faceted rulemaking proceedings in which EPA was then engaged proceedings which generally have not been subject to objection for reason of inadequate public explanation, and of which the special exemption concerning the 1 March deadline constituted an exceedingly minor part. It cannot be expected that every phrase and element of a comprehensive rule will itself be the subject of an exhaustive statement of basis and purpose, for otherwise the rulemaking process will become bogged down and belabored with excessive and merely self-justifying administrative amplification.[210] Though the public statements made by EPA in the course of its rulemaking proceedings on the subject of the "special exemption" are far from exhaustive, they are sufficient to inform the public and this court of the tension faced by EPA between requests for further public comment and the on-rushing deadline for permit review, and to suggest that it was for the purpose of relieving this tension that EPA allowed the special exemption. There is nothing mysterious or sinister about the fact that EPA's explanation was concise; it was more than evident from EPA's statements that the feared "inequity" would arise from the fact that, absent the special exemption, facilities subject to extended public controversy (regardless of the merits of their construction) would effectively become subject to PSD requirements more stringent than the requirements applicable to facilities subject to less controversy, where no further time for public comment had been requested. If the special exemption is to be reversed, therefore, it must be for reason of substantive arbitrariness rather than for any procedural error by EPA in not elaborating further, by public notice, the basis and purpose for that exemption.
 
 
 136
 2. Allegations that the Special Exemption was Arbitrary and Capricious
 
 
 137
 The Cheyenne Tribe also has urged forcefully that the EPA Administrator's decision to exempt certain facilities from the 1 March review deadline was "arbitrary," "capricious," and an "abuse of discretion,"[211] because of a lack of support in the administrative record for the claim that "inequity" would result without such exemption.[212] The Cheyenne Tribe argues that there is no evidence to support the contention that it would be "inequitable" In every case for applicants to be reviewed according to the new PSD requirements, if the review of an application would have been completed by 1 March 1978 but for an extension in the public comment period.[213] The Cheyenne Tribe seeks to draw an "equitable" distinction, for example, between a permit applicant who submitted a completed application early in 1977 on which action had been "unreasonably delayed" by EPA, whom "it might arguably be inequitable to hold . . . to the March 1st deadline,"[214] and an applicant whose papers had not been submitted in final form until early 1978 much closer to the review deadline of 1 March 1978. It is further argued that the Administrator should have considered a large number of factors relevant to the question of whether "inequity" would arise in particular cases as a result of the 1 March deadline.[215] Though the considerations proffered by the Cheyenne Tribe are worthwhile, and are relevant to the issue of which applications would suffer inequity as a result of the imposition of an absolute review deadline, they miss, for the most part, the only concern addressed directly by the special exemption: whether inequity would result from final review of an application delayed beyond 1 March For reason of an extension in the public comment period beyond that date. Delays involved in the permit review process prior to 1 March whether for reason of the complexity of issues involved, procrastination by applicants, bureaucratic confusion, or extendedE, 195 U.S.App.D.C. 73 extended public controversy and comment are essentially irrelevant to a consideration of inequity that may result After 1 March as a result of the single factor of Extensions in the public comment period. An applicant that has previously procrastinated in the submission of an application and one who has not, for example, will suffer equal injury if their permit applications are not reviewed by 1 March. But neither applicant is more likely than the other to arouse public controversy sufficient to compel EPA to Extend the public comment period beyond 1 March, and it is the arguably inequitable result that arises from Greater public controversy in one case than in another that was addressed by EPA's special exemption.
 
 
 138
 EPA might have done well to design a generally more sophisticated procedure to determine in which cases the 1 March cut-off date should apply and in which cases it should not, in light of a wide variety of equitable considerations.[216] Usually, however, it is in the nature of cut-off dates to be somewhat arbitrary, and certainly in the present case it was no more arbitrary for EPA to establish the 1 March deadline subject to one "equitable" exemption, pertaining to the varying degrees of public controversy aroused in particular cases, than to establish a 1 March deadline with no "equitable" exemptions at all.
 
 
 139
 As we noted earlier, it was within the discretion of EPA to deny all extensions of the public comment period in the present case[217] and to proceed with final permit review prior to 1 March 1978 with only those final comments then submitted. Certainly the Cheyenne Tribe does not complain here of EPA's decision to extend the public comment period in the case of the Colstrip units, for it was principally in response to requests from the Cheyenne Tribe that EPA chose to grant that extension. Furthermore, as a result of information gathered in the course of the extension period, EPA Reversed its earlier decision to grant a construction permit to the Colstrip units, even under the pre-s 165 preconstruction requirements.[218] It is hardly in the name of "equity," therefore, that the Cheyenne Tribe can complain not only that the public comment period should have been extended, but that Montana Power Company's application should have been reviewed under more stringent PSD requirements as a result of the passage of time during the extension period. The petitioner in this case cannot have its cake and eat it too; the Cheyenne Tribe has fared quite well, to date, in combatting the Colstrip units, and it must here be denied the further advantage that it seeks in having us lift the special exemption that EPA allowed the Company as a result of the extended period of permit review.[219]
 
 
 140
 In summary, therefore, EPA's extensions of the comment period and the accompanying "special exemptions" seem to us to have been a reasonable attempt by EPA to reconcile the various contending interests affected by implementation of the new preconstruction requirements of the Clean Air Act Amendments, and to reflect a reasonable and fully supportable exercise of the EPA Administrator's discretion.
 
 
 141
 IV. REVIEW ON SUBSTANTIVE GROUNDS OF EPA'S RULEMAKING FOR
 
 PRECONSTRUCTION REVIEW
 
 142
 It only remains for this court to determine whether the general scheme for accommodation of sections 165 and 168 devised by EPA in its rulemaking proceedings can pass muster under the appropriate substantive standard of review.
 
 A. Review of the Interpretive Rule
 
 143
 As noted earlier, EPA's First Rule, promulgated in final form on 3 November 1977,[220] is interpretive and is not subject to attack in this case except for reason of its failure to implement as of 7 August 1977 the requirements of § 165. Since it is interpretive of a statute which EPA is called upon to enforce, the First Rule is entitled to "great deference" and must be sustained if it has "warrant in the record" and a "reasonable basis in law."[221]
 
 
 144
 In the present case, the First Rule is indisputably correct in applying as of 7 August 1977 the PSD requirements cited in § 168(b) of the Clean Air Act as effective on that date. Its non-implementation of the PSD requirements of § 165, which EPA justifies most explicitly in Supplementary Information to the Second and Third Rules, is likewise a matter of interpretation that we find to be correct in light of the inconsistency between sections 165 and 168.[222] We sustain the First Rule, therefore, without reservation.
 
 B. Review of the Legislative Rules
 
 145
 The Second and Third Rules are legislative in nature and are subject to the familiar "arbitrary" or "capricious" standard prescribed in APA § 10(e).[223] We have noted recently in another case, also involving informal rulemaking procedures conducted by EPA under the Clean Air Act, that the standard of review applicable to informal rulemaking is a "highly deferential one" and "presumes agency action to be valid," but that "(t)his is not to say . . . that we must rubber-stamp the agency decision as correct."[224] Thus we must engage in a "substantial," "searching and careful" inquiry into the facts, so as to assure ourselves that the agency action was "based on a consideration of the relevant factors * * * ."[225]
 
 
 146
 The most relevant factors to be considered here are the various considerations that were before Congress in fashioning its plan to implement the strengthened requirements for preconstruction review of major pollution-emitting sources. These considerations include the need for (1) enhanced protection of the environmental quality of the nation's air;[226] (2) minimization of economic dislocation and loss as a result of such enhanced protection;[227] (3) a heightened enforcement role for states, pursuant to federally-imposed minimum environmental standards;[228] and (4) facilitation of an efficient administrative transition from enforcement of the "old" to " new" preconstruction review requirements.[229]
 
 
 147
 By striking a relatively even-handed balance between the inconsistent provisions of sections 165 and 168 via rulemaking, EPA has given more than adequate consideration to each of the above concerns and has afforded each of them adequate expression in the final rules. By not postponing the effective date of the requirements of § 165 until the time of approval of revised state implementation plans, as called for by § 168 of the Act standing alone, EPA has given expression to the concern of Congress expressed in § 165 that a minimum number of major pollution-emitting facilities be constructed or modified after 7 August 1977 without satisfying rigorous new environmental requirements. In giving notice on 3 November 1977 that facilities that had not received construction permits by 1 March 1978 (as well as facilities that had received permits by that date but would not commence construction before 1 December 1978) would thereafter be reviewed according to the new requirements of § 165, and in providing the special exemption to the two facilities whose applications would have been reviewed by 1 March 1978 but for the extension in the period for public comment, EPA has demonstrated its concern for avoiding economic dislocation while also allowing full play for public discussion and dissent.[230] By providing guidance to the states on the procedures for incorporation of the requirements of § 165 into revised state implementation plans, and by not compelling immediate compliance with the requirements of § 165, as called for by § 165 standing alone, EPA has shown its concern for strengthening the enforcement role of the states.[231] And by providing generally for the implementation of the new preconstruction requirements according to a gradual plan of deadlines and schedules established through rulemaking, EPA has sought to effect an efficient transition from enforcement of the old PSD requirements to the new.[232]
 
 V. CONCLUSION
 
 148
 Other, equally reasonable accommodations of the above competing interests can be imagined, and we do not suggest that EPA's procedures or final solutions in any sense approach the ideal. The agency's early reversals of policy concerning the proper time of implementation of § 165[233] and the repeated delays in issuance of EPA's final rules with the consequent further extension in the "construction commencement" deadline for sources otherwise exempt from § 165,[234] together disclose an administrative process in this case that is not ideal. But, on the whole, we are presented here with a relatively happy picture of an agency's attempt to bring harmony and efficiency to a regulatory scheme that in its original statutory conception was badly flawed.
 
 
 149
 As we noted in another case, some years ago:[235]
 
 
 150
 Rule makers, as the delegatees of legislative power, are no more likely than their delegators to make everybody happy with a particular exercise of that power. Our function is to see only that the result is reasonable and within the range of authority conveyed, that it has been formulated in the manner prescribed, and that the disappointed have had the opportunity provided by Congress to try to make their views prevail. On all these counts we are satisfied by the record before us.
 
 
 151
 As we also ruled in that case, and for the reasons noted in this opinion, the petitions for review in the present case are all
 
 
 152
 Denied.
 
 LEVENTHAL, Circuit Judge, concurring:
 
 153
 I concur in Judge Wilkey's opinion for the court, and take this occasion to express appreciation for the effort and skill with which he has wended his way through the labyrinth of the 1977 Amendments to the Clean Air Act under discussion.
 
 
 154
 I add this note as a concurrence-for-emphasis.[1]
 
 
 155
 When, as here, an agency has rule-making power, it is not confined to "procedural minutiae" but may take action that "conforms with the purposes and policies of Congress and does not contravene any terms of the Act."[2] This includes an authority to adopt programs aimed at "maximum effectuation of Congressional objectives" and "maintaining the fairness, equity and efficiency" of the government's program.[3]
 
 
 156
 In this case, the Environmental Protection Agency has adopted a regulation that is reasonable in terms of furthering, to the maximum possible extent, the broad objectives of Congress; and it has not in this process violated any discernible Congressional command as to particulars, for the only provisions in the statute relating to such particulars contradict and therefore countermand each other.[4] The fruit of Judge Wilkey's tilth in depth is an appreciation of the legitimacy and propriety of EPA's disposition of a vexing problem.[5] When an agency shows good sense, "(c)ourts are loath to say that good sense is not good law."[6]
 
 
 157
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge, dissenting:
 
 
 158
 Judge Wilkey's careful explanation of the genesis of this litigation need not be repeated.[1] In a nutshell, Congress, in passing the Clean Air Act Amendments of 1977,[2] placed EPA in a dilemma by giving facially contradictory instructions in Sections 165(a)[3] and 168[4] regarding the effective date of Section 165(a)'s stringent preconstruction review and permitting requirements. Its counsel styles EPA's response to this predicament as an "interpretation"[5] of the Amendments but, as the court rightly recognizes,[6] in truth EPA deemed the search for a consistent congressional directive futile and proceeded to legislate.[7] It charted a "prudent"[8] middle course between Sections 165(a) and 168, which the court today sustains.
 
 
 159
 I respectfully disagree. Perhaps surprisingly when an extremely complicated statute must be construed and any resulting interpretation entails tremendous economic and environmental consequences, the source of my dissension can be simply stated. Congress may have meant Section 165(a) to become effective immediately upon enactment of the 1977 Amendments. It may, on the other hand, have intended Section 165(a)'s requirements to govern only after their incorporation into state implementation plans pursuant to the procedure established by the Clean Air Act, with preexisting federal regulatory specifications already written into existing state plans to control in the interim. But plainly enough for me, Congress contemplated that one point or the other would become the effective date, and did not delegate responsibility for specifying an entirely different date to EPA. When Congress in a statute indisputably says "A" or "B" but does not make clear which, interpretation must, in my view, be utterly impracticable before the agency responsible for administering the law can say "C."
 
 
 160
 The court throws up its hands at the formidable construction problem presented by Sections 165(a) and 168. To be sure, the issue cannot be resolved by giving every provision of the 1977 Amendments its most natural and expansive meaning when considered in isolation. But scrutinized in light of the entire statute and its legislative history, I think Sections 165(a) and 168 can be reconciled,[9] and thus I side with Lord Wensleydale:
 
 
 161
 It is a very useful rule in the construction of a statute, to adhere to the ordinary meaning of the words used, and to the grammatical construction, unless that is at variance with the intentions of the legislature to be collected from the statute itself, or leads to any manifest absurdity or repugnance, in which case the language may be varied or modified, so as to avoid such inconvenience, but no further.[10]
 
 I. THE STATUTE
 
 162
 It is axiomatic in a democracy that courts are to construe statutes so as to effectuate the lawgivers' intent.[11] Yet the vicissitudes and occasionally the impossibility of ascertaining a uniform legislative purpose,[12] and the importance of reading statutes the way affected parties naturally would,[13] has led to the rule that the intention of the legislature must be primarily determined from the language of the entire statute itself.[14] So I now turn to review the critical provisions of the Clean Air Act Amendments of 1977.
 
 A. Section 168
 
 163
 Section 168 is strictly an interim measure, as its caption attests.[15] It provides in full:
 
 PERIOD BEFORE PLAN APPROVAL
 
 164
 Sec. 168. (a) Until such time as an applicable implementation plan is in effect for any area, which plan meets the requirements of this part to prevent significant deterioration of air quality with respect to any air pollutant, applicable regulations under this Act prior to enactment of this part shall remain in effect to prevent significant deterioration of air quality in any such area for any such pollutant except as otherwise provided in subsection (b).
 
 
 165
 (b) If any regulation in effect prior to enactment of this part to prevent significant deterioration of air quality would be inconsistent with the requirements of section 162(a), section 163(b) or section 164(a), then such regulations shall be deemed amended so as to conform with such requirements. In the case of a facility on which construction was commenced (in accordance with the definition of 'commenced' in section 169(2)) after June 1, 1975, and prior to the enactment of the Clean Air Act Amendments of 1977, the review and permitting of such facility shall be in accordance with the regulations for the prevention of significant deterioration in effect prior to the enactment of the Clean Air Act Amendments of 1977.[16]
 
 
 166
 Subsection (a) incontrovertibly requires that the preexisting federal regulations designed to prevent significant deterioration Shall[17] remain in effect until the new implementation U.S.App.D.C. 80 implementation plans are proposed by the states and approved by EPA. Subsection (b) unequivocally specifies the only exceptions to this principle.[18]
 
 
 167
 The Environmental Groups' effort to dismiss Section 168 as a mere "savings clause" deserves the short shrift the court gives it.[19] That function is adequately served by Section 406(b).[20] Further, during the period of its operation, Section 168(a) does not merely authorize, it requires, EPA's prior PSD regulations to continue in effect, save as amended in Section 168(b).
 
 
 168
 The Environmental Groups develop two other arguments to circumvent the difficulties Section 168 poses for their position. In the first place, they maintain that EPA possessed authority to implement Section 165 immediately and independently of state plans.[21] This, of course, does not avoid conflict with Section 168(a), which governs until "an applicable implementation plan is in effect,"[22] and in any event is wholly alien to the Clean Air Act's framework, which basically requires federally-established standards to be applied to individual sources of pollution through state implementation plans. The Supreme Court has explained this division of functions:
 
 
 169
 The Agency is plainly charged by the Act with the responsibility for setting the national ambient air standards. Just as plainly, however, it is relegated by the Act to a secondary role in the process of determining and enforcing the specific, source-by-source emission limitations which are necessary if the national standards it has set are to be met. Under § 110(a)(2), the Agency is Required to approve a state plan which provides for the timely attainment and subsequent maintenance of ambient air standards, and which also satisfies that section's other general requirements. The Act gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of § 110(a)(2), and the Agency may devise and promulgate a specific plan of its own only if a State fails to submit an implementation plan which satisfies those standards. § 110(c). Thus, so long as the ultimate effect of a State's choice of emission limitations is compliance with the national standards for ambient air, the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation.[23]
 
 
 170
 Congress adhered to this allocation of authority in devising the 1977 PSD Amendments. Congress added to Section 110(a)(2)[24] of the Act the requirement that each state plan include a program for enforcing the PSD standards.[25] Section 161 is of the same tenor.[26]
 
 
 171
 Secondly, the Environmental Groups contend that EPA had authority to implement Section 165 immediately by directly amending applicable state implementation plans.[27] In support of this view they cite Section 110(c).[28] Unlike the majority,[29] I would reject this argument without equivocation. Section 110(c) clearly contemplates that a state be given the initial opportunity to submit a plan that complies with federal standards.[30] Only if the state fails to submit timely a satisfactory plan may EPA act.[31] No state was then in default of its obligations under the 1977 Amendments since Section 406(d)(2)[32] gave the states until nine months after EPA fashioned necessary regulations to revise their plans in accordance with the Amendments. These regulations were promulgated on June 19, 1978,[33] and thus EPA's action under review here cannot be justified by reliance on Section 110(c).
 
 
 172
 Nor should Section 167[34] be read to authorize immediate implementation of Section 165 through federal revision of state plans. In the first place, as the court notes,[35] Section 167 grants EPA the power to take action against major emitting facilities that fail to conform to the requirements of the Act, and that, of course, leads back to the original dispute over whether Section 165 or Section 168 sets out the Act's requirements during the interim period. In the second place, even were Section 167 otherwise an appropriate warrant for immediate implementation of Section 165, conflict with Section 168 would not be avoided. Section 168(a) requires that existing PSD regulations continue until "an applicable implementation plan"[36] is in effect, and Section 110(d) defines "applicable implementation plan" as "the implementation plan, or most recent revision thereof, which has been approved under (Section 110(a)) or promulgated under (Section 110(c)) and which implements the requirements of this section."[37] Thus, action pursuant to Section 167 would not constitute promulgation of an "applicable implementation plan."
 
 
 173
 The Environmental Groups do not focus on the one part of Section 168 on which a marginally plausible argument in support of their position can be built the last sentence of subsection (b).[38] Congress there specified that a facility on which construction was "commenced" defined to mean a facility whose owner or operator has obtained all necessary permits and who has either begun building or has entered into agreements, which cannot be modified without substantial loss to the owner, to undertake and complete construction shortly[39] after June 1, 1975, but before enactment of the 1977 Amendments shall be subject to the preexisting PSD regulations. It could be argued that the negative implication can properly be drawn: that facilities on which construction had not been commenced before enactment of the 1977 Act are subject to the new, more stringent preconstruction review and permitting standards set out in Section 165. The second sentence of subsection (b) would thus be an exception to the rule of subsection (a) and the puzzle of accommodating Section 168 with Section 165(a) would be solved. This reconciliation is unsatisfactory, however. Negative implications, of course, are not valid as a matter of deductive logic and are usually considered weak indicators of congressional intent.[40] More importantly, to construe the last sentence of subsection (b) as vaguely implying that which would have been expressly commanded by inclusion of Section 165(a) in the enumeration of the immediately preceding sentence is to impute to Congress a Kafkaesque obscurantism.[41] Further, the origin of the curious second sentence of Section 168(b), which will be explicated below, reveals that a much more limited role was envisioned for that provision.[42]
 
 
 174
 To sum up, until new state implementation plans go into effect, Section 168, on its face at least, requires, not merely permits, preexisting federal regulations for the prevention of significant deterioration in the air quality of attainment areas of the country to remain in effect except as they are specifically amended by the provisions of the 1977 Amendments listed in Section 168(b), and Section 165(a) is not one of those provisions.
 
 B. Section 165
 
 175
 The linchpin of the Environmental Groups' position is the introductory clause of Section 165(a).[43] It provides that "(n)o major emitting facility on which construction is commenced after the date of the enactment of this part, may be constructed in any area to which this part applies unless . . ."[44] the requirements spelled out in the remainder of Section 165(a) are met. Read in light of the definition of "commenced" set out in Section 169(2)(A),[45] this portion of Section 165(a) seems clear enough at first blush: contrary to Section 168, existing PSD regulations should not remain in force pending adoption of implementation plans in conformance with the 1977 Amendments.
 
 
 176
 Upon closer examination, however, even the introductory language of Section 165(a) is not completely free from ambiguity. Preconstruction review and permitting of major emitting facilities is expressly required only in areas "In which this part applies."[46] "(T)his part" means Part C of Title I of the Clean Air Act.[47] The statute does not specify the areas in which Part C applies the attainment areas. It does, however, establish a procedure for determining the "clean air" regions of the Nation.
 
 
 177
 Section 161 requires state implementation plans to include such measures "as may be necessary . . . to prevent significant deterioration of air quality in each region (or portion thereof) identified pursuant to section 107(d)(1)(D) or (E)."[48] Section 107(d)(1)[49] commands each state to submit to EPA within 120 days of enactment of the 1977 Amendments a list of those portions of the state that do not meet a national ambient air quality standard, and a list of both those that meet all such standards and those which, for lack of sufficient information, cannot be classified and therefore are deemed clean air areas. Section 107(d)(2)[50] directs EPA within the next 60 days to review these submissions and to promulgate them with such modifications as considered necessary. EPA published its list of clean air areas on March 3, 1978,[51] almost seven months after enactment of the 1977 Act. Thus, the introductory clause of Section 165(a) itself suggests that review and permitting pursuant to that section's standards could not have been carried out immediately upon enactment.
 
 
 178
 The Environmental Groups and the court respond to this interpretation of Section 165(a) by asserting that the phrase in question "was intended solely to define the geographic scope of the section's application and not to postpone its effective date."[52] For one thing, the court says, " § 163(b) of the Act, like § 165, applies by its terms to designated 'clean air' areas, and yet Congress directed specifically in § 168(b) that § 163(b) was to take effect on 7 August 1977."[53] This example, it seems to me, is not dispositive. The increments and ceilings established by Section 163(b)[54] apply in "any" class I, II or III area[55] regions ultimately to be designated pursuant to the procedures of Section 107(d).[56] However, Section 168(b) amended existing regulations only to the extent that they were "inconsistent with the requirements"[57] of Section 163(b). EPA's preexisting PSD regulations designated Class I, II and III[58] areas and those designations are consistent with Section 163(b) until the job of redesignation pursuant to Section 107(d) is completed. In other words, the new increments of Section 163(b) replaced EPA's standards but EPA's designation of clean air areas remains in force until modified pursuant to Section 107(d). Section 165, on the other hand, is not mentioned in Section 168(b), so the requirements of Section 165 simply replace the old preconstruction review and permitting regulations, which were applicable in all areas of the country.[59]
 
 
 179
 As a further ground for rejecting the idea that the designation of attainment areas must precede application of Section 165(a), the court points again to "the immediately preceding phrase, which provides that no nonconforming facility may be constructed 195 U.S.App.D.C. 84 constructed After 7 August 1977,"[60] and expresses reluctance to find inconsistency within a single subsection.[61] I see no necessary inconsistency. Even if the clause proscribing construction of nonconforming plants after August 7, 1977 was intended to be read in the natural way adopted by the court, there is no unavoidable conflict with the view that Congress contemplated that designation of clean air areas would precede the review specified in Section 165(a). Rather, the upshot of the court's construction might just as well be that Congress intended a moratorium on construction of major emitting facilities until such time as attainment areas had been designated.
 
 
 180
 Other provisions of Section 165 buttress the conclusion that the preconstruction review and permitting process spelled out in that section could not have been implemented on August 7, 1977. Section 165(e)(1) is perhaps the clearest on this score:
 
 
 181
 The review provided for in subsection (a) of this section shall be preceded by an analysis in accordance with regulations of the Administrator, promulgated under this subsection, which may be conducted by the State (or any general purpose unit of local government) or by the major emitting facility applying for such permit, of the ambient air quality at the proposed site and in areas which may be affected by emissions from such facility for each pollutant subject to regulation under this chapter which will be emitted from such facility.[62]
 
 
 182
 Section 165(e)(1) unmistakably requires air quality analyses, conducted pursuant to federal regulations, to precede permitting under Section 165(a), and both promulgation of the regulations and production of the analyses take time.[63] The court perceives "no reason why the effective date in § 165(e) should control the effective date provided in § 165(a)."[64] That position, in my view, is defensible only if, again, the proscription of Section 165(a) was intended to flatly ban new construction until the Act's new mechanisms are geared up.
 
 
 183
 In sum, although Section 165(a)'s apparent prohibition of construction of major emitting facilities whose owners or operators failed to make the demonstration called for in that section could have been invoked on August 7, 1977, the showing required for approval could not conceivably have been made until considerably later. This naturally leads to two questions: Did Congress think that the national interest in preservation of our clean air areas warranted imposition of a moratorium on construction of major emitting facilities until the more stringent requirements of the 1977 Amendments could be met? If not, and if Congress intended the prior preconstruction review and permitting regulations to apply to facilities on which construction was "commenced"[65] prior to implementation of the procedures and standards specified in the 1977 Act, what explains the phrase in Section 165(a) that seemingly provides that no facility that does not meet the new requirements may be constructed after August 7, 1977? To explore these issues, I next delve into the legislative history of Sections 165 and 168.
 
 II. THE LEGISLATIVE HISTORY
 
 184
 As the court underscores,[66] Section 165 was basically derived from a Senate bill, S. 252,[67] while Section 168 evolved from a House bill, H.R. 6161.[68] An understanding of what those bills originally provided, and how they were modified in conference, is crucial to excavation of Congress' purpose.
 
 A. The Senate Bill
 
 185
 Section 5(a) of S. 252 would have required the states to submit revised implementation plans incorporating the new PSD standards within seven months after enactment.[69] Several provisions must be consulted to divine the Senate's approach to the period before submission of the state plans.
 
 
 186
 Section 6 of S. 252, the predecessor of Section 165(a), would have added a new subsection (g)(4) to Section 110 of the Clean Air Act.[70] The introductory clause of proposed Section 110(g)(4) specified that "(n)o major emitting facility on which construction is commenced after June 1, 1975, may be constructed in any area designated under this subsection . . ."[71] unless certain requirements were met. Congress did not conjure the June 1, 1975, date out of thin air. On the contrary, in passing Part C of Title I of the Clean Air Act, Congress was essentially codifying, revising and strengthening EPA's PSD regulations,[72] promulgated in 1974 and 1975 pursuant to court order.[73] These regulations provided for preconstruction review only of projects which had "not commenced construction or modification prior to June 1, 1975."[74] "Commenced" was defined to mean "that an owner or operator has undertaken a continuous program of construction or modification or that an owner or operator has entered into a contractual obligation to undertake and complete, within a reasonable time, a continuous program of construction or modification."[75]
 
 
 187
 The Senate was disturbed by the looseness of EPA's definition of "commenced." The Senate Report expressed the belief that "it is appropriate to require review of facilities which have not actually begun construction or so changed their position as to risk substantial loss if the project is canceled or modified."[76] Accordingly, Section 6[77] of the Senate bill adopted substantially the definition of "commenced" ultimately enacted in Section 169(2)(A).[78] The Senate bill thus narrowed EPA's definition of "commenced" so as to capture within the statute proposed facilities for which permits had been obtained and contracts let, provided the owner's obligations could be altered without substantial loss. It did not, however, seek to apply the Act's standards to facilities "commenced" as defined in the new, stricter way prior to enactment of the 1977 amendments. Following its new definition of "commenced," S. 252 stated:
 
 
 188
 Provided, That in the case of a facility on which construction was commenced in accordance 195 U.S.App.D.C. 86 acccordance with this definition after June 1, 1975, and prior to the enactment of the Clean Air Amendments of 1977, the review and permitting of such facility shall be in accordance with the regulations for the prevention of significant deterioration in effect prior to the enactment of the Clean Air Amendments of 1977.[79]
 
 
 189
 Neither the introductory clause of proposed Section 110(g)(4) nor the definition of "commenced" was designed to establish which standard of preconstruction review governed sources on which construction is commenced after enactment but before submission and approval of revised state implementation plans. That task was assigned to proposed Section 110(g)(7)(A), which read:
 
 
 190
 Until a revision of the implementation plan in accordance with this subsection is submitted and approved, significant deterioration for those pollutants covered by such regulations shall be regulated pursuant to applicable regulations and procedures for prevention of significant deterioration established under authority of the Clean Air Act in effect prior to the enactment of the Clean Air Amendments of 1977, except as those regulations provide for designations of nondeterioration areas which allow increases in emissions of air pollutants or any reduction in air quality inconsistent with paragraph (1) and (2) of this subsection, or do not require the degree of control required by paragraph (6)(A) of this subsection, or are otherwise inconsistent with the requirements of this subsection.[80]
 
 
 191
 This provision's stated exceptions largely swallowed its rule. Preexisting regulations were continued in order to avoid any regulatory hiatus, but those regulations inconsistent with the new statutory PSD requirements were superseded.
 
 
 192
 In summary, the Senate bill did through proposed Section 110(g)(7)(A) what the Environmental Groups suggest was done by the introductory clause of Section 165(a), but the Senate did not assign that role to the latter. The introductory clause of what was to become Section 165(a), in conjunction with the definition of "commenced" and its proviso, was concerned with extension of preconstruction review and permitting requirements to owners and operators who could comply with the PSD[81] standards before beginning construction without incurring substantial economic loss or liability by breaching construction contracts.
 
 B. The House Bill
 
 193
 The House bill, H.R. 6161,[82] afforded the states a longer time to submit revised implementation plans than did the Senate bill. Section 119 of H.R. 6161 gave the states a minimum of one year to develop their plans.[83] Section 108(a) of H.R. 6161 specified the rule of law to apply during the interim.[84] It would have added Section 160(h) to the Clean Air Act, to read as follows:
 
 
 194
 (1) Until such time as an applicable implementation plan is in effect for any area which plan meets the requirements of this section to prevent significant deterioration of air quality with respect to any air pollutant, applicable regulations under this Act in effect prior to enactment of this section shall remain in effect to prevent significant deterioration of air quality in any such area for any such pollutant, except as otherwise provided in paragraph (2) of this subsection.
 
 
 195
 (2) If any regulation in effect prior to enactment of this section to prevent significant deterioration of air quality would be inconsistent with the requirements of subsection (c)(2) and (c)(3)(B), then such regulations shall be deemed amended so as to conform with such requirements.[85]
 
 
 196
 The House Report contained a section captioned "Safeguards against moratorium on growth."[86] In one passage in this section, the Committee explained the rationale of proposed Section 160(h):
 
 
 197
 Sixth, the committee has included additional safeguards in the section regarding economic development. These include: . . .
 
 
 198
 (5) No temporary lapse of ongoing programs during the time necessary to propose and promulgate new regulations under the section; existing regulations (as amended by this section) will remain in effect until such new regulations are in effect.[87]
 
 
 199
 Simply put, enactment of the House bill would have explicitly resolved the controversy at bar in favor of the Industry Groups' position: There would be no moratorium on permitting of new facilities; pending submission of new state implementation plans, existing regulations would govern.
 
 C. Conference Decisions
 
 200
 The pertinent decisions of the Conference Committee can be simply sketched. Determining their significance, however, is fraught with some uncertainty.
 
 
 201
 First, and perhaps foremost, the Committee agreed to adopt substantially the transitional approach embodied in proposed Section 160(h) of the House bill.[88] Section 168 of the enacted legislation[89] differs in just two ways from proposed Section 160(h). For one thing, the two provisions deemed immediately effective in Section 160(h) were recast as three such provisions in Section 168(b), but this was a change in nomenclature, not substance.[90] For another, the proviso to the definition of "commenced" found in the Senate bill[91] was framed in sentence form and tacked behind the specified exceptions to the rule that preexisting PSD regulations are to govern pending submission and approval of revised implementation plans.[92] It will be recalled that the proviso's sole function was to avoid unfair retroactive application of the new preconstruction review and permitting standards.[93] Consequently, although the Conference Committee's inclusion of that provision in Section 168(b) still seems curious, the negative-implication argument discussed above[94] is unpersuasive.
 
 
 202
 Second, the Committee adopted the substance of proposed Section 110(g)(4)[95] of the Senate bill and recast it as Section 165(a).[96] It also adopted the Senate's definition of "commenced."[97] The Senate version was not appropriated without relevant modification, however. The Senate bill, it will be remembered, narrowed the definition of "commenced" found in EPA's regulations, and accordingly expanded the reach of the preconstruction review and permitting requirements.[98] Proposed Section 110(g)(4) of S. 252 imposed the new standards on all major emitting facilities on which construction had not started by June 1, 1975,[99] and then in a proviso stipulated that facilities on which construction began after June 1, 1975, but before enactment of the 1977 amendments would be governed by the preexisting regulations.[100] The Conference Committee changed the June 1, 1975, date to the date of enactment of the Act,[101] thus allowing those facilities under construction on June 1, 1975 by EPA's definition of "commenced," even though not under the new definition to remain exempt from all preconstruction review and permitting strictures.
 
 
 203
 Third, the Conference Committee failed to adopt the Senate's proposed Section 110(g)(7)(A),[102] the transitional provisional mandating application of the new preconstruction review standards to facilities on which construction is commenced after enactment but before applicable revised implementation plans are in force.
 
 
 204
 Without suggesting that these actions evidence unmistakably a consistent congressional intent, I do think the Conference Committee's decisions can fairly be taken to reflect approbation of the House approach to preconstruction review during the period state implementation plans are being developed. In the first place, the House's specific response to this issue was adopted.[103] The House Report had emphasized the importance of this provision in avoiding severe economic disruption,[104] and it seems difficult to believe that although the provision was ratified its rationale was not. Secondly, the Senate's explicit interim measure was rejected.[105] Lastly, the introductory clause of Section 165(a) was primarily concerned with setting the effective date for application of the statute's new definition of "commenced," not with setting the date for application of the new PSD standards or with imposing a moratorium on new construction.[106] In sum, the Conference Committee, it seems to me, opted for an orderly transition to the new preconstruction review and permitting standards with a minimum of economic dislocation. It decided to continue the existing PSD regulations in effect until the states could submit and garner endorsement of revised implementation plans.[107]III. CONCLUSION
 
 
 205
 This is by no means the first time a court has been summoned to construe arguably inconsistent provisions of a single law. The court's acceptance of the superficial conflict here and its administrative solution may be unprecedented, however. The traditional judicial response to such a situation is aptly illustrated by the Supreme Court's decision in Clark v. Uebersee Finanz-Korp.[108] In that case, the Court was called upon to construe Sections 5(b) and 9(a) of the Trading with the Enemy Act,[109] as amended by the First War Powers Act of 1941.[110] Section 5(b) granted the President the power to seize "any property or interest (subject to the jurisdiction of the United States) of Any foreign country or national thereof."[111] Section 9(a), on the other hand, permitted "any person not an enemy or ally of enemy"[112] to sue for reclamation of appropriated property. Despite the broad language of Section 5(b), the Court declined to hold that a non-enemy foreign national whose seized property was never owned or controlled by an enemy had no remedy under Section 9(a).[113] The Court explained its approach in language from which I take my cue today: "We are dealing with hasty legislation which Congress did not stop to perfect as an integrated whole. Our task is to give all of it . . . the most harmonious, comprehensive meaning possible."[114]
 
 
 206
 Undoubtedly, Congress could enact flatly inconsistent provisions, each of which would simply cancel the other out. And it is conceivable that Congress could simply say in one breath that a particular statutory provision is immediately effective and in the next say that its effectiveness is subject to conditions precedent, the fulfillment of which requires time. Were this all that Congress did in enacting the Clean Air Act Amendments of 1977, I might join in the court's opinion. But, in my view, the Act's structure and history enable a reconciliation of the apparent conflict between Sections 165(a) and 168.[115] I would hold that EPA's preexisting PSD regulations, as amended by Section 168(b), govern the preconstruction review and permitting of pollution sources on which construction is commenced after August 7, 1977, but before revision and approval of applicable state implementation plans, and consequently would reach no other issue in the case. Accordingly, I respectfully dissent.
 
 
 
 [1]
 Pub.L. No. 88-206, 77 Stat. 392 (17 Dec. 1963), as amended, 42 U.S.C.A. §§ 7401-7642 (1978)
 
 
 [2]
 Clean Air Act Amendments of 1977, Pub.L. No. 95-95, 91 Stat. 685 (7 August 1977)
 
 
 [3]
 Clean Air Act § 101(b)(1), 42 U.S.C.A. § 7401(b)(1) (1978)
 
 
 [4]
 For discussion of the pattern of federal-state cooperation in environmental regulation prescribed by the Clean Air Act prior to the 1977 Amendments, see Train v. Natural Resources Defense Council, Inc., et al., 421 U.S. 60, 63-68, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975); Sierra Club v. Environmental Protection Agency, 176 U.S.App.D.C. 335, 340-41, 540 F.2d 1114, 1119-20 & n.1 (1976), Cert. denied, 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977)
 
 
 [5]
 See Clean Air Act, Title I, Part C, §§ 160-169A, 42 U.S.C.A. §§ 7470-91 (1978). Section 110 of the Act, 42 U.S.C.A. § 7410 (1978), provides generally for the submission of state implementation plans for approval by EPA in accord with federal air pollution standards set forth in sections 160-169A and elsewhere in the Act. Under § 110(c), 42 U.S.C.A. § 7410(c) (1978), EPA is to suspend a state plan and implement a plan of its own only if a state plan fails to meet minimum federal standards or is not submitted for approval within the requisite period of time
 
 
 [6]
 See 40 C.F.R. § 52.21 (1977). These regulations were first promulgated by EPA on 5 December 1974, See 39 Fed.Reg. 42509 (1974), with various revisions promulgated in 1975, See, e.g., 40 Fed.Reg. 2802, 25004 & 42011 (1975)
 
 
 [7]
 These regulations were generally sustained in earlier proceedings before this court as consistent with authority conferred on the EPA in the Act to improve the nation's air quality. See Sierra Club v. Environmental Protection Agency, supra. The Supreme Court granted petitions for certiorari on two issues raised by petitioners in that case. See Montana Power Company v. EPA, 430 U.S. 953, 97 S.Ct. 1597, 51 L.Ed.2d 802 (1977). After passage of the 1977 Amendments, however, the Supreme Court vacated this court's decision upholding the promulgation and remanded the case for reconsideration in light of the 1977 Amendments. See Montana Power Co. v. EPA, 434 U.S. 809, 98 S.Ct. 40, 54 L.Ed.2d 66 (1977). This court, on 9 November 1977, remanded the case to EPA for reconsideration. Sierra Club v. EPA, No. 74-2063 (D.C. Cir., 9 Nov. 1977) (remand order). See also Sierra Club v. Ruckelshaus, 344 F.Supp. 253 (D.D.C.1972), Aff'd per curiam, 4 ERC 1815 (D.C. Cir. 1972), Aff'd by an equally divided Court, Sub nom. Fri v. Sierra Club, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973) (in light of underlying purpose of Act, EPA obliged to disapprove any state plan not including measure to prevent significant deterioration of air quality in clean air areas)
 
 
 [8]
 See Sierra Club v. Environmental Protection Agency, supra, 176 U.S.App.D.C. at 342-44, 540 F.2d at 1121-23 (detailed discussion of regulations for prevention of significant deterioration of air quality promulgated pursuant to Clean Air Act prior to 1977 Amendments); 42 Fed.Reg. 57479 (3 November 1977) & 43 Fed.Reg. 26380 & 26388 (19 June 1978) (review of EPA's PSD regulations effective prior to 1977 Amendments and of changes effected by those Amendments). Compare the requirements of Clean Air Act §§ 162, 163, and 165, 42 U.S.C.A. §§ 7472, 7473, and 7475, With 40 C.F.R. 52.21 (1977). For example, § 165 of the Act, as amended on 7 August 1977, tightens the preconstruction review requirements in EPA's preexisting PSD regulations by requiring a case-by-case determination of whether the "best available technology" to control an enlarged number of pollutants subject to regulation under the Act will be employed in each proposed facility, and requires public hearings rather than opportunity for public comment alone with regard to each facility. See Clean Air Act § 165; 40 C.F.R. § 52.21(d) & (e) (1977)
 
 
 [9]
 See note 5 Supra (role of federal Government in overseeing and approving state plans under Act as amended). As stressed by industry intervenors in this case, the Act as amended makes clear that the "primary responsibility for assuring air quality within the entire geographic area comprising . . . (each) State" is to rest with the state rather than the federal Government. See Clean Air Act § 107(a), 42 U.S.C.A. § 7407(a) (1978). Cf. Clean Air Act § 101(a)(3), 42 U.S.C.A. § 7401(a)(3) (1978) (congressional finding that "the prevention and control of air pollution at its source is the primary responsibility of States and local governments"). The Act nevertheless does provide for an aggressive federal role in rescinding or modifying a state plan in the case of a breach by the state of federally-mandated air pollution standards and implementation plan procedures. See Clean Air Act § 110(c), 42 U.S.C.A. § 7410(c) (1978)
 
 
 [10]
 The term "major emitting facility" is defined in § 169(1) of the Clean Air Act, 42 U.S.C.A. § 7479(1) (1978), to include 28 categories of pollution sources, including fossil-fuel fired steam electric plants, pulp mills, and iron and steel mill plants that "emit, or have the potential to emit, one hundred tons per year or more of any air pollutant . . . ." Under EPA's regulations in effect prior to the 1977 Amendments, only 19 categories of sources were subject to PSD requirements. See 40 C.F.R. § 52.21 (1977)
 
 
 [11]
 For those new PSD requirements set forth in the 1977 Amendments that are not "self-executing" and therefore immediately effective as of the date of enactment of the Amendments, on 7 August 1977, a state need not submit an implementation plan that incorporates those requirements before nine months after the promulgation of any regulation necessary for the approval of such revision. See Clean Air Act Amendments § 406(d)(2), 42 U.S.C.A. § 7401 nt (1978). Therefore, to incorporate the new PSD requirements other than those set forth in §§ 162(a), 163(b), and 164(a) of the Act (42 U.S.C. §§ 7472(a), 7473(b), and 7474(a) (1978)), which according to § 168(b) of the Act are to be of immediate effect, and also in the case of the requirements of § 165 at issue in this case, a state need submit a revised implementation plan no earlier than nine months after the issuance of EPA's revised PSD regulations on 19 June 1978, See 43 Fed.Reg. 26380-26410 (1978) or thus by 19 March 1979. The period between the enactment of the Amendments on 7 August 1977 and 19 March 1979 may be referred to as the "interim period," during which pre-existing PSD regulations (as revised by those new federal regulations of immediate effect and the regulations affirmed in this case) and the state plans that implement those regulations are to remain in effect. See Clean Air Act § 168, 42 U.S.C.A. § 7478 (1978)
 
 
 [12]
 42 U.S.C.A. § 7475 (1978) (emphasis added)
 
 
 [13]
 Clean Air Act § 169(2)(A), 42 U.S.C.A. § 7479(2)(A) (1978), provides that a facility has "commenced" construction only after its operator or owner has obtained all necessary preconstruction approvals or permits required under governmental air pollution laws or regulations and has either begun a "continuous program of physical on-site construction" or "entered into binding agreements . . . to undertake a program of construction . . . to be completed within a reasonable time." This definition replaces the less strict definition of "commenced" in pre-existing federal PSD regulations. See 40 C.F.R. § 52.21(b)(7) (1977)
 
 
 [14]
 Clean Air Act §§ 160-169A, 42 U.S.C.A. §§ 7470-91 (1978). This Part establishes new federal standards for the prevention of significant deterioration (PSD) of air quality
 
 
 [15]
 42 U.S.C.A. § 7475(a)(5)-(a)(8) (1978)
 
 
 [16]
 42 U.S.C.A. § 7478 (1978) (emphasis added)
 
 
 [17]
 See, e.g., p. --- of 195 U.S.App.D.C., p. 859 of 600 F.2d & note 54 Infra (allegation that up to 100 major facilities commencing construction after 7 August 1977 would have become subject to review under § 165 if that section had been enforced as of that date)
 
 
 [18]
 See Brief for Respondents and Appellees, the Environmental Protection Agency Et al., at 12 (hereinafter cited as EPA Brief)
 
 
 [19]
 See Memorandum from David G. Hawkins, EPA Assistant Administrator for Air and Waste Management, to Douglas Costle, EPA Administrator, Reprinted in App. vol. II at 617-18 (memorandum dated 4 October 1977) (§ 165 omitted from list in § 168(b) because of "oversight by Congressional staff caused by renumbering of sections during the last minute drafting process"; technical amendment to be drafted by Committee staff to rectify omission)
 
 
 [20]
 See Memorandum from David G. Hawkins and Marvin Durning, EPA Assistant Administrators, to EPA Regional Administrators, Reprinted in App. vol. I at 82-86 (memorandum dated 6 October 1977) (EPA had determined that "the failure to reference Section 165 (in Section 168) is not controlling and that Section 165 (up to subsection (e)) was intended to be effective upon enactment.")
 
 
 [21]
 See 123 Cong.Rec. S18372 (daily ed. 1 Nov. 1977), Reprinted in Legisl.Hist.App. at 3, 4 (Statement of Senator Muskie, Senate sponsor of Clean Air Act Amendments of 1977) ("I believe the October 6th Hawkins memo is the correct interpretation (of §§ 165 and 168) . . .") (hereinafter cited as Muskie Statement); 123 Cong.Rec. H11958 (daily ed. 1 Nov. 1977), Reprinted in Legisl.Hist.App. at 8 (statement of Representative Rogers, House sponsor of Clean Air Act Amendments of 1977) (". . . (T)he terms of section 165 clearly seem to me to require case-by-case . . . (preconstruction) review as of August 7, 1977, and . . . I believe that to be the intent of the conferees . . . .") (hereinafter cited as Rogers Statement)
 
 
 [22]
 See Letter from Sen. Dale Bumpers to Douglas Costle, EPA Administrator, Reprinted in App. vol. II at 620-21 (letter dated 14 October 1977) (". . . (I)t seems to me clear from the face of . . . (Section 168) that Section 165 is not to be implemented immediately"; immediate implementation could obstruct construction of new utility in Arkansas and cause higher utility rates); Letter from Representatives David L. Cornwell, Jim Wright, Lee H. Hamilton, Romano L. Mazzoli, and Bob Gammage to Barbara Blum, EPA Deputy Administrator, Reprinted in App. vol. II at 640-42 (letter dated 19 October 1977) (immediate implementation of § 165 would cause "unnecessary and costly delays to facilities" and layoffs of workers in Indiana, Arkansas, and Texas); Letter from Senators John L. McClellan, Birch Bayh, Dale Bumpers, Lloyd Bentsen, Wendell H. Ford, Walter D. Huddleston, John Tower, and Richard G. Lugar to Barbara Blum, EPA Deputy Administrator, Reprinted in App. vol. II at 643-45 (letter dated 19 October 1977) (fearing "costly delays" to new facilities from § 165); Letter from Sen. James A. McClure to Douglas Costle, EPA Administrator, Reprinted in App. vol. II at 646 (letter dated 24 October 1977) ("Only the specific provisions enumerated in Section 168(b) were intended to be immediately applicable.")
 
 
 [23]
 See Pub.L. No. 95-190, § 14(a), 91 Stat. 1399. In introducing these amendments, Senator Muskie noted that "The Clean Air Act Amendments of 1977 were passed by Congress August 4 immediately prior to the August recess. Because of the rush to produce this legislation prior to the date the automobile companies would begin to produce model 1978 cars, there was little time for the detailed proofreading that usually accompanies the production of a conference report. As a result, there are a number of . . . errors . . . technical problems . . . (and) ambiguous language that should be clarified." See Muskie Statement, Supra note 21
 
 
 [24]
 See Muskie Statement, Supra note 21 ("It is not the purpose of these amendments to re-open substantive issues in the Clean Air Act. . . . Those issues that were not settled by the 1977 amendments remain unsettled. . . . An example of the kind of substantive amendments that have been rejected and have not been included in this package . . . (is that of the effective date for the provisions of § 165).")
 
 
 [25]
 See id
 
 
 [26]
 See Memorandum from David G. Hawkins, EPA Assistant Administrator, to Barbara Blum, EPA Acting Administrator, Reprinted in App. vol. II at 631-32 (memorandum dated 18 October 1977) (urging reversal of earlier EPA conclusion that § 165 should be implemented immediately, because of failure of congressional committees to propose clarifying amendments and likely operation of § 165 against "some significant (pollution) sources which are ready now to receive permits and begin construction"; two-to-three-month deferral of enforcement of § 165 would be an "acceptable compromise")
 
 
 [27]
 See Memorandum from David G. Hawkins and Marvin Durning, EPA Assistant Administrators, to EPA Regional Administrators, Reprinted in App. vol. I at 87-88 (memorandum dated 27 October 1977) (new interpretation reached "(u)pon consideration of the potentially disruptive effects of giving Section 165 immediate effect" and because initial interpretation of § 165 was "based on assurances that . . . a technical amendment would be adopted to remove any uncertainty," but that "(i)t now appears that no technical amendment will be offered on this subject.")
 
 
 [28]
 See 42 Fed.Reg. 57459 (3 November 1977) ("unnecessary and impracticable" to propose that the changes mandated by § 168 be opened to public comment before becoming "administratively final," though comments to be considered; only sections to be automatically incorporated into regulations are 162(a), 163(b), and 164(a), as specified in § 168(b)). Though this regulation makes no direct reference to § 165, EPA later construed this regulation, along with two others published the same day, See 42 Fed.Reg. 57471 & 57479 (3 November 1977), to constitute (for purposes of judicial review) its "final decision" not to implement § 165, thus setting that section apart from the several sections specified in § 168(b) as effective immediately on 7 August 1977. See EPA Brief at 18; 43 Fed.Reg. 26389 (19 June 1978)
 
 
 [29]
 See 42 Fed.Reg. 57471 (3 November 1977) (proposing guidelines to states on steps to take in revising state implementation plans); 42 Fed.Reg. 57479 (3 November 1977) (proposing incorporation of standards of § 165 into federal PSD requirements)
 
 
 [30]
 See 42 Fed.Reg. 57479 (3 November 1977). EPA further demonstrated its understanding of the "drafting inconsistencies" between sections 165 and 168 by pointing out that "EPA has chosen not to make Section 165 effective immediately upon enactment because it is not one of the Sections specified in Section 168 . . . . There is a substantial legal argument, however, that Section 165(a) was intended to be immediately effective because it applies by its terms to sources which commence construction 'after the date of enactment' of the 1977 Amendments." See id
 
 
 [31]
 1 December 1978 was selected because on that date, assuming EPA's regulations would be published in final form on 1 March 1978, revised state implementation plans were scheduled to be "due." See Clean Air Act Amendments § 406(d), 42 U.S.C.A. § 7401 nt (1978) (states to submit revised implementation plans to EPA before the later of: one year after 7 August 1977, or nine months after date of promulgation by EPA of any regulations necessary for approval of such plan revision)
 
 
 [32]
 42 U.S.C.A. § 7601(a)(1) (1978)
 
 
 [33]
 See Citizens to Save Spencer County v. EPA, No. 78-1002 (filed on 3 Jan. 1978)
 
 
 [34]
 See Petition to Review in No. 78-1002, Citizens to Save Spencer County
 
 
 [35]
 See Clean Air Act § 307(b)(1), 42 U.S.C. § 7607(b)(1) (1978)
 
 
 [36]
 See EPA's "Motion to Dismiss" in No. 78-1002 (filed on 15 Feb. 1978). This jurisdictional objection is inconsistent with EPA's present position that the Federal Register notices of 3 November 1977 constitute such "final action." See, e. g., EPA Brief, supra, at 66
 
 
 [37]
 See Order of 28 March 1978 in No. 78-1002
 
 
 [38]
 EDF et al. v. Costle et al., No. 78-0281 (D.D.C., petition filed 17 Feb. 1978); petition of EDF Reprinted in App. vol. I at 66
 
 
 [39]
 Accepting a jurisdictional argument of EPA that was inconsistent with EPA's argument before this court in the action brought by Citizens to Save Spencer County, No. 78-1002, See p. ---- of 195 U.S.App.D.C., p. 857 of 600 F.2d & note 33 Supra, the trial court stated that EPA in its public notices of 3 November 1977 had "taken a final action as to . . . whether § 165 was to be immediately effective" and that "(a)s such, review of this action rests exclusively in the jurisdiction of the Court of Appeals of this Circuit under (Clean Air Act) § 307(b)(1) (42 U.S.C. § 7607(b)(1))." See EDF et al. v. Costle et al., 448 F.Supp. 89 (1978)
 
 
 [40]
 See id. at 94
 
 
 [41]
 See Order of 27 April 1978 in No. 78-1239 (D.C.Cir.)
 
 
 [42]
 The date of 1 March 1978 was selected because it followed by approximately 60 days the intended date of closure for the 60-day period of public comment on 3 January 1978. See 42 Fed.Reg. 57471 & 57479 (3 November 1977)
 
 
 [43]
 42 Fed.Reg. 64378 (23 December 1977). EPA also noted that "The requests (for an extension in the comment period) have generally been based upon the need for more time to address the numerous, highly significant, and sometimes complex issues involved," and that the publication delay was justified because "EPA's intent is to publish the rules in final form as quickly as possible, but only after considering and weighing relevant public comments." Id
 
 
 [44]
 See id
 
 
 [45]
 43 Fed.Reg. 9529 (8 March 1978)
 
 
 [46]
 See briefs filed in Nos. 78-1331 & 78-1626, The Northern Cheyenne Tribe v. Environmental Protection Agency (Montana Power Company, et al., and Pittston Company, intervenors), consolidated with the present action
 
 
 [47]
 See 43 Fed.Reg. 26380 & 26388 (19 June 1978)
 
 
 [48]
 See 43 Fed.Reg. 26388, 26390 (19 June 1978)
 
 
 [49]
 See note 31 Supra (deadline of nine months following promulgation of necessary regulations)
 The effect on applicant facilities of EPA's dual-deadline process was clarified in a further EPA notice of 8 December 1977. See 42 Fed.Reg. 62020-21 (1977). See also 43 Fed.Reg. 26390-91 (19 June 1978) (further justification in final rule for bifurcated deadline).
 
 
 [50]
 EPA's thoroughgoing defense at this stage may perhaps be explained by the fact that by 19 June 1978, when the final rules were issued, EPA's approach to the PSD issue was already locked in struggle in the courts. See pp. --- - --- of 195 U.S.App.D.C., p. 857 of 600 F.2d & notes 33-41 Supra
 
 
 [51]
 43 Fed.Reg. 26389-90 (19 June 1978)
 
 
 [52]
 Id. at 26391
 
 
 [53]
 Industry Groups have alleged that projects costing "billions of dollars" will be affected by the present dispute, and that delays caused by implementation of § 165 as of 7 August 1977 would have resulted in "millions of dollars of losses due to the idling of men and equipment." See Brief of 31 August 1978 for Petitioners B. F. Goodrich Co., Et al., at 24 (hereinafter cited as Industry Petitioners' Brief of 31 August 1978). See also id. at 24-39 (detailing specific projects affected)
 
 
 [54]
 See Brief of 13 June 1978 for Petitioners Citizens to Save Spencer County, Et al. at 5 (hereinafter cited as Petitioners' Brief of 13 June 1978); App. vol. I at 89-91 (appellants' calculation of number of facilities exempted from § 165 by EPA delay in enforcement). This decision not to enforce § 165 as of 7 August 1977 also has been alleged to have the effect of allowing production of "substantially greater emissions of sulfur dioxide, particulates and other pollutants than would otherwise have been permitted if Section 165(a) had been applied to these facilities." See Petitioners' Brief of 13 June 1978, Supra, at 5
 
 
 [55]
 Clean Air Act §§ 160-169A, 42 U.S.C.A. §§ 7470-91 (1978)
 
 
 [56]
 42 U.S.C.A. § 7475 (1978)
 
 
 [57]
 42 U.S.C.A. § 7478 (1978)
 
 
 [58]
 See note 31 Supra
 
 
 [59]
 The industry of counsel, at least, is suggested by the fact that fourteen separate briefs totalling some 1175 pages have been filed on the appellate level alone in this case, as well as five volumes of appendices containing supplementary information and legislative history of 2072 pages
 
 
 [60]
 See, e. g., Petitioners' Brief of 13 June 1978, Supra, at 24d, 65-66
 
 
 [61]
 See, e. g., Reply Brief of 6 October 1978 for Petitioners B. F. Goodrich Co., Et al. at 6 (hereinafter cited as Industry Reply Brief of 6 October 1978)
 
 
 [62]
 42 U.S.C.A. § 7401 nt (1978)
 
 
 [63]
 42 U.S.C.A. § 7478 (1978)
 
 
 [64]
 42 U.S.C.A. §§ 7470-91 (1978)
 
 
 [65]
 See Industry Reply Brief of 6 October 1978, Supra, at 30-31
 
 
 [66]
 42 U.S.C.A. § 7475(a)(1)-(a)(8) (1978)
 
 
 [67]
 See Brief of 25 September 1978 of Intervenor-Respondents Environmental Defense Fund Et al. at 42
 
 
 [68]
 See Industry Reply Brief of 6 October 1978, Supra, at 15
 
 
 [69]
 See, e. g., id. at 6
 
 
 [70]
 See, e. g., Industry Petitioners' Brief of 31 August 1978, Supra, at 42-44, 61-62
 
 
 [71]
 42 U.S.C.A. § 7407(d)(1) (1978)
 
 
 [72]
 42 U.S.C.A. § 7473(b)(1) (1978)
 
 
 [73]
 42 U.S.C.A. § 7475(e)(1) & (e)(2) (1978)
 
 
 [74]
 See Petitioners' Brief of 13 June 1978, Supra, at 56-59
 
 
 [75]
 See, e. g., Brief of 31 August 1978 for Intervenor/Respondents and Industry Amici Curiae at 46-49 (hereinafter cited as Industry Intervenors' Brief of 31 August 1978). Industry Groups cite especially § 127(b) of the Clean Air Act Amendments of 1977, 42 U.S.C.A. § 7479 nt (1978), which requires EPA to study, and, within one year of the Amendments' enactment (I. e., by 7 August 1978), to report to Congress on the "consequences" of regulating the "major emitting facilities" that would not become subject to PSD regulation until § 165 is implemented. Industry Groups argue that this provision "seems to assume a transition period during which Congress will be able to determine the probable impact" of its new regulations and to revise those regulations if necessary before their implementation through state plans. See Industry Intervenors' Brief of 31 August 1978, Supra, at 48
 
 
 [76]
 42 U.S.C.A. § 7475(a)(2) (1978)
 
 
 [77]
 See, e. g., Petitioners' Brief of 13 June 1978, Supra, at 67
 
 
 [78]
 See Industry Reply Brief of 6 October 1978, Supra, at 19
 
 
 [79]
 See Clean Air Act § 162(a), 42 U.S.C.A. § 7472(a) (1978) (providing that certain regions are to be designated as "clean air" areas "(u)pon the enactment of . . . (Part C of Title I of the Act)," just as § 165 provides that its construction prohibition is to take effect "after the date of enactment of . . . (Part C).")
 
 
 [80]
 See Reply Brief of 6 October 1978 of Petitioners Environmental Defense Fund, Et al. at 19-20 (hereinafter cited as Petitioners' Reply Brief of 6 October 1978)
 
 
 [81]
 42 U.S.C.A. § 7401 nt (1978) (emphasis added)
 
 
 [82]
 42 U.S.C.A. § 7401 nt (1978)
 
 
 [83]
 42 U.S.C.A. § 7410(a)(1) (1978)
 
 
 [84]
 A similar provision is contained in § 406(d)(2)(B), 42 U.S.C.A. § 7401 nt (1978)
 
 
 [85]
 42 U.S.C.A. § 7410(a)(2)(B) & (D) (1978)
 
 
 [86]
 See Industry Petitioners' Brief of 31 August 1978, Supra, at 41-42, 51; Industry Reply Brief of 6 October 1978, Supra, at 5
 
 
 [87]
 See Petitioners' Reply Brief of 6 October 1978, Supra, at 21
 
 
 [88]
 42 U.S.C.A. § 7410(c)(1) (1978)
 
 
 [89]
 See 42 Fed.Reg. 57459, 57461 (3 November 1977) (citing § 110 as one of several statutory sections providing authority for final rule that, among other things, implements sections 162(a), 163(b), and 164(a) of the Clean Air Act retroactively as of 7 August 1977)
 
 
 [90]
 42 U.S.C.A. § 7477 (1978) (emphasis added)
 
 
 [91]
 S. 242, 95th Cong., 1st Sess. (reported by the Senate 10 May 1977), Reprinted in Legisl.Hist.App. at 54-65
 
 
 [92]
 See id. § 6, which would have added § 110(g)(4) to the Clean Air Act, providing: "No major emitting facility on which construction is commenced after June 1, 1975, may be constructed in any area designated under this subsection . . . (unless specified environmental requirements have been met)." The definition of the term "commenced," to be added as § 110(g)(6) (C) of the Act, however, made clear that sources initiating construction between 1 June 1975 and the date of enactment of the Amendments would be subject to EPA's pre-existing PSD regulations, notwithstanding the 1 June 1975 effective date stipulated in the proposed § 110(g)(4). This same provision also would have had the effect of subjecting the Amendments' new, expanded category of "major emitting facilities" to the old PSD requirements up to 7 June 1977, thus also phasing in the new PSD regime
 
 
 [93]
 To the contrary, § 6 of S. 252 would have added to the Act a new § 110(g) (7)(A), which would provide that "Until a revision of the implementation plan in accordance with this subsection is submitted and approved, significant deterioration for those pollutants covered by such regulations shall be regulated pursuant to applicable regulations and procedures . . . in effect prior to the enactment of the Clean Air Amendments of 1977, Except as those regulations . . . (are) Inconsistent with the requirements of this subsection." (emphasis added)
 
 
 [94]
 See Industry Reply Brief of 6 October 1978, Supra, at 16
 
 
 [95]
 H.R. 6161, 95th Cong., 1st Sess. (passed by the House 26 May 1977), Reprinted in Legisl.Hist.App. at 68-88
 
 
 [96]
 See id. § 108(a), proposing new preconstruction review requirements to be added to the Clean Air Act
 
 
 [97]
 See id., proposing a new § 160(h) to provide that "Until such time as an applicable (state) implementation plan is in effect for any area . . ., applicable regulations under this Act in effect prior to enactment of this section shall remain in effect . . . (with the exception of requirements contained in several subsections not pertaining to preconstruction review.)"
 
 
 [98]
 The Conference based § 165(a) on proposed § 110(g)(6)(C) of S. 252, and § 168 on proposed § 160(h) of H.R. 6161. See notes 92 & 97 Supra
 
 
 [99]
 See Muskie Statement, Supra note 21 ("Because of the rush to produce this legislation . . ., there was little time for the detailed proofreading that usually accompanies the production of a conference report. As a result, there are a number of . . . errors . . . technical problems . . . (and) some ambiguous language. . . .")
 
 
 [100]
 See p. --- of 195 U.S.App.D.C., p. 854 of 600 F.2d & note 19 Supra
 
 
 [101]
 See Rogers Statement, Supra note 21, at 8
 
 
 [102]
 See id
 
 
 [103]
 See Muskie Statement, Supra note 21
 
 
 [104]
 See, e.g., Schwegmann Brothers v. Calvert Distillers Corp., 341 U.S. 384, 394-95, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) ("It is the sponsors that we look to when the meaning of the statutory words is in doubt."); Accord, NLRB v. Fruit and Vegetable Packers and Warehousemen, Local 760, 377 U.S. 58, 66, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964). But see Regional Rail Reorganization Act Cases, 419 U.S. 102, 132, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), Quoting National Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. 612, 634 n. 34, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967) ("(P)ost-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage," because "(s)uch statements 'represent only the personal views of these legislators, since the statements were (made) after passage of the Act.' ")
 
 
 [105]
 See p. --- of 195 U.S.App.D.C., p. 855 of 600 F.2d & note 22 Supra
 
 
 [106]
 See, e. g., Industry Petitioners Brief of 31 August 1978, Supra, at 73-78
 
 
 [107]
 H.R.6161, the House bill that passed the House and was considered by the conferees to the Clean Air Act Amendments of 1977, See note 95 Supra, is discussed in the report of the House Committee on Interstate and Foreign Commerce, H.R.Rep.No.95-294, 95th Cong., 1st Sess. (1977) (hereinafter cited as House Report). That report noted that as a general matter, "The . . . (PSD) review and permit process will be a State responsibility, and . . . most, if not all of the States will simply carry out that review in conjunction with their existing preconstruction review . . .. EPA will not be in the business of granting permits unless a State fails to revise and submit an approvable plan . . . or refuses to administer the entire (PSD) program . . .." Id. at 144-45. Even the bill reported out of this House committee, however, provided for immediate federal implementation of several new PSD requirements. See H.R.6161, 95th Cong., 1st Sess. § 160(h)(2) (1977) (exceptions to rule of delayed implementation referred to in § 168(b) of Clean Air Act)
 
 
 [108]
 The Senate bill, S.252, is discussed in the report of the Senate Committee on Environment and Public Works. See S.Rep.No.95-127, 95th Cong., 1st Sess. 36, U.S.Code Cong. & Admin.News, p. 1077 (1977) ("The committee intends a sharply restricted role for the Environmental Protection Agency in regard to implementing the . . . (PSD program).")
 
 
 [109]
 Compare, for example, sections 110(a)(2)(J) & 161 of the Act, 42 U.S.C. §§ 7410(a)(2)(J) & 7471 (1978) (states to adopt plans that contain measures that EPA finds necessary to prevent significant deterioration of air quality), With § 110(a)(2)(A) & (B), 42 U.S.C. §§ 7410(a)(2)(A) & (B) (1978) (states to determine measures needed to enforce national ambient air quality standards)
 
 
 [110]
 The principal difference is whether during the interim period prior to adoption of revised state plans EPA is to follow the substantive and procedural provisions of its own regulations or those prescribed by Congress
 
 
 [111]
 42 U.S.C.A. § 7478(b) (1978)
 
 
 [112]
 See, e. g., H.R.Rep.No.95-294, Supra note 107, at 171-72 ("extraordinary lengths" taken not to cause "current construction to be halted" or to "clamp even a temporary moratorium on planned industrial and economic development"); S.Rep.No.95-127, Supra note 108, at 11 (EPA to "minimize any disruption that might be caused in implementing the Act" and "permit process to prevent significant deterioration should (not) become a vehicle for inaction or delay.")
 
 
 [113]
 The principal measure taken by the House was its proposed Clean Air Act § 160(h), See note 97 Supra, which was adopted by the Conference as Clean Air Act § 168, allowing most pre-existing PSD regulations to remain in effect during the "interim" period before new state plans are approved. The Senate, in its proposed Clean Air Act § 110(g)(6)(C), See note 92 Supra, proposed the measure eventually incorporated by the conference into Clean Air Act § 165, 42 U.S.C.A. § 7475 (1978), to limit the application of new PSD requirements to sources that had not already commenced construction as of 7 August 1977, even if those sources were years away from actual operation. See notes 92-93 Supra
 
 
 [114]
 The Conference, for example, rejected the House Committee's proposal to "grandfather" many planned and existing pollution-emitting sources from new PSD requirements. See H.R.6161, Supra note 95, § 108(a), proposing new Clean Air Act § 160(c)(2)(E) & (c)(4)(A)
 
 
 [115]
 For example, the Conference accepted that part of the Senate Committee's proposed § 110(g)(6)(C), See proposed S.252, Supra note 91, § 6, that exempted from the new PSD requirements sources that had not yet commenced on-site construction but had "entered into binding agreements or contractual obligations . . . to undertake a program of construction of the facility to be completed within a reasonable time . . .," rather than the proposed House provision, which would exempt a facility only if it had "undertaken a continuous onsite program of construction or modification of such source," See H.R.6161, Supra note 95, § 108(a), proposing new Clean Air Act § 160(c)(4)(A). The final provision is contained in Clean Air Act § 169(2)(A), 42 U.S.C.A. § 7479(2)(A) (1978)
 
 
 [116]
 See pp. --- - --- of 195 U.S.App.D.C., pp. 873-874 of 600 F.2d & notes 128-36 Infra
 
 
 [117]
 See, e.g., Colorado Public Interest Research Group, Inc. v. Train, 507 F.2d 743, 746 (10th Cir. 1974), Cert. granted, 421 U.S. 998, 95 S.Ct. 2393, 44 L.Ed.2d 664, Rev'd on other grounds, 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976) ("An unambiguous statute must be given effect according to its plain and obvious meaning."); Sea-Land Service, Inc. v. Federal Maritime Commission, 131 U.S.App.D.C. 246, 250, 404 F.2d 824, 828 (1968) ("Ordinarily, where the language of a statute is clear and unambiguous on its face, the thrust of that language should not be controverted by seeking to show an inconsistent legislative intent."); U. S. v. Western Pacific Railroad Co., 385 F.2d 161, 163 (10th Cir. 1967), Cert. denied, 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 656 (1968) ("An unambiguous statute must be given effect according to its plain and obvious meaning."); General Electric Co. v. Southern, Construction Co., 383 F.2d 135, 138 (5th Cir. 1967), Cert. denied, 390 U.S. 955, 88 S.Ct. 1049, 19 L.Ed.2d 1148 (1968) (court to "give effect to the plain and obvious meaning of the statute without reading in or reading out"); Kansas City, Missouri v. Federal Pacific Electric Co., 310 F.2d 271, 273-74 (8th Cir. 1962), Cert. denied, 373 U.S. 914, 83 S.Ct. 1297, 10 L.Ed.2d 415 (1963) (fundamental principle that "a court should not engage in interpreting or construing a statute that is clear and unambiguous on its face")
 
 
 [118]
 See, e.g., Montgomery Charter Service, Inc. v. Washington Metropolitan Area Transit Comm'n, 117 U.S.App.D.C. 34, 38, 325 F.2d 230, 234 (1963); Maiatico v. United States, 112 U.S.App.D.C. 295, 301, 302 F.2d 880, 886 (1962); Fisher v. District of Columbia, 82 U.S.App.D.C. 371, 372-73, 164 F.2d 707, 708-09 (1947)
 
 
 [119]
 See generally Kenai Peninsula Borough v. Andrus, 436 F.Supp. 288, 291 (D.Alaska 1977) (supporting statutory construction that "does not lead to absurd or impracticable results")
 
 
 [120]
 See, e.g., Ginsberg & Sons, Inc. v. Popkin, 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704 (1932) (a "cardinal rule" that "if possible, effect shall be given to every clause and part of a statute"); Ex parte the Public National Bank of New York, 278 U.S. 101, 104, 49 S.Ct. 43, 44, 73 L.Ed. 202 (1928) (". . . (W)e are not at liberty . . . to deny effect to a part of a statute. No rule of statutory construction has been more definitely stated or more often repeated than the cardinal rule that 'significance and effect shall, if possible, be accorded to every word,' " Quoting Market Co. v. Hoffman, 101 U.S. 112, 115, 25 L.Ed. 782 (1879) ); R. V. McGinnis Theaters and Pay TV, Inc. v. Video Independent Theatres, Inc., 262 F.Supp. 607, 613 (N.D.Okl.1966), Aff'd, 386 F.2d 592 (10th Cir. 1967), Cert. denied, 390 U.S. 1014, 88 S.Ct. 1265, 20 L.Ed.2d 163 (1968) ("Statutes must be read and construed together to give effect to both . . . .")
 
 
 [121]
 See pp. --- - --- of 195 U.S.App.D.C., pp. 873-874 of 600 F.2d & notes 128-36 Infra
 
 
 [122]
 Cf. Lenkin v. District of Columbia, 149 U.S.App.D.C. 129, 140, 461 F.2d 1215, 1226 (1972) (in meeting the "challenge . . . to give significance to every provision of a legislative enactment," a court "must . . . reconcile superficial conflicts to the fullest extent Possible . . . .") (emphasis added)
 
 
 [123]
 As the Supreme Court stated under analogous circumstances in Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 250, 90 S.Ct. 1583, 1592, 26 L.Ed.2d 199 (1970), "Statutory interpretation requires more than concentration upon isolated words; rather, consideration must be given to the total corpus of pertinent law and the policies that inspired ostensibly inconsistent provisions." Chief Justice Marshall also stated long ago that "Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived. . . ." United States v. Fisher, 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1805). See also Richards v. United States, 369 U.S. 1, 11, 82 S.Ct. 585, 591-92, 7 L.Ed.2d 492 (1962) (fundamental that "a section of a statute should not be read in isolation from the context of the whole Act . . ."); Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 285, 76 S.Ct. 349, 359, 100 L.Ed. 309 (1955) (" 'In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy,' " Quoting United States v. Boisdores Heirs, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009); Markham v. Cabell, 326 U.S. 404, 409, 66 S.Ct. 193, 195, 90 L.Ed. 165 (1945) ("The policy as well as the letter of the law is a guide to decision . . . to ameliorate . . . (the law's) seeming harshness or to qualify its apparent absolutes . . . ."); United States v. Hutcheson, 312 U.S. 219, 235, 61 S.Ct. 463, 85 L.Ed. 788 (1941) (legislation touching on sensitive national problems not to be read in a "spirit of mutilating narrowness")
 
 
 [124]
 See Burnet v. Guggenheim, 288 U.S. 280, 285, 53 S.Ct. 369, 371, 77 L.Ed. 748 (1933) ("A statute will be construed in such a way as to avoid unnecessary hardship when its meaning is uncertain.")
 
 
 [125]
 See generally United States v. Bass, 404 U.S. 336, 344, 92 S.Ct. 515, 521, 30 L.Ed.2d 488 (1971) ("While courts should interpret a statute with an eye to the surrounding statutory landscape and an ear for harmonizing potentially discordant provisions, these guiding principles are not substitutes for congressional lawmaking."); Zaimi v. United States, 155 U.S.App.D.C. 66, 78, 476 F.2d 511, 523 (1973). Further, we need not decide in this case whether in the absence of the actual exercise of legislative rulemaking authority by the agency, this court's interpretive authority would allow the court alone to devise a "middle course" similar to that adopted here by EPA. We are aware, however, of separation of powers considerations that could constrain a court in pursuing such an independent course
 
 
 [126]
 See Cass v. United States, 417 U.S. 72, 83, 94 S.Ct. 2167, 2173, 40 L.Ed.2d 668 (1974) (" 'In resolving ambiguity, we must allow ourselves some recognition of the existence of sheer inadvertence in the legislative process,' " Quoting with approval Schmid v. United States, 436 F.2d 987, 992, 193 Ct.Cl. 780 (1971) ); United States v. Canadian Vinyl Industries, 555 F.2d 806, 811 (Cust. & Pat.App.1977)
 
 
 [127]
 Problems of construction of inconsistent statutory provisions drawn up in haste have arisen before. As the Supreme Court noted with regard to the Trading With the Enemy Act, as amended by the First War Powers Act of 1941, 55 Stat. 839, 50 U.S.C.App. (Supp. V. 1946), in Clark v. Uebersee Finanz-Korp, 332 U.S. 480, 488-89, 68 S.Ct. 174, 178, 92 L.Ed. 88 (1947): "We are dealing with hasty legislation which Congress did not stop to perfect as an integrated whole. Our task is to give all of it . . . the most harmonious, comprehensive meaning possible. . . . (T)he answer to our problem cannot be had by the use of logic alone. We are dealing here with conflict and confusion in the statute. . . ." The Court thereafter adopted the statutory construction that was "more consonant with the functions sought to be served by the Act" and that did not "impute to Congress a purpose to paralyze with one hand what it sought to promote with the other." Id. at 489, 68 S.Ct. at 178. Cf. Shell Oil Co. v. Federal Power Comm'n, 491 F.2d 82, 88 (5th Cir. 1974) (within the discretion of Commission to choose "one of two possible interpretations of its own ambiguous regulations")
 
 
 [128]
 See, e.g., Hou Ching Chou v. Attorney General, 362 F.Supp. 1288, 1292 (D.D.C.1973) (in determining whether rule is interpretative or "substantive" (I. e., legislative), court must look, Inter alia, to the "source (of) authority for its promulgation"). The source of authority is of special relevance when that authority requires a particular form of rulemaking to be followed. See Automotive Parts & Accessories Ass'n v. Boyd, 132 U.S.App.D.C. 200, 203, 407 F.2d 330, 333 (1968) (informal vs. formal rulemaking)
 
 
 [129]
 42 Fed.Reg. 57459, 57471 & 57479 (3 November 1977)
 
 
 [130]
 42 U.S.C.A. § 7601 (1978)
 
 
 [131]
 42 U.S.C.A. § 7601(a)(1) (1978)
 
 
 [132]
 See, e.g., Guardian Federal Savings and Loan Ass'n v. Federal Savings and Loan Insurance Corp., 191 U.S.App.D.C. 135, 589 F.2d 658 (1978) (". . . (P)ublic participation assures that the agency will have before it the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions. Public rulemaking procedures increase the likelihood of administrative responsiveness to the needs and concerns of those affected.")
 
 
 [133]
 344 F.Supp. 253 (D.D.C.), Aff'd, 4 ERC 1815 (D.C.Cir.1972), Aff'd by an equally divided Court sub nom. Fri v. Sierra Club, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973)
 
 
 [134]
 In that case the Supreme Court affirmed a determination by the District Court for the District of Columbia that one of the fundamental purposes of the Clean Air Act (as reflected in the Act's "purposes" clause, the legislative history, and previous administrative interpretations) was to prevent the degradation of existing clean air areas, and that therefore the EPA Administrator was obliged to assert his authority to implement that purpose and to disapprove a state pollution control plan that would have allowed for degradation of clean air areas. See id. The rulemaking authority of EPA under the Clean Air Act has also been strongly affirmed by this Circuit recently in Sierra Club v. Environmental Protection Agency, 176 U.S.App.D.C. 335, 540 F.2d 1114 (1976), Cert. denied, 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977). See also Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 486 F.2d 375 (1973), Cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974)
 
 
 [135]
 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) (interpretive rulemaking)
 
 
 [136]
 Id., 415 U.S. at 231, 94 S.Ct. at 1072 (emphasis added)
 
 
 [137]
 5 U.S.C. § 553 (1976)
 
 
 [138]
 See pp. --- - --- of 195 U.S.App.D.C., pp. 879-886 of 600 F.2d & notes 172-210 Infra. No party to the present case has argued that EPA was obliged to follow formal rulemaking procedures an argument that in any event we would have been obliged to reject because of the lack of the requisite triggering language for formal rulemaking in the underlying statute. See Automotive Parts & Accessories Ass'n v. Boyd, supra, 132 U.S.App.D.C. at 203, 407 F.2d at 333. EPA, however, certainly could have chosen to engage in formal rulemaking
 
 
 [139]
 See EPA Brief, Supra, at 66-67
 
 
 [140]
 See, e. g., National Ass'n of Insurance Agents, Inc. v. Board of Governors of Federal Reserve System, 160 U.S.App.D.C. 144, 146, 489 F.2d 1268, 1270 (1974) (affirming that notice and comment requirements of APA do not apply to interpretive rules)
 
 
 [141]
 See 42 Fed.Reg. 57459 (3 November 1977)
 
 
 [142]
 42 U.S.C.A. §§ 7472(a), 7473(b) & 7474(a) (1978)
 
 
 [143]
 See 42 U.S.C.A. § 7478(b) (1978)
 
 
 [144]
 Specifically, § 162(a) identified various new regions of the country as "Class I" ("clean air") areas, for which a lesser degree of deterioration of air quality would be allowed; § 163(b) provided a more restrictive definition of the "increments" and "ceilings" in air pollution that would be allowed; and § 164(a) excluded certain areas from "Class III" ("least clean air") consideration and set more restrictive procedures for the future designation of Class III areas
 
 
 [145]
 See 42 Fed.Reg. 57471 & 57479 (3 November 1977)
 
 
 [146]
 As EPA stated in its Supplementary Information to the Second Rule, 42 Fed.Reg. 57471 (3 November 1977), issues raised in the Second Rule were to be "read together" with the issues raised in the First and Third Rules, 42 Fed.Reg. 57459 & 57479 (3 November 1977), and "public comments should address all three actions in a consolidated fashion."
 
 
 [147]
 42 Fed.Reg. 57459 (3 November 1977)
 
 
 [148]
 Id
 
 
 [149]
 Id
 
 
 [150]
 Id
 
 
 [151]
 Gibson Wine Co. v. Snyder, 90 U.S.App.D.C. 135, 137, 194 F.2d 329, 331 (1952). Accord, National Ass'n of Insurance Agents, Inc. v. Board of Governors of Federal Reserve System, supra
 
 
 [152]
 Pickus v. United States Board of Parole, 165 U.S.App.D.C. 284, 290, 507 F.2d 1107, 1113 (1974). See also Joseph v. United States Civil Service Comm'n, 180 U.S.App.D.C. 281, 294, 554 F.2d 1140, 1153 (1977) (interpretive rule entails "clarification of statutory language")
 
 
 [153]
 Pesikoff v. Secretary of Labor, 163 U.S.App.D.C. 197, 203, 501 F.2d 757, 763 n.12 (1974), Cert. denied, 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315 (1974). We also find of relevance here the distinction we drew in another case between agency action that imposes new duties and that which simply "reminds" affected parties of existing duties. See Yale Broadcasting Co. v. Federal Communications Commission, 155 U.S.App.D.C. 390, 395, 478 F.2d 594, 599 (1973) ("public debate and scrutiny of rulemaking proceedings" required in the former case, not in the latter). In the present case, as will be seen, EPA's First Rule of 3 November 1977 primarily codified into federal regulations a set of statutory provisions that had binding legal effect even without such codification. The Second and Third Rules, however, created legal obligations not spelled out so explicitly by statute and thus created corresponding "new duties" in affected parties
 It should be noted, however, that in this Circuit a finding of "substantial impact" of an agency's rule has not been deemed determinative of whether that rule is interpretive or legislative, and therefore whether it is subject to notice and comment requirements of the APA. See Eastern Kentucky Welfare Rights Organization v. Simon, 165 U.S.App.D.C. 239, 253-54, 506 F.2d 1278, 1290-91 n.30 (D.C.Cir.1974), Vacated on other grounds, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Cf. Lewis-Mota v. Secretary of Labor, 469 F.2d 478, 481-82 (2d Cir. 1972); Chisholm v. Federal Communications Commission, 176 U.S.App.D.C. 1, 45-46, 538 F.2d 349, 393-94 (1976), Cert. denied, 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976) (Wright, J., dissenting). In any event the present Rule, which merely restates new statutory provisions of the Clean Air Act Amendments, could not Itself be construed to have a "substantial impact" on affected parties.
 
 
 [154]
 See, e.g., Petitioners' Brief of 13 June 1978, Supra, at 94-101
 
 
 [155]
 We need not reach the question here of whether EPA After completion of informal rulemaking proceedings could have proceeded to implement § 165 as of 7 August 1977, or, on the other hand, to await the revision of state implementation plans in compliance with § 168, rather than effecting its eventual "middle course" between the two. But clearly EPA was on solid ground in exercising the rulemaking authority afforded it under Clean Air Act § 301 to harmonize to the maximum extent possible the intent of Congress as expressed in the two sections. Thus it puts the cart before the horse to argue that, Prior to embarking on such a "harmonization" rulemaking proceeding, EPA should have engaged in a "mini-review" process to buttress a decision not to enforce § 165 (or, for that matter, § 168), to the exclusion of the other section
 
 
 [156]
 There was also no need for further "study" by EPA of the possible economic ramifications of its decision, reached prior to its "harmonization" rulemaking proceedings, not to enforce § 165 as of 7 August 1977. Cf. Brief of 13 September 1978 of Petitioners Environmental Defense Fund, Et al. at 19-42 (alleging "abuse of discretion" by EPA Administrator in not compiling adequate information or following prescribed "analytical framework" in determining economic consequences of immediate enforcement of § 165). Though a number of factors were apparently given some consideration by EPA in reaching that enforcement decision, we construe that decision to have been primarily legal rather than factual in nature. See 42 Fed.Reg. 57479 (3 November 1977) (noting "legal argument" concerning effective date of § 165 and defending its decision not to enforce § 165 immediately "(I)n light of . . . drafting inconsistencies between Sections 165(a) and 168"). As such, the pre-rulemaking decision not to enforce § 165 as of 7 August 1977 need not have been founded on either a searching review or public demonstration of any factual "proof" that adverse consequences would follow from a contrary decision. But see pp. --- - --- of 195 U.S.App.D.C., pp. 889-890 of 600 F.2d & notes 226-32 Infra (factors relevant to determinations in course of rulemaking decision)
 
 
 [157]
 42 Fed.Reg. 57471 (3 November 1977) (as proposed); 43 Fed.Reg. 26380 (19 June 1978) (as promulgated)
 
 
 [158]
 Clean Air Act § 110, 42 U.S.C.A. § 7410 (1978), sets forth in detail the manner in which state environmental plans are to be revised and implemented in accord with substantive federal air quality regulations, and provides for a degree of continuing supervision and enforcement of those regulations by EPA
 
 
 [159]
 Public comments were thus due by 3 January 1978. See 42 Fed.Reg. 57471 (3 November 1977)
 
 
 [160]
 The nine-month deadline was also called for by Clean Air Act Amendments § 406(d)(2), 42 U.S.C.A. § 7401 nt (1978)
 
 
 [161]
 42 Fed.Reg. 57479 (3 November 1977) (as proposed); 43 Fed.Reg. 26388 (19 June 1978) (as promulgated)
 
 
 [162]
 I.e., 1 March 1978 rather than 7 August 1977 (But see p. --- of 195 U.S.App.D.C., p. 856 of 600 F.2d & n. 31 Supra (1 March 1978 deadline only to obtain permits, not to commence construction))
 
 
 [163]
 I. e., 1 March 1978 rather than 1 December 1978, the date on which revised state plans incorporating those same requirements would be due (and could theoretically have been approved by EPA) in accordance with the Second Rule, and on which the "(p)eriod (b)efore (state) (p)lan (a)pproval" covered by § 168 thereby could have been ended. See note 11 Supra
 
 
 [164]
 42 Fed.Reg. 57479 (3 November 1977). As in the case of the Second Rule, EPA called for submission of written comments on the proposed Third Rule within two months, by 3 January 1978. See id
 
 
 [165]
 See 43 Fed.Reg. 26380 & 26388 (19 June 1978)
 
 
 [166]
 The effective reach of the § 165 requirements was further weakened by the delay in publication, however, because EPA in its final rules extended the deadline for commencement of construction of new facilities to be subject to its Old PSD requirements from 1 December 1978 to 19 March 1979, so as to conform to the new date on which (according to the statutory nine-month allowance period) revised state implementation plans would then be due. See notes 11 & 163 Supra
 
 
 [167]
 See p. --- of 195 U.S.App.D.C., p. 876 of 600 F.2d & notes 151-53 Supra
 
 
 [168]
 See pp. --- - --- of 195 U.S.App.D.C., pp. 873-874 of 600 F.2d & notes 129-36 Supra
 
 
 [169]
 See pp. --- - --- of --- U.S.App.D.C., pp. 889-890 of 600 F.2d & notes 223-32 Infra
 
 
 [170]
 Gibson Wine Co. v. Snyder, supra, 90 U.S.App.D.C. at 137, 194 F.2d at 331
 
 
 [171]
 The Post hoc characterizations of these rules as interpretive by EPA counsel are of no avail. As the Second Circuit has noted, "(T)he label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact." Lewis-Mota v. Secretary of Labor, supra, 469 F.2d at 481-82. See also Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 416, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942). This must especially be true when the label is placed on the agency's rule by counsel after the rule is promulgated in final form and the rule is undergoing court review
 
 
 [172]
 See 42 Fed.Reg. 57479 (3 November 1977) (Third Rule). That Rule also applied the requirements of § 165 to any proposed facility that Had received a permit by 1 March 1978 but Would not commence construction by 19 March 1979 (the "dual-deadline" schedule, See p. --- of 195 U.S.App.D.C., p. 856 of 600 F.2d & note 31 Supra ). Id. This aspect of the Rule, however, does not raise the question of unlawful retroactive effects
 
 
 [173]
 5 U.S.C. § 551(4) (1976)
 
 
 [174]
 5 U.S.C. § 553(d) (1976)
 
 
 [175]
 See, e.g., PBW Stock Exchange, Inc. v. Securities and Exchange Comm'n, 485 F.2d 718, 732 (3d Cir. 1973), Cert. denied, 416 U.S. 969, 94 S.Ct. 1992, 40 L.Ed.2d 558 (1974) (" . . . (R)ules ordinarily look to the future and are applied prospectively only . . . ."); Retail, Wholesale and Department Store Union, AFL-CIO v. National Labor Relations Board, 151 U.S.App.D.C. 209, 217, 466 F.2d 380, 388 (D.C.Cir.1972) (rules resulting from formal rulemaking proceedings "are prospective in application only")
 
 
 [176]
 APA § 4(c), 5 U.S.C. § 553(d)(3) (1976). EPA also notes that the APA provides an exception from the prospective-effect rule for "interpretive rules," See APA § 4(c), 5 U.S.C. § 553(d)(2) (1976), and argues that this exception is applicable here. As we have noted elsewhere in this opinion, See pp. --- - --- of 195 U.S.App.D.C., 877-879 of 600 F.2d & notes 157-71 Supra, however, the Second and Third Rules at issue here are legislative rather than interpretive rules and thus do not fit within this exception
 
 
 [177]
 See 43 Fed.Reg. 26388, 26390 (19 June 1978) (Third Rule) (need for public comment, but interest in not further postponing implementation of § 165)
 
 
 [178]
 See 42 Fed.Reg. 57471 & 57479 (3 November 1977) (Second and Third Rules); Id. at 57471 ("EPA intends to make . . . (the proposed new PSD requirements contained in these Rules) effective immediately upon final promulgation, no later than March 1, 1978")
 
 
 [179]
 See 42 Fed.Reg. 64378 (23 December 1977) (in response to requests from "(s)everal interested persons" based upon "the need for time to address the numerous, highly significant, and sometimes complex issues involved," deadline for written public comments to be extended from 3 January 1978 to 31 January 1978); 43 Fed.Reg. 26388, 26389 (19 June 1978) (final promulgation of Third Rule) (public hearings held on the proposed rules in Washington, Chicago, and Denver on 9 January 1978, and "more than 250 written comments on the proposals" received)
 
 
 [180]
 See 42 Fed.Reg. 64378 (23 December 1977) ("In light of . . . (the extension in the period for public comment) EPA may not be able to meet the March 1 publication date. EPA's intent is to publish the rules in final form as quickly as possible, but only after considering and weighing relevant public comments. EPA does not intend to change the previously-announced 'permit deadline' of March 1, 1978, for determining whether sources will be subject to the new PSD rules. . . .") (emphasis added)
 
 
 [181]
 See Memorandum from EPA Assistant Administrators David G. Hawkins and Marvin Durning to EPA Regional Administrators, Reprinted in Supp.App. vol. I at 285-86 (if requested by applicant, applications for preconstruction permits to be processed under the proposed regulations after 1 March 1978 in order to minimize delay, though no permits actually to be issued before regulations issued in final form) (Memorandum dated 22 February 1978); 43 Fed.Reg. 26388, 26390 (19 June 1978) (Third Rule) ("EPA has upon request . . . (between 1 March and 19 June 1978) reviewed certain applications as to their approvability under the proposed regulations")
 
 
 [182]
 See 43 Fed.Reg. 26388, 26390 (19 June 1978) (postponing effective date of regulations until final date of promulgation would have allowed consumption of allowable "increments . . . (in pollution emissions) to a much greater extent. . . .")
 
 
 [183]
 APA § 4(c), 5 U.S.C. § 553(d)(3) (1976)
 
 
 [184]
 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). The Supreme Court stated in that opinion that: " . . . (R)etroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law." Id., 332 U.S. at 203, 67 S.Ct. at 1581
 
 
 [185]
 In the case of Retail, Wholesale and Department Store Union, AFL-CIO v. National Labor Relations Board, supra, this court adopted the standard of review with regard to retroactive administrative rules established in SEC v. Chenery, supra, and stated further that:
 Among the considerations that enter into a resolution of the problem (of retroactivity) are (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.
 Id., 151 U.S.App.D.C. at 219, 466 F.2d at 390. These are essentially the factors that we have considered here. Cf. Niagara Mohawk Power Corp. v. Federal Power Comm'n, 126 U.S.App.D.C. 376, 382-83, 379 F.2d 153, 159-60 (1976) ("reasonable" for Commission to issue licenses with effective dates earlier than date of issuance, since "(i)n general retrospective applications of law are not lightly inferred, but here the agency's actions were a reasonable exercise of its implied authority").
 
 
 [186]
 See, e.g., Maceren v. District Director, Immigration and Naturalization Service, Los Angeles, Calif., 509 F.2d 934, 939-40 (9th Cir. 1974) (" . . . (C)ourts have sought to balance the possible inequitable results produced by the retroactive application of an administrative rule against the demands of statutory design."); People of State of California, State Lands Comm'n v. Simon, 504 F.2d 430, 438-39 (Em.App. 1974), Cert. denied, 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294 (1974) ("A retroactive rule is invalid, generally speaking, only if unreasonable."); General Telephone Co. of Southwest v. United States, 449 F.2d 846, 863 (5th Cir. 1971) ("Where a rule has retroactive effects, it may nonetheless be sustained in spite of such retroactivity if it is reasonable.")
 
 
 [187]
 D.C. Cir. Nos. 78-1331 & 78-1626
 
 
 [188]
 Pacific Power and Light Company, Portland General Electric Company, Puget Sound Power and Light Company, Washington Water Power Company, and The Pittston Company. See Brief of Intervenors Montana Power Company, Et al. at vi (hereinafter cited as Brief for Montana Power)
 
 
 [189]
 EPA determined on 12 June 1978 that, even under its pre-1 March requirements, the application of Montana Power Company for a permit to construct the Colstrip units must be denied because of the impermissibly high volume of pollutants likely to be emitted by that facility in its "clean air" (Class I) region. This determination has been challenged by Montana Power and is presently before the Ninth Circuit in Puget Sound Power & Light Co., et al. v. EPA, No. 78-2824. The issue of which set of preconstruction review requirements is to be applied by EPA to Montana Power's PSD application is properly the subject of the present litigation, however, and will remain an issue so long as Montana Power continues to seek to meet whatever preconstruction review requirements are applicable to its proposed facility at Colstrip
 
 
 [190]
 43 Fed.Reg. 26388, 26406 (19 June 1978). Only the Montana Power Company and Pittston Company applications, finally reviewed by EPA on 12 June 1978 and 18 August 1978, respectively, have been subject to this special exemption
 It has also been brought to this court's attention that EPA recently has ruled that, for those sources subject to the 1 March 1978 permit deadline exemption for reason of extensions in the public comment period, the construction deadline of 19 March 1978 is also to be extended to allow construction to commence on those sources "within the same amount of time that would be the case for a person issued the required permits just before March 1, (1978,) I. e., within one year and 18 days from permit issuance." 43 Fed.Reg. 58188, 58189 (13 December 1978). Since parties to this proceeding do not presently seek review of this further exemption, we decline to pass on its merits.
 
 
 [191]
 See 40 C.F.R. § 52.21(e)(vi) (1977)
 
 
 [192]
 See, e. g., 43 Fed.Reg. 9529 (8 March 1978) (noting "significant public comment" generated by affected applications)
 
 
 [193]
 See Memorandum from EPA Assistant Administrators David G. Hawkins and Marvin Durning to EPA Regional Administrators, Reprinted in Supp.App. vol. I at 285-86 (Memorandum dated 22 February 1978)
 
 
 [194]
 See Memorandum from EPA Administrator Douglas M. Costle to Regional Administrators, Reprinted in Supp.App. vol. II at 381 (Memorandum dated 28 February 1978)
 
 
 [195]
 See 43 Fed.Reg. 9529 (8 March 1978). The Federal Register notice referred to the EPA Memoranda of both 22 and 28 February 1978, See notes 193 & 194 Supra, and justified the exemption as a means to "avoid any possible inequities" resulting from decisions to extend the period for public comment
 
 
 [196]
 43 Fed.Reg. 26388, 26391 (19 June 1978)
 
 
 [197]
 See 5 U.S.C. § 553(c) (1976)
 
 
 [198]
 See APA § 10(e), 5 U.S.C. § 706(2) (1976) (a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, (or) an abuse of discretion . . . .")
 
 
 [199]
 See APA § 4(b), 5 U.S.C. § 553(c) (1976)
 
 
 [200]
 Automotive Parts & Accessories Ass'n v. Boyd, supra, 132 U.S.App.D.C. at 208, 407 F.2d at 338. See also Rodway v. United States Dep't of Agriculture, 168 U.S.App.D.C. 387, 395, 514 F.2d 809, 817 (1975) (basis and purpose statement not to be "abstract explanation" but "to respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule"); Amoco Oil Co. v. Environmental Protection Agency, 163 U.S.App.D.C. 162, 179, 501 F.2d 722, 739 (1974) (basis and purpose statement must be "sufficiently detailed and informative to allow a searching judicial scrutiny of how and why the regulations were actually adopted" and to allow reviewing court to determine that agency action was not " 'arbitrary' " or " 'capricious' ")
 
 
 [201]
 Tabor v. Joint Board for Enrollment of Actuaries, 185 U.S.App.D.C. 40, 45, 566 F.2d 705, 710 (1977)
 
 
 [202]
 Id. 185 U.S.App.D.C. at 45, 566 F.2d at 710. See also Kennecott Copper Corp. v. Environmental Protection Agency, 149 U.S.App.D.C. 231, 235, 462 F.2d 846, 850 (1972) ("Particularly as applied to environmental regulations, produced under the tension of need for reasonable expedition and need for resolution of a host of nagging problems, we are loath to stretch the requirement of a 'general statement' into a mandate for reference to all the specific issues raised in comments.")
 
 
 [203]
 See Automotive Parts & Accessories Ass'n v. Boyd, supra, 132 U.S.App.D.C. at 208, 407 F.2d at 338 (statement of basis and purpose to be considered "in the light of the reasons stated by the Administrator's denial of rehearing"). In that case, the statement of basis and purpose in the text of the standard itself was only 22 words long and stated simply: "This standard specifies requirements for head restraints to reduce the frequency and severity of neck injury in rear-end and other collisions." See id. n.12
 
 
 [204]
 Tabor v. Joint Board for Enrollment of Actuaries, supra, 185 U.S.App.D.C., at 47, 566 F.2d at 712
 
 
 [205]
 For discussion of the substance of this question, see pp. --- - --- of 195 U.S.App.D.C., pp. 886-888 of 600 F.2d & notes 211-19 Infra
 
 
 [206]
 43 Fed.Reg. 26388, 26391 (19 June 1978)
 Though the EPA Administrator stressed in that Memorandum, as reprinted in the Federal Register, that he was announcing a "policy change," which EPA argues is thereby entitled to the "statement of policy" exemption from the informal rulemaking requirements of the APA, See EPA Brief, Supra, at 70, we have already rejected a similar contention of EPA with regard to these rulemaking proceedings. See pp. --- - --- of 195 U.S.App.D.C., pp. 878-879 of 600 F.2d & notes 167-71 Supra (proceedings not "interpretive" but clearly "legislative" in nature and thus subject to all requirements of APA informal rulemaking). We view the "special exemption" as an integral part of the legislative rulemaking process that EPA commenced on 3 November 1977 and completed on 19 June 1978. EPA cannot excuse every alleged irregularity in that process by the simple resort of identifying such irregularity as a mere "interpretation" or "statement of policy" thereby immune from the general rulemaking requirements of APA § 4 (5 U.S.C. § 553 (1976)). We also must dismiss the assertion by Montana Power Co., Et al. that the special exemption is a mere rule of agency "procedure" and thus exempt from informal rulemaking requirements according to APA § 4(a) & (b), 5 U.S.C. § 553(b) & (c) (1976). See Brief for Montana Power, Supra, at 14-19 (Citing, inter alia, Pickus v. United States Board of Parole, 165 U.S.App.D.C. 284, 289, 507 F.2d 1107, 1112 n.9 (1974) ("The (§ 553(b)) exemption is by its terms from only the notice requirement, but (§ 553(c)) applies only if (§ 553(b)) also applies.")). This claim is nowhere made by EPA itself, and in any event the special exemption at issue here is no more a mere rule of "procedure" than the overall rule itself. In promulgating the Second and Third Rules EPA was involved in a legislative task, and therefore the individual components of those Rules cannot be lightly dismissed (and thereby excused from the requirements of the APA) as mere rules of intra-agency "procedure."
 
 
 [207]
 43 Fed.Reg. 9529 (8 March 1978)
 
 
 [208]
 Though the prospect of litigation should not be the factor on which administrative decisions turn, it is only realistic to suppose that EPA anticipated that charges of dilatory tactics and abuse of discretion would be brought against it if it had effected a delay beyond 1 March 1978, for reason of a discretionary extension in the period for public comment, in its final review of permit applications submitted by the two companies then undergoing the final stages of PSD review. See Brief for Montana Power, Supra, at 33-51 (detailing extended history of construction permit applications and negotiations by Montana Power and Pittston Companies with EPA). Though suit has now been brought against EPA instead by the Cheyenne Tribe for reason of the special extension, in March 1978 it may well have seemed to EPA that allowing public comment to continue while exempting the affected applications from the new PSD requirements would constitute, from an administrative point of view, the "path of least resistance."
 
 
 [209]
 See 42 Fed.Reg. 26388, 26391 (19 June 1978)
 
 
 [210]
 In the case of the Second and Third Rules at issue here, Supplementary Information that precedes and explains the Rules published in final form already exceeds in volume and detail the Rules themselves. See 43 Fed.Reg. 26380-26410 (19 June 1978)
 
 
 [211]
 See APA § 10(e), 5 U.S.C. § 706(2)(A) (1976)
 
 
 [212]
 In making this inquiry we follow the standards we set previously in Ethyl Corp. v. Environmental Protection Agency, 176 U.S.App.D.C. 373, 406-08, 541 F.2d 1, 34-36 (1976), Cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976), where we noted that to determine whether agency action is arbitrary or capricious, a reviewing court "must engage in a 'substantial inquiry' into the facts, one that is 'searching and careful,' " and must assure itself that the agency decision was " 'based on consideration of the relevant factors' " (citations omitted). See also National Ass'n of Food Chains, Inc. v. Interstate Commerce Comm'n, 175 U.S.App.D.C. 346, 353, 535 F.2d 1308, 1315 (1976) (court to ascertain that agency "demonstrably has given reasoned consideration to the issues")
 
 
 [213]
 See Brief of 1 September 1978 of Petitioner Northern Cheyenne Tribe at 29
 
 
 [214]
 See id. at 28-29
 
 
 [215]
 These factors include the number of applicants as to which there were, prior to 1 March 1978, pending requests for an extension of the public comment period; the date on which each such applicant had filed its completed PSD application; whether the PSD applicants "knew or should have foreseen that 'meritorious' requests for an extension of the public comment would be made"; cases in which EPA itself had "unreasonably delayed" review of an application; and whether EPA had "made any commitments to decide pending PSD applications before March 1st" where "applicants had acted in reliance upon such commitments." See id. at 34-38
 
 
 [216]
 Furthermore, if EPA was determined to design a review schedule allowing only One class of "equitable" exemptions, it might have designated a class with an equitable claim more compelling than that of applicants whose construction plans were the subject of public controversy. See note 215 Supra (other equitable considerations proposed by Cheyenne Tribe). We are not convinced, however, that it is the role of this court under present circumstances to prescribe by hind-sight the equitable considerations that EPA should have made in designing its rules
 
 
 [217]
 See note 191, Supra, citing 40 C.F.R. § 52.21(e)(1)(iv) (1977) (within discretion of EPA to allow extension of initial 30-day comment period for an additional 30 days). When an initial comment period is extended, the agency is required to consider all comments submitted during the extended period before reaching a final decision on an application. See id
 
 
 [218]
 See note 189 Supra. Cheyenne Tribe still faces litigation brought by Montana Power Company in the Ninth Circuit seeking to overturn this EPA favorable disposition. See id
 
 
 [219]
 A more relevant question that might be raised concerning EPA's special exemption is whether in the two instances in which permit applications were considered by EPA under the old PSD requirements, for reason of the special exemption, permit review would actually have been completed before 1 March 1978 if the comment period had not been extended. Such completion "but for the extension" was the express condition for the exemption stated in EPA's Third Rule. See 43 Fed.Reg. 26391 (19 June 1978). The Cheyenne Tribe has pointed out that EPA, in determining on 28 February 1978 to extend the public comment period on the Colstrip units, also decided to "seek an independent review of all . . . data (submitted during the review period) and the proposed (permit) action by other experts within EPA who, up to now, have not participated in this matter," so as to "subject the regional office's findings to another level of review." See Letter from Alan Merson, EPA Regional Administrator, to Joseph A. McElwain, President, Montana Power Company, Reprinted in Supp.App. vol. II at 382-83 (letter dated 28 February 1978). We thus agree with the Cheyenne Tribe that it is somewhat unclear how, on 28 February 1978, EPA was able to conclude that But for the extension of the public comment period, it would have been able to reach a well-founded decision (one way or the other) on Montana Power's application
 It is also true, however, that Montana Power's permit application, as well as that of the Pittston Company for its power plant in Maine, had been before EPA for consideration for some time. Though the following facts are not officially on the record before this court, Montana Power Company notes in its brief, See Brief for Montana Power, Supra, at 34, that Montana Power originally applied to EPA on 1 July 1976 for a PSD permit for Colstrip units 3 and 4. EPA informed Montana Power that it considered Montana Power's application complete as of 12 July 1976, and that it would make a preliminary determination of whether to grant the permit by 11 August 1976. See id. & id. at Addendum B. EPA announced on 16 September 1976 that it had made a preliminary determination to approve the application, but deferred a final determination until after the Northern Cheyenne Tribe reservation, 15 miles south of the Colstrip site, was redesignated a Class I ("clean air") site on 5 August 1977. Further delays, petitions, hearings, and comments followed until final rejection of Montana Power Company's PSD application by EPA on 12 June 1978. See id. at 10.
 The Pittston company officially approached EPA with its application for a PSD permit on 25 April 1977, See id. at 41, and the application was deemed complete on 24 June 1977 with public comments and responses to be submitted to the EPA by 12 September 1977. On 7 August 1977, by enactment of the Clean Air Act Amendments of 1977, a site adjacent to the planned Pittston facility was designated an international park classified as a Class I ("clean air") area. Pittston's application was deemed complete for a second time on 18 November 1977. Further negotiations and public comment continued until final approval of Pittston's revised application on 18 August 1978. See id. at 11, 40-51.
 
 
 [220]
 42 Fed.Reg. 57459 (3 November 1977)
 
 
 [221]
 See Udall v. Tallman, 380 U.S. 1, 16 (1964), Reh. denied, 380 U.S. 989 (1965); Unemployment Compensation Comm'n of Alaska v. Aragon, 329 U.S. 143, 153-54 (1946). See also Train v. Natural Resources Defense Council, 421 U.S. 60, 87 (1975) (interpretation by EPA of Clean Air Act need only be "sufficiently reasonable to preclude the Court of Appeals from substituting its judgment for that of the Agency"); Skidmore v. Swift & Co., 323 U.S. 134, 139-40 (1944) (". . . (R)ulings, interpretations and opinions of the Administrator under . . . (the Fair Labor Standards Act), while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance," and "(t)he weight of such a judgment in a particular case will depend upon . . . (a variety of factors) which give it power to persuade, if lacking power to control.")
 
 
 [222]
 See pp. --- - --- of 195 U.S.App.D.C., pp. 853-855 of 600 F.2d & notes 17-18 Supra
 
 
 [223]
 5 U.S.C. § 706(2)(A) (1976). We had resort to this standard in discussing earlier the substantive "reasonableness" of the Third Rule's "special exemption" from the 1 March 1978 permit deadline. See pp. --- - --- of 195 U.S.App.D.C., pp. 886-888 of 600 F.2d & notes 211-19 Supra
 
 
 [224]
 Ethyl Corp. v. Environmental Protection Agency, supra, 176 U.S.App.D.C. at 405-06, 541 F.2d at 33-34 (citations omitted)
 
 
 [225]
 See id. 176 U.S.App.D.C. at 407-08, 541 F.2d at 35-36, Citing Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415-16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1972). See generally the searching review of the question of the appropriate standard of review itself, in cases of administrative informal rulemaking, in Ethyl Corp. v. Environmental Protection Agency, supra, 541 F.2d at 33-37 & nn.69-78
 
 
 [226]
 See, e.g., Clean Air Act § 101(a)(2), 42 U.S.C.A. § 7401(a)(2) (1978) (". . . (G)rowth in the amount and complexity of air pollution . . . has resulted in mounting dangers to the public health and welfare . . . ."); Id. § 101(b)(1), 42 U.S.C.A. § 7401(b)(1) (1978) (purpose of Clean Air Act to "protect and enhance the quality of the Nation's air resources . . ."). The Clean Air Act and its Amendments themselves stand as a testament to this concern
 
 
 [227]
 Both House and Senate Committee Reports reflect this concern, though to varying degrees. See H.R.Rep.No.95-294, Supra note 107, at 171-72 ("extraordinary lengths" taken to prevent cessation of current construction or even a "temporary moratorium on planned . . . development"); S.Rep.No.95-127, Supra note 108, at 11 (EPA urged to "minimize any disruption that might be caused in implementing" the Act)
 
 
 [228]
 See, e.g., Clean Air Act § 101(a)(3), 42 U.S.C.A. § 7401(a)(3) (1978) (the "prevention and control of air pollution at its source is the primary responsibility of States and local governments"); Id. § 110, 42 U.S.C.A. § 7410 (1978) (providing generally for promulgation and approval of state implementation plans, subject to federal review)
 
 
 [229]
 See, e.g., S.Rep.No.95-127, Supra note 108, at 11 ("resources and time (available to achieve the objectives of the Act) must not be dissipated")
 
 
 [230]
 See, e.g., 43 Fed.Reg. 26389 (19 June 1978) (one factor pointing against advisability of immediately implementing § 165 is that ". . . Section 165(a) would have imposed a lengthy moratorium on new construction, since Sections 165(a)(2) and (e) require an analysis in accordance with regulations that as of August 7, 1977, had not even been proposed."); Id. at 26390 (". . . (U)ndue economic disruption would have resulted from sudden imposition of the new requirements.")
 
 
 [231]
 See generally 43 Fed.Reg. 26380 (19 June 1978) (Second Rule) (requirements for preparation, adoption, and submittal of state implementation plans); Id. at 26388 (Third Rule) (goal to reduce immediate increase in pollution emissions to allow greater planning role for states)
 
 
 [232]
 EPA's concern for orderly implementation was reflected in the Supplementary Information to its Third Rule, where it was stated: "Immediate implementation (of § 165) . . . would have promoted disorderly administration, since it would have precluded normal notice and comment and the attending opportunity to better understand the statute, anticipate its effects and establish generic ground rules. . . . In the absence of generic rules, inconsistency and confusion in the treatment of applications throughout the country might well have occurred." 43 Fed.Reg. 26390 (19 June 1978)
 
 
 [233]
 See pp. --- - --- of 195 U.S.App.D.C., pp. 854-856 of 600 F.2d & notes 19-30 Supra
 
 
 [234]
 In its notice of proposed rulemaking, EPA proposed to set a "construction commencement" deadline of 1 December 1978 for those sources otherwise exempt from § 165 because they had met the proposed "permit" deadline of 1 March 1978. See p. --- of 195 U.S.App.D.C., p. 856 of 600 F.2d & note 31 Supra. But because the final rules were issued more than three months late, the "construction commencement" deadline was also extended by more than three months, to 19 March 1978, to coincide with the similarly-postponed "due date" for revised state implementation plans. See 43 Fed.Reg. 26391 (19 June 1979). It has nowhere been shown that All of these various delays and postponements were necessitated by extensions in EPA's periods for public comment
 
 
 [235]
 Automotive Parts & Accessories Ass'n v. Boyd, supra, 132 U.S.App.D.C. at 213, 407 F.2d at 343
 
 
 [1]
 See Austin v. United States, 127 U.S.App.D.C. 180, 194, 382 F.2d 129, 143 (1967)
 
 
 [2]
 Niagara Mohawk Power Corp. v. Federal Power Commission, 126 U.S.App.D.C. 376, 381, 379 F.2d 153, 158 (1967)
 
 
 [3]
 Id. 126 U.S.App.D.C. at 382, 379 F.2d at 159
 
 
 [4]
 One is reminded of Eugene Field's The Gingham Dog and the Calico Cat. The tension between the two animals culminates in these final lines of doggerel: "The truth about the cat and pup is this, They ate each other up."
 
 
 [5]
 As a general rule, the "wise and sound course for the courts is to give to the terms of a statute their plain meaning, so long as the resultant effect is sensible and not in conflict with a discernible purpose." Border Pipe Line Co. v. FPC, 84 U.S.App.D.C. 142, 171 F.2d 149 (1948). Separation of powers considerations restrain a court, and Congress is usually available to correct an erroneous construction. In this case no "plain meaning" is discernible, clarification by Congress is not a realistic alternative, and the agency's rule making is not constrained by the separation of powers considerations that inhibit a court
 
 
 [6]
 Niagara Mohawk, supra, 126 U.S.App.D.C. at 383, 379 F.2d at 160
 
 
 [1]
 See Majority Opinion (Maj. Op.), 195 U.S.App.D.C., at ----, 600 F.2d at 850-860
 
 
 [2]
 Pub.L. No. 95-95, 91 Stat. 685 (Aug. 7, 1977), amending the Clean Air Act, 42 U.S.C.A. §§ 7401-7626 (1978)
 
 
 [3]
 42 U.S.C.A. § 7475(a) (1978), quoted in part in text accompanying note 44 Infra
 
 
 [4]
 42 U.S.C.A. § 7478 (1978), quoted in full in text accompanying note 16 Infra
 
 
 [5]
 Brief for EPA 52
 
 
 [6]
 Maj. Op., 195 U.S.App.D.C., at ----, 600 F.2d at 873-874, 877-879
 
 
 [7]
 See 42 Fed.Reg. 57479 (Nov. 3, 1977) (proposed rules); 43 Fed.Reg. 26380 (June 19, 1978) (final rules)
 
 
 [8]
 "In light of the drafting inconsistencies between Sections 165(a) and 168, EPA feels that the most prudent course is to implement Section 165(a) as quickly as possible, but through the rulemaking process." 42 Fed.Reg. 57479 (Nov. 3, 1977)
 
 
 [9]
 See Parts I, II Infra
 
 
 [10]
 Becke v. Smith, 2 M & W 191, 195 (1836). See, E.g., Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 631-632, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207, 224 (1973); Montgomery Charter Serv., Inc. v. Washington Metropolitan Area Transit Comm'n, 117 U.S.App.D.C. 34, 38, 325 F.2d 230, 234 (1963); Maiatico v. United States, 112 U.S.App.D.C. 295, 301, 302 F.2d 880, 886 (1962); Bailey v. United States, 511 F.2d 540, 546, 206 Ct.Cl. 169 (1975)
 
 
 [11]
 See, E.g., Philbrook v. Glodgett, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525, 533 (1976); National R. R. Passenger Corp. v. National Ass'n of R. R. Passengers, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646, 652 (1974); City of New York v. Train, 161 U.S.App.D.C. 114, 123, 494 F.2d 1033, 1042 (1974), Aff'd, 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975)
 
 
 [12]
 It has been observed that "the intention of the legislature is undiscoverable in any real sense. . . . The chances that of several hundred men each will have exactly the same determinate situation in mind as possible reductions of a given determinable, are infinitesimally small." Radin, Statutory Interpretation, 43 Harv.L.Rev. 863, 870 (1930). But Cf. Landis, A Note on "Statutory Interpretation," 43 Harv.L.Rev. 886 (1930)
 
 
 [13]
 Justice Jackson's memorable expression of this view bears repeating:
 (T)here are practical reasons why we should accept whenever possible the meaning which an enactment reveals on its face. Laws are intended for all of our people to live by; and the people go to law offices to learn what their rights under those laws are. Here is a controversy which affects every little merchant in many States. Aside from a few offices in the larger cities, the materials of legislative history are not available to the lawyer who can afford neither the cost of acquisition, the cost of housing, or the cost of repeatedly examining the whole congressional history. Moreover, if he could, he would not know any way of anticipating what would impress enough members of the Court to be controlling. To accept legislative debates to modify statutory provisions is to make the law inaccessible to a large part of the country.
 Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 396-397, 71 S.Ct. 745, 751, 95 L.Ed. 1035, 1049 (1951) (concurring opinion). See also O. W. Holmes, Collected Legal Papers 207 (1920) ("we do not inquire what the legislature meant; we only ask what the statute means").
 
 
 [14]
 See, E.g., Flora v. United States, 357 U.S. 63, 65, 78 S.Ct. 1079, 1081, 2 L.Ed.2d 1165, 1167 (1958); Browder v. United States, 312 U.S. 335, 338, 61 S.Ct. 599, 601, 85 L.Ed. 862, 865 (1941); AFL-CIO v. Marshall, 187 U.S.App.D.C. 121, 127, 570 F.2d 1030, 1036 (1978)
 
 
 [15]
 Though not necessarily controlling, a section's caption is some evidence of the intended congressional scheme. See Lan Jen Chu v. Commissioner of Internal Revenue, 486 F.2d 696, 700 (1st Cir. 1973); First Bank & Trust Co. v. Feuquay, 405 F.2d 990, 993 (6th Cir. 1969); White v. Chicago, B & Q R. R., 417 F.2d 941, 948 (8th Cir. 1969)
 
 
 [16]
 § 168, 91 Stat. 740, 42 U.S.C.A. § 7478 (1978)
 
 
 [17]
 "The word 'shall' is the language of command in a statute . . . ." Association of Am. R.R. v. Costle, 183 U.S.App.D.C. 362, 364, 562 F.2d 1310, 1312 (1977). See Union Elec. Co. v. EPA, 427 U.S. 246, 257, 96 S.Ct. 2518, 2525, 49 L.Ed.2d 474, 483 (1976)
 
 
 [18]
 This follows from the language of § 168(a) itself, see text accompanying note 16 Supra, and is not dependent on adoption of the maxim Expressio unius est exclusio alterius. See National Petroleum Refiners Ass'n v. FTC, 157 U.S.App.D.C. 83, 87, 482 F.2d 672, 676 (1973), Cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974)
 
 
 [19]
 Maj. Op., 195 U.S.App.D.C., at ----, 600 F.2d. 861-862
 
 
 [20]
 42 U.S.C.A. § 7401 note (1978)
 
 
 [21]
 See, E.g., Brief of Sept. 25, 1978, for Environmental Groups 4-13
 
 
 [22]
 42 U.S.C.A. § 7478(a) (1978); see notes 36-37 Infra and accompanying text
 
 
 [23]
 Train v. Natural Resources Defense Council, 421 U.S. 60, 79, 95 S.Ct. 1470, 1481-1482, 43 L.Ed.2d 731, 745-746 (1975) (emphasis in original) (footnote omitted)
 
 
 [24]
 42 U.S.C.A. § 7410(a)(2) (1978)
 
 
 [25]
 42 U.S.C.A. § 7410(a)(2)(B), (D), (E), & (J) (1978)
 
 
 [26]
 42 U.S.C.A. § 7471 (1978)
 
 
 [27]
 See, E.g., Brief of Sept. 25, 1978, for Environmental Groups 13-17
 
 
 [28]
 42 U.S.C.A. § 7410(c) (1978) in part provides:
 The Administrator shall, after consideration of any State hearing record, promptly prepare and publish proposed regulations setting forth an implementation plan, or portion thereof, for a State if
 (A) the State fails to submit an implementation plan which meets the requirements of this section,
 (B) the plan, or any portion thereof, submitted for such State is determined by the Administrator not to be in accordance with the requirements of this section, or
 (C) the State fails, within 60 days after notification by the Administrator or such longer period as he may prescribe, to revise an implementation plan as required pursuant to a provision of its plan referred to in subsection (a)(2) (H) of this section.
 
 
 [29]
 Maj. Op., 195 U.S.App.D.C., at ----, 600 F.2d. at 865
 
 
 [30]
 See note 28 Supra
 
 
 [31]
 See note 28 Supra
 
 
 [32]
 42 U.S.C.A. § 7401 note (1978)
 
 
 [33]
 43 Fed.Reg. 26380, 26388 (June 19, 1978)
 
 
 [34]
 Section 167 provides:
 The Administrator shall, and a State may take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction of a major emitting facility which does not conform to the requirements of this part, or which is proposed to be constructed in any area included in the list promulgated pursuant to paragraph (1)(D) or (E) of subsection (d) of section 107 of this Act and which is not subject to an implementation plan which meets the requirements of this part.
 
 
 [91]
 Stat. 740, 42 U.S.C.A. § 7477 (1978)
 
 
 [35]
 Maj. Op., 195 U.S.App.D.C., at ----, 600 F.2d. at 865-866
 
 
 [36]
 42 U.S.C.A. § 7478(a) (1978), quoted in text accompanying note 16 Supra
 
 
 [37]
 42 U.S.C.A. § 7410(d) (1978)
 
 
 [38]
 42 U.S.C.A. § 7478(b) (1978), quoted in text accompanying note 16 Supra
 
 
 [39]
 42 U.S.C.A. § 7479(2)(A) (1978) provides:
 (T)he term "commenced" as applied to construction of a major emitting facility means that the owner or operator has obtained all necessary preconstruction approvals or permits required by Federal, State, or local air pollution emissions and air quality laws or regulations and either has (i) begun, or caused to begin, a continuous program of physical on-site construction of the facility or (ii) entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of construction of the facility to be completed within a reasonable time.
 
 
 [40]
 See, E.g., United States v. Menasche, 348 U.S. 528, 536-537, 75 S.Ct. 513, 518-519, 99 L.Ed. 615, 623 (1955)
 
 
 [41]
 A presumption against this imputation seems to undergird such principles of statutory construction as Expressio unius est exclusio alterius. See, e.g., Botany Worsted Mills v. United States, 278 U.S. 282, 288-289, 49 S.Ct. 129, 131-132, 73 L.Ed. 379, 385 (1929). See also Vroon v. Templin, 278 F.2d 345, 348-349 (4th Cir. 1960) ("(w)e do not think it permissible to construe a statute on the basis of a mere surmise as to what the Legislature intended and to assume that it was only by inadvertance that it failed to state something other than what it plainly stated")
 
 
 [42]
 See notes 91-94 Infra and accompanying text
 
 
 [43]
 § 165(a), 91 Stat. 735, 42 U.S.C.A. § 7475(a) (1978)
 
 
 [44]
 Id
 
 
 [45]
 42 U.S.C.A. § 7479(2)(A) (1978), quoted Supra note 39
 
 
 [46]
 42 U.S.C.A. § 7475(a) (1978) (emphasis supplied), quoted in relevant part in text accompanying note 44 Supra
 
 
 [47]
 See 42 U.S.C.A. §§ 7470-7491 (1978)
 
 
 [48]
 § 161, 91 Stat. 731, 42 U.S.C.A. § 7471 (1978)
 
 
 [49]
 42 U.S.C.A. § 7407(d)(1) (1978)
 
 
 [50]
 42 U.S.C.A. § 7407(d)(2) (1978)
 
 
 [51]
 43 Fed.Reg. 8962-9059 (March 3, 1978)
 
 
 [52]
 Maj. Op., 195 U.S.App.D.C. at ----, 600 F.2d at 862; e. g., Brief of Sept. 25, 1978, for Environmental Groups 21-24
 
 
 [53]
 Maj. Op., 195 U.S.App.D.C. at ----, 600 F.2d at 862 (footnote omitted)
 
 
 [54]
 § 163(b), 91 Stat. 732, 42 U.S.C.A. § 7473(b) (1978)
 
 
 [55]
 Id
 
 
 [56]
 42 U.S.C.A. § 7407(d) (1978)
 
 
 [57]
 42 U.S.C.A. § 7478(b) (1978), quoted in text accompanying note 16 Supra
 
 
 [58]
 40 C.F.R. § 52.21(c) (1977)
 
 
 [59]
 40 C.F.R. § 52.21(c)(3)(i) (1977)
 
 
 [60]
 Maj. Op., 195 U.S.App.D.C. at ----, 600 F.2d at 863, (emphasis in original)
 
 
 [61]
 Id
 
 
 [62]
 § 165(e)(1), 91 Stat. 738, 42 U.S.C.A. § 7475(e)(1) (1978)
 
 
 [63]
 See § 165(e)(3), 91 Stat. 738, 42 U.S.C.A. § 7475(e)(3) (1978) (giving EPA six months to promulgate the necessary regulations)
 
 
 [64]
 Maj. Op., 195 U..S.App.D.C. at ----, 600 F.2d. at 863
 
 
 [65]
 See 42 U.S.C.A. § 7479(2)(A) (1978), quoted Supra note 39
 
 
 [66]
 Maj. Op., 195 U.S.App.D.C. at ----, 600 F.2d at 866
 
 
 [67]
 S. 252, 95th Cong., 1st Sess. (1977)
 
 
 [68]
 H.R. 6161, 95th Cong., 1st Sess. (1977)
 
 
 [69]
 S. 252, 95th Cong., 1st Sess. § 5(a) (1977) (amending § 110(a)(1) of the Clean Air Act)
 
 
 [70]
 S. 252, 95th Cong., 1st Sess. § 6 (1977) (adding § 110(g)(4) to the Clean Air Act)
 
 
 [71]
 Id
 
 
 [72]
 See, E.g., S. Rep. No. 127, 95th Cong., 1st Sess., at 29 (1977):
 During hearings in 1974 and 1975 the committee was urged to clarify and resolve this issue through legislation, rather than leaving the matter to the courts. This section provides the statutory substance to the more general language in section 101(b) of the act, which articulates the concept of the prevention of significant deterioration. The committee intends in this new subsection 110(g) to completely define the requirements of the Clean Air Act to prevent significant deterioration.
 
 
 [73]
 Sierra Club v. Ruckelshaus, 344 F.Supp. 253 (D.D.C.1972), Aff'd per curiam, 4 E.R.C. 1815 (D.C. Cir. 1972), Aff'd by an equally divided Court, sub nom. Fri v. Sierra Club, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973). See also Sierra Club v. EPA, 176 U.S.App.D.C. 335, 540 F.2d 1114 (1976), Vacated and remanded for further consideration in light of Clean Air Act Amendments of 1977 sub nom. Montana Power Co., v. EPA, 434 U.S. 809, 98 S.Ct. 42, 54 L.Ed.2d 66 (1977)
 
 
 [74]
 40 C.F.R. § 52.21(d)(1) (1975)
 
 
 [75]
 40 C.F.R. § 52.21(b)(7) (1975)
 
 
 [76]
 S. Rep. No. 127, 95th Cong., 1st Sess. 33 (1977)
 
 
 [77]
 S. 252, 95th Cong., 1st Sess. § 6 (1977) (adding § 110(g)(6)(C) to the Clean Air Act)
 
 
 [78]
 42 U.S.C.A. § 7479(2)(A) (1978), quoted Supra note 39
 
 
 [79]
 S. 252, 95th Cong., 1st Sess. § 6 (1977) (adding § 110(g)(6)(C) to the Clean Air Act)
 
 
 [80]
 S. 252, 95th Cong., 1st Sess. § 6 (1977) (adding § 110(g)(7)(A) to the Clean Air Act)
 
 
 [81]
 For those facilities on which construction was commenced after June 1, 1975, but prior to enactment of the 1977 amendments, the applicable PSD standards would be set out in EPA's preexisting regulations, see note 79 Supra and accompanying text; for those commenced after enactment, the statute's requirements would govern. See note 80 Supra and accompanying text
 
 
 [82]
 H.R. 6161, 95th Cong., 1st Sess. (1977)
 
 
 [83]
 H.R. 6161, 95th Cong., 1st Sess. § 119 (1977) (adding § 110(g) to the Clean Air Act). This provision was substantially adopted as § 406(d)(2) of the Clean Air Act Amendments of 1977. 42 U.S.C.A. § 7401 note (1978). I agree with the court that § 406 does not materially advance resolution of the instant controversy. Maj. Op., 195 U.S.App.D.C. at ----, 600 F.2d at 861, 864-865
 
 
 [84]
 H.R. 6161, 95th Cong., 1st Sess. § 108(a) (1977) (adding § 160 to the Clean Air Act)
 
 
 [85]
 H.R. 6161, 95th Cong., 1st Sess. § 108(a) (1977) (adding § 160(h) to the Clean Air Act)
 
 
 [86]
 H.R. Rep. No. 294, 95th Cong., 1st Sess. 171 (1977). See note 15 Supra
 
 
 [87]
 H.R. Rep. No. 294, 95th Cong., 1st Sess. 171-172 (1977)
 
 
 [88]
 See note 85 Supra and accompanying text
 
 
 [89]
 42 U.S.C.A. § 7478 (1978), quoted in text accompanying note 16 Supra
 
 
 [90]
 The sections made immediately applicable establish the new allowable increments, provide for mandatory Class I classification of certain areas, and prohibit reclassification of certain areas to Class III. See 42 U.S.C.A. §§ 7472(a), 7473(b) and 7474(a) (1978)
 
 
 [91]
 See note 79 Supra and accompanying text
 
 
 [92]
 42 U.S.C.A. § 7478(b) (1978), quoted in text accompanying note 16 Supra
 
 
 [93]
 See notes 70-79 Supra and accompanying text
 
 
 [94]
 See notes 38-42 Supra and accompanying text
 
 
 [95]
 See notes 70-71 Supra and accompanying text
 
 
 [96]
 42 U.S.C.A. § 7475(a) (1978), quoted in part in text accompanying note 44 Supra
 
 
 [97]
 See notes 74-78 Supra and accompanying text
 
 
 [98]
 See notes 74-78 Supra and accompanying text
 
 
 [99]
 See text accompanying note 74 Supra
 
 
 [100]
 See text accompanying note 79 Supra
 
 
 [101]
 See 42 U.S.C.A. § 7475(a) (1978), quoted in part in text accompanying note 44 Supra
 
 
 [102]
 Quoted in text accompanying note 80 Supra
 
 
 [103]
 H.R. 6161, 95th Cong., 1st Sess. § 108(a) (1977) (adding § 160(h) to the Clean Air Act), quoted in text accompanying note 85 Supra
 
 
 [104]
 H.R. Rep. No. 294, 95th Cong., 1st Sess. 171-172 (1977), quoted in text accompanying note 87 Supra
 
 
 [105]
 S. 252, 95th Cong., 1st Sess. § 6 (1977) (adding § 110(g)(7)(A) to Clean Air Act), quoted in text accompanying note 80 Supra
 
 
 [106]
 See notes 70-79 Supra and accompanying text
 
 
 [107]
 Unlike the majority, Maj. Op., 195 U.S.App.D.C. at ---- - ----, 600 F.2d at 867-868, I accord no decisional weight to the post-enactment statements of the sponsors of the 1977 Act. Regional Rail Reorganization Act Cases, 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320, 347 (1974); National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 634 n.34, 87 S.Ct. 1250, 1265 n.34, 18 L.Ed.2d 357, 375 n.34 (1967); Aparacor, Inc. v. United States, 571 F.2d 552, 556-557 (Ct.Cl. En banc 1978)
 
 
 [108]
 332 U.S. 480, 68 S.Ct. 174, 92 L.Ed. 88 (1947). See Sturges v. Crowninshield, 17 U.S. (4 Wheat.) 122, 202, 4 L.Ed. 529, 550 (1819) ("(w)here words conflict with each other, where the different clauses of an instrument bear upon each other, and would be inconsistent, unless the natural and common import of words be varied, construction becomes necessary, and a departure from the obvious meaning of words is justifiable"). See also FPC v. Panhandle E. Pipe Line Co., 337 U.S. 498, 514, 69 S.Ct. 1251, 1260, 93 L.Ed. 1499, 1509 (1949) ("(i)f possible all sections of the Act must be reconciled so as to produce a symmetrical whole"); cases cited Supra note 10
 
 
 [109]
 40 Stat. 411 (1917)
 
 
 [110]
 55 Stat. 839 (1941)
 
 
 [111]
 50 U.S.C.App. § 616 (Supp. V 1946) (emphasis supplied)
 
 
 [112]
 50 U.S.C.App. § 9(a) (1940)
 
 
 [113]
 332 U.S. at 486-487, 68 S.Ct. at 176-177, 92 L.Ed. at 92-93
 
 
 [114]
 Id. at 488, 68 S.Ct. at 178, 92 L.Ed. at 94
 
 
 [115]
 See Parts I, II Supra. As the court's opinion indicates, EPA's interpretation of §§ 165(a) and 168 has varied with time and political pressure. Maj. Op., 195 U.S.App.D.C. at ---- - ----, 600 F.2d. at 854-856. While ordinarily an agency's construction of the statute it is charged with administering is entitled to deference, this latitude "is not a license to construe statutory language in any manner whatever (or) to conjure up powers with no clear antecedents in statute or judicial construction . . . ." National Ass'n of Regulatory Util. Comm'rs v. FCC, 174 U.S.App.D.C. 374, 391, 533 F.2d 601, 618 (1976)